Appeal No. 16-1354

# United States Court of Appeals
## *for the*
# Federal Circuit

SECURE AXCESS, LLC,

*Appellant,*

– v. –

EMC CORPORATION and RSA SECURITY LLC,

*Appellees.*

APPEAL FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE,
PATENT TRIAL AND APPEAL BOARD, IN CASE NO. IPR2014-00475

## OPENING BRIEF OF APPELLANT
## SECURE AXCESS, LLC

ANTHONY K. BRUSTER
ANDREW J. WRIGHT
BRUSTER PLLC
P.O. Box 92091
Southlake, Texas 76092
871.601.9564
akbruster@brusterpllc.com
andrew@brusterpllc.com

ANDRÉ J. BAHOU
SECURE AXCESS, LLC
VICE PRESIDENT & CHIEF LEGAL OFFICER
555 Republic Drive, Suite 200
Plano, Texas 75074
972.767.9856
aj.bahou@secureaxcess.com

GREGORY GONSALVES
GONSALVES LAW FIRM
2216 Beacon Lane
Falls Church, Virginia 22043
571.419.7252
gonsalves@gonsalveslawfirm.com

ERIC M. ALBRITTON
ALBRITTON LAW FIRM
P.O. Box 2649
Longview, Texas 75606
903.757.8449
ema@emafirm.com

*Counsel for Appellant*
*Secure Axcess, LLC*

## <u>CERTIFICATE OF INTEREST</u>

Pursuant to Federal Circuit Rule 47.4, counsel for Appellant Secure Axcess, LLC, certifies as follows:

1.    The full name of every party represented by me is:

**Secure Axcess, LLC**

2.    The name of the real party in interest represented by me is:

**Not applicable**

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:

**Secure Axcess, LLC, is a wholly owned subsidiary of Prism Technologies, LLC. Prism Technologies, LLC, is wholly owned by Prism Technologies Group, Inc., a publicly traded company (PRZM).**

4.    The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or agency or are expected to appear in this court are:

**Bruster PLLC:**

Andrew J. Wright

Anthony K. Bruster

**Albritton Law Firm:**

Eric M. Albritton

**Secure Axcess, LLC:**

André J. Bahou

**Gonsalves Law Firm**

Dr. Gregory J. Gonsalves

Dated: February 19, 2016.

Respectfully submitted,

_____

ANDREW J. WRIGHT

ANTHONY K. BRUSTER
ANDREW J. WRIGHT
BRUSTER PLLC
1330 N. White Chapel Blvd., Suite 100
P.O. Box 92091
Southlake, Texas 76092
871.601.9564
akbruster@brusterpllc.com
andrew@brusterpllc.com

ERIC M. ALBRITTON
ALBRITTON LAW FIRM
222 North Fredonia Street
Longview, Texas 75601
P.O. Box 2649
Longview, Texas 75606
903.757.8449
ema@emafirm.com

GREGORY GONSALVES
GONSALVES LAW FIRM
2216 Beacon Lane
Falls Church, Virginia 22043
571.419.7252
gonsalves@gonsalveslawfirm.com

ANDRÉ J. BAHOU
SECURE AXCESS, LLC
VICE PRESIDENT & CHIEF LEGAL OFFICER
555 Republic Drive, Suite 200
Plano, Texas 75074
972.767.9856
aj.bahou@secureaxcess.com

*Counsel for Appellant*
*Secure Axcess, LLC*

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ............................................................................. ii

TABLE OF CONTENTS ...................................................................................v

TABLE OF AUTHORITIES ............................................................................ viii

TABLE OF ABBREVIATIONS ..........................................................................xi

STATEMENT OF RELATED CASES ...................................................................1

I.      STATEMENT OF JURISDICTION .................................................................6

II.     STATEMENT OF THE ISSUES .....................................................................6

III.    STATEMENT OF THE CASE .......................................................................9

        A.    THE GLAZER PATENTS .......................................................................10

              1.    The Problem Identified by the Glazer Patents:
                    Verifying that Presented Content Originated
                    from an Authenticated Source ..................................................11

              2.    Important Teachings in the Glazer Patents..............................14

              3.    The Importance of Securing the Preferences File
                    in the Glazer Patents ................................................................17

              4.    The Embodiment Disclosed in the '838 Patent: Encryption ....18

              5.    The Embodiment Disclosed in the '191 Patent: Location ........19

              6.    The Challenged '191 Patent Claims ........................................20

        B.    THE IPR PROCEEDINGS ......................................................................22

              1.    The Prior Art References at Issue.............................................22

                    a.    Arent ...............................................................................23

|  |  | b. | Tygar ................................................................23 |
|  |  | c. | Schneier ...........................................................24 |
|  |  | d. | Merritt..............................................................25 |
|  |  | e. | Yoshiura ...........................................................25 |

| | 2. | The Parties Disputed the Role of the Authenticity Key in Determining or Enabling the Location of the Preferences File .....................................................26 |

| | 3. | The Board's Final Written Decision.........................27 |

IV.   SUMMARY OF THE ARGUMENT...........................................28

V.    ARGUMENT ...........................................................................29

    A.   THE APPLICABLE STANDARDS OF REVIEW ...........................29

    B.   THE CORRECT CLAIM CONSTRUCTION STANDARD...............29

    C.   SECURE AXCESS'S CONSTRUCTION OF THE "LOCATION" TERMS IS THE BROADEST REASONABLE INTERPRETATION ..................30

        1.   The Claim Language Supports Secure Axcess's Proposed Construction...............................................31

        2.   The Specification Supports Secure Axcess's Proposed Construction...............................................32

        3.   The Testimony of Dr. Katz Supports Secure Axcess's Proposed Construction...............................................36

        4.   The Board's Dictionary Definitions Support Secure Axcess's Proposed Constructions..................36

    D.   THE BOARD COMMITTED LEGAL ERROR BY READING THE "LOCATION" TERMS OUT OF THE CLAIMS .............................38

E.    THE BOARD'S ERROR AFFECTED ITS DECISION AND
REQUIRES REMAND..............................................................................42

VI.    CONCLUSION ...........................................................................................43

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Aventis Pharma S.A. v. Hospira, Inc.*
    675 F.3d 1324 (Fed. Cir. 2012)....................................................................30

*Becton, Dickinson & Co. v. One StockDug Holdings, LLC*
    IPR2013-00235, Paper 30 (P.T.A.B. Sept. 25, 2014) ...................................30

*C.R. Bard, Inc. v. United States Surgical Corp.*
    388 F.3d 858 (Fed. Cir. 2004).......................................................................37

*Digital Biometrics, Inc. v. Identix, Inc.*
    149 F.3d 1335 (Fed. Cir. 1988).....................................................................31

*Edwards Lifesciences LLC v. Cook Inc.*
    582 F.3d 1322 (Fed. Cir. 2009).....................................................................32

*Ericsson, Inc. v. Intellectual Ventures I LLC*
    IPR2014-00921, Paper 8 (P.T.A.B. Dec. 16, 2014).....................................30

*Hill-Rom Servs., Inc. v. Stryker Corp.*
    755 F.3d 1367 (Fed. Cir. 2014)...............................................................29, 30

*Intellectual Ventures Mgmt., LLC v. Xilinx, Inc.*
    IPR2012-00019, Paper 33 (P.T.A.B. Feb. 10, 2014) ..............................29, 30

*In re Abbott Diabetes Care Inc.*
    696 F.3d 1142, 1151 (Fed. Cir. 2012)..........................................................43

*In re Am. Acad. of Sci. Tech. Ctr.*
    367 F.3d 1359 (Fed. Cir. 2004).....................................................................34

*Lexion Med., LLC v. Northgate Tech., Inc.*
    641 F.3d 1352 (Fed. Cir. 2011)...............................................................33, 40

*Markman v. Westview Instruments*
    517 U.S. 370 (1996) ......................................................................................34

*Medrad, Inc. v. MRI Devices Corp.*
  401 F.3d 1313 (Fed. Cir. 2005) ........................................32, 33, 41

*Phillips v. AWH Corp.*
  415 F.3d 1303 (Fed. Cir. 2005) (en banc) ...........................*passim*

*Starhome GmbH v. AT&T Mobility LLC*
  743 F.3d 849 (Fed. Cir. 2014) ........................................................30

*Tempo Lighting, Inc. v. Tivoli, LLC*
  742 F.3d 973 (Fed. Cir. 2014) .................................................29, 40

*Toshiba Corp. v. Imation Corp.*
  681 F.3d 1358 (Fed. Cir. 2012) .....................................................30

*Towne v. Eisner*
  245 U.S. 418 (1918) ...............................................................33, 41

*United States v. Adams*
  383 U.S. 39 (1966) ........................................................................34

*Wowza Media Sys., LLC v. Adobe Sys. Inc.*
  IPR2013-00054, Paper 12 (P.T.A.B. Apr. 8, 2013) .....................29

## Statutes & Rules

28 U.S.C. § 1295(a)(4)(A) .................................................................6

35 U.S.C. § 102 .........................................................................22, 23

35 U.S.C. § 103 .........................................................................22, 23

35 U.S.C. § 112 ¶ 2 .........................................................................32

35 U.S.C. § 141 .................................................................................6

35 U.S.C. § 141(c) .............................................................................6

35 U.S.C. § 319 .................................................................................6

37 C.F.R. § 1.75(d)(1) ........................................................................34

37 C.F.R. § 42.100(b) ....................................................................30, 34

FED. CIR. R. 47.5(a) ............................................................................1

FED. CIR. R. 47.5(b) ............................................................................1

**Other Authority**

MPEP § 2111.01(I) ............................................................................34

MPEP § 2111.01(IV) .........................................................................35

# TABLE OF ABBREVIATIONS

## Parties

| | |
|---|---|
| Appellant or Secure Axcess | Secure Axcess, LLC |
| Appellees | EMC Corporation & RSA Security LLC |
| EMC | EMC Corporation |
| RSA | RSA Security LLC |

## Citations

| | |
|---|---|
| Appx_____ | Joint Appendix at page(s) _____ |
| MPEP | Manual of Patent Examining Procedure |

## Terms

| | |
|---|---|
| '191 Patent | United States Patent No. 7,631,191 |
| '838 Patent | United States Patent No. 7,203,838 |
| Arent | United States Patent No. 6,018,724 |
| Board | Patent Trial and Appeal Board |
| BRI | Broadest Reasonable Interpretation |
| CBM | Covered Business Method Review |
| IPR | *Inter Partes* Review |
| Glazer Patents | United States Patent Nos. 7,631,191 & 7,203,838 |
| Merritt | United States Patent No. 5,475,756 |
| PTAB | Patent Trial and Appeal Board |

Schneier

BRUCE SCHNEIER, APPLIED CRYPTOGRAPHY: PROTOCOLS, ALGORITHMS AND SOURCE CODE IN C (2d ed. 1996)

Tygar

J.D. TYGAR & ALMA WHITTEN, *WWW Electronic Commerce and Java Trojan Horses*, in PROCEEDINGS OF THE 2ND USENIX WORKSHOP ON ELECTRONIC COMMERCE (Nov. 18–21, 1996)

Yoshiura

European Patent Application Publication No. EP 0 883 284 A2

## STATEMENT OF RELATED CASES

Pursuant to Fed. Cir. R. 47.5(a), counsel for Appellant, Secure Axcess, LLC ("Secure Axcess" or "Appellant"), certifies that no other appeal from the same proceeding in the United States Patent & Trademark Office, Patent Trial and Appeal Board ("PTAB" or "the Board") is or was previously before this Court or any other appellate court, whether under the same or a similar title.

Pursuant to Fed. Cir. R. 47.5(b), counsel for Secure Axcess states that the Court's decision in this appeal may affect the following judicial and administrative matters:

Appeals before the Federal Circuit Court of Appeals

1.    Appeal from the Final Written Decision in Covered Business Methods Review, Case No. CBM2014-00100. *See* Case No. 16-1353. The Court has ordered that these appeals be treated as companion cases for purposes of assigning the cases to the same merits panel for argument.

Covered Business Methods Reviews before the PTAB

1.    Petition for Covered Business Methods Review of U.S. Patent No. 7,631,191 by T. Rowe Price Investment Services, Inc., Case No. CBM2015-00027 (instituted June 22, 2015).

1

United States District Court actions involving the patent at issue

1.    *Secure Axcess, LLC v. U.S. Bank Nat'l Assoc., et al.*, Civ. No. 6:13-CV-717, United States District Court for the Eastern District of Texas (filed on September 27, 2013); case stayed pending the outcome of PTAB Case No. CBM2014-00100 (Dkt. No. 215); stay continued pending Joint Status Report regarding appeals of PTAB Case Nos. CBM2014-00100 and IPR2014-00475 (Dkt. No. 228); and the following cases, which have been consolidated with Civ. No. 6:13-CV-717 (Dkt. No. 32):

2.    *Secure Axcess, LLC v. Ally Bank, et al.*, Civ. No. 6:13-CV-718, United States District Court for the Eastern District of Texas (filed on September 27, 2013); consolidated with Civ. No. 6:13-CV-717 (Dkt. No. 54);

3.    *Secure Axcess, LLC v. Nationwide Bank, et al.*, Civ. No. 6:13-CV-721, United States District Court for the Eastern District of Texas (filed on September 27, 2013); consolidated with Civ. No. 6:13-CV-717 (Dkt. No. 37);

4.    *Secure Axcess, LLC v. PNC Bank, N.A., et al.*, Civ. No. 6:13-CV-722, United States District Court for the Eastern District of Texas (filed on

September 27, 2013); consolidated with Civ. No. 6:13-CV-717 (Dkt. No. 37);

5.  *Secure Axcess, LLC v. Sovereign Bank, National Association*, Civ. No. 6:13-CV-723, United States District Court for the Eastern District of Texas (filed on September 27, 2013); consolidated with Civ. No. 6:13-CV-717 (Dkt. No. 31);

6.  *Secure Axcess, LLC v. The Vanguard Group, Inc., et al.*, Civ. No. 6:13-CV-724, United States District Court for the Eastern District of Texas (filed on September 27, 2013); consolidated with Civ. No. 6:13-CV-717 (Dkt. No. 52);

7.  *Secure Axcess, LLC v. Bank of the West, et al.*, Civ. No. 6:13-CV-779, United States District Court for the Eastern District of Texas (filed on October 16, 2013); consolidated with Civ. No. 6:13-CV-717 (Dkt. No. 37);

8.  *Secure Axcess, LLC v. Cadence Bank, N.A.*, Civ. No. 6:13-CV-780, United States District Court for the Eastern District of Texas (filed on October 16, 2013); consolidated with Civ. No. 6:13-CV-717 (Dkt. No. 46);

9.  *Secure Axcess, LLC v. Charles Schwab Bank, et al.*, Civ. No. 6:13-CV-781, United States District Court for the Eastern District of Texas

(filed on October 16, 2013); consolidated with Civ. No. 6:13-CV-717 (Dkt. No. 26);

10. *Secure Axcess, LLC v. Commerce Bank, et al.*, Civ. No. 6:13-CV-782, United States District Court for the Eastern District of Texas (filed on October 16, 2013); consolidated with Civ. No. 6:13-CV-717 (Dkt. No. 44);

11. *Secure Axcess, LLC v. Ocwen Fin. Corp.*, Civ. No. 6:13-CV-783, United States District Court for the Eastern District of Texas (filed on October 16, 2013); consolidated with Civ. No. 6:13-CV-717 (Dkt. No. 26);

12. *Secure Axcess, LLC v. Orange Savings Bank, SSB, et al.*, Civ. No. 6:13-CV-784, United States District Court for the Eastern District of Texas (filed on October 16, 2013); consolidated with Civ. No. 6:13-CV-717 (Dkt. No. 30);

13. *Secure Axcess, LLC v. Raymond James & Assocs., Inc., et al.*, Civ. No. 6:13-CV-785, United States District Court for the Eastern District of Texas (filed on October 16, 2013); consolidated with Civ. No. 6:13-CV-717 (Dkt. No. 31);

14. *Secure Axcess, LLC v. T. Rowe Price Inv. Servs., Inc., et al.*, Civ. No. 6:13-CV-787, United States District Court for the Eastern District of

Texas (filed on October 16, 2013); consolidated with Civ. No. 6:13-CV-717 (Dkt. No. 35);

15.  *Secure Axcess, LLC v. Trustmark Nat'l Bank, et al.*, Civ. No. 6:13-CV-788, United States District Court for the Eastern District of Texas (filed on October 16, 2013); consolidated with Civ. No. 6:13-CV-717 (Dkt. No. 38);

## I.    STATEMENT OF JURISDICTION

This is an appeal pursuant to 35 U.S.C. § 141(c) from the Final Written Decision (Paper 30) of the Patent Trial and Appeal Board of the United States Patent & Trademark Office entered on September 8, 2015, in *Inter Partes* Review No. IPR2014-00475. *See* Appx1–71.

Secure Axcess timely filed a notice of appeal on November 9, 2015. This Court therefore has jurisdiction over this appeal under 35 U.S.C. §§ 141 and 319 and 28 U.S.C. § 1295(a)(4)(A).

## II.    STATEMENT OF THE ISSUES

This appeal presents a narrow legal issue specific to this case: whether the PTAB erred in finding that the "broadest reasonable interpretation" ("BRI") in light of the specification of Claims 1, 17, 29, 31, and 32 of the '191 Patent does not require an authenticity key to be used to, or provide the ability to, determine the location of a preferences file. In particular, this appeal focuses on the BRI of the following claim phrases:

> "returning, from the authentication host computer, the formatted data to enable the authenticity key to be retrieved from the formatted data and to locate a preferences file,"[1] Appx91 (Claim 1);

-------

[1] Language reflects errors corrected via Certificate of Correction dated May 11, 2010. *See* Appx93.

"to enable authentication of the authenticity key to verify a source of the

formatted data and to retrieve an authenticity stamp from a

preferences file,"[2] Appx91 (Claim 17);

"wherein the authenticity key enables location of a preferences file,"

Appx92 (Claim 29);

"wherein the authenticity key is retrieved from the formatted data to locate a

preferences file," Appx92 (Claim 31); and

"retrieving, by the client computer, the authenticity key from the formatted

data to locate a preferences file," Appx92 (Claim 32).

The '191 Patent involves a system and method for authenticating a webpage.[3] In particular, the invention describes two important aspect of webpage security: (1) authentication of the page (*i.e.*, a machine-level determination that the page is from an authentic source); and (2) validation of the page to a user (*i.e.*, providing a visual or audio indication to a user that the webpage has been authenticated so the user may determine whether the source is valid). As discussed herein, authentication and validation are separate parts of the invention discussed in the '191 Patent—the former focusing on a machine-level process and the latter

---

[2] Language reflects errors corrected via Certificate of Correction dated May 11, 2010. *See* Appx93.

[3] Although the patented invention covers electronic data presented to a user, this brief discusses the Glazer Patents' embodiments and claims in the context of webpages as examples of electronic data for the reader's convenience.

focusing on the user. To facilitate the validation aspect of the invention, the '191 Patent discusses the concept of an "authenticity stamp," which is a visual or audio indication that the information the user is viewing (*e.g.*, a webpage) has been authenticated. The authenticity stamp is known to and indicative of the user. In other words, the stamp is not the same for all users. Rather, each user expects to see a particular stamp. If the user sees his or her stamp, he or she knows that (1) the authentication process was successful; and (2) the information being shown is from the intended source. Appx88 at 6:1–13.

Because the authenticity stamp is known to and indicative of each user, the security of the file containing the stamp is an important aspect of the invention described in the '191 Patent. As discussed further below, the '191 Patent secures the file (referred to in the patent as a "preferences file") by requiring other information—the "authenticity key" in the claims of the '191 Patent—to locate, or enable location of, the preferences file.

Here, finding that the '191 Patent did not explicitly define the words "enable" or "locate," the Board relied extensively on dictionary definitions, ignoring the context in which those words are used in the disclosed embodiments and in the claim language of the '191 Patent. In doing so, the Board committed legal error, which led to an erroneous claim interpretation that read the important security limitations out of the claims entirely. Because the Board's interpretation

effectively removed the security of the preferences file from the claims, its construction was not the broadest *reasonable* construction in light of the specification.

The claim construction issues disputed in this appeal affect every rejected claim of the '191 Patent. The same claim construction issues are also disputed in the related appeal, Case No. 16-1353, and the Covered Business Methods Review currently pending before the PTAB, Case No. CBM2015-00027.

Secure Axcess asks this Court to reject the Board's erroneous construction and erroneous analytical approach, vacate the Board's determination that the challenged claims are unpatentable, and remand for further proceedings under a correct BRI of the challenged claim language.

## III.    STATEMENT OF THE CASE

This is an appeal from the Board's Final Written Decision in IPR2014-00100, concluding that claims 1–23 and 25–32 of U.S. Patent No. 7,631,191 ("the '191 Patent") are unpatentable as anticipated and/or obvious in light of five references: (1) U.S. Patent No. 6,018,724 ("Arent"); (2) BRUCE SCHNEIER, APPLIED CRYPTOGRAPHY: PROTOCOLS, ALGORITHMS AND SOURCE CODE IN C (2d ed. 1996) ("Schneier"); (3) U.S. Patent No. 5,475,756 ("Merritt"); (4) J.D. TYGAR & ALMA WHITTEN, *WWW Electronic Commerce and Java Trojan Horses*, in PROCEEDINGS OF THE 2ND USENIX WORKSHOP ON ELECTRONIC COMMERCE (Nov. 18–21, 1996)

9

("Tygar"); and (5) European Patent Application Publication No. EP 0 883 284 A2 ("Yoshiura"). *See* Appx1–71.

In its petition for *inter partes* review, Appellees alleged that fifteen references anticipated and/or rendered obvious every claim of the '191 Patent on a total of 27 different grounds comprising 105 unique combinations of references. *See* Appx107–08. Only the five references specifically identified above are at issue in the present appeal, and, as discussed below, only two of those references (Arent and Tygar) are relevant to the appealed issues.

## A.    THE GLAZER PATENTS

The challenged patent, United States Patent No. 7,631,191 ("the '191 Patent"), describes and claims a "System and Method for Authenticating a Webpage." *See* Appx72–93. The '191 Patent claims priority to—and shares common disclosure with—United States Patent No. 7,203,838 ("the '838 Patent").[4] *See* Appx1172–94. At a high level, the inventions disclosed in the '838 and '191 Patents (collectively, the "Glazer Patents") relate to machine-level authentication of data presented to a user and the use of an "authenticity stamp" to verify for the user that the information displayed has been authenticated and is from a valid source.

---

[4] The '191 Patent is a continuation of the '838 Patent and shares a common specification. Only the '191 Patent is specifically at issue in this appeal. Unless indicated otherwise (*e.g.*, when discussing the claims of the '838 Patent), the citations in this brief refer to the '191 Patent.

Only the '191 Patent was specifically at issue in the underlying proceeding and, thus, is specifically at issue in the present appeal. However, Secure Axcess discusses both Glazer Patents herein, as the similarities and differences are important to a full understanding of their disclosures and claims and to the arguments made herein.

### 1. The Problem Identified by the Glazer Patents: Verifying that Presented Content Originated from an Authenticated Source

The Glazer Patents relate to technology for verifying that data presented to a user (*e.g.*, a webpage) is from its true source. Because fraudulent webpages often appear authentic, it can be difficult for users to determine whether the page they are viewing is genuine. *See* Appx86 at 1:25–29. For example, a fraudster may copy the styling and general content of a webpage, including a company's logo, and create a malicious site in hopes that innocent users will sign on and reveal personal identification information. Appx86 at 1:23–48. The Glazer Patents address this issue. A webpage that has been authenticated according to the techniques described in the Glazer Patents includes "all of the information in the same format as the non-authenticated page." Appx86 at 2:58–60. However, the authenticated page also includes an "authenticity stamp." Appx86 at 2:60–62.

Figures 1 and 2 illustrate an exemplary use of an authenticity stamp:



**Appx74 at Fig. 1**



**Appx75 at Fig. 2**

Figures 1 and 2 each show webpage 50 having title 52, hyperlinks 54A, 54B, 54C, and 54D, textual information 56, and graphical images 58A and 58B. Appx86 at 2:54–57. Figure 1 shows an example of webpage 50 that *has not* been authenticated. Figure 2 shows an example of webpage 50 that *has* been authenticated. Appx86 at 2:54–61. The authenticated webpage shown in Figure 2, unlike the non-authenticated webpage shown in Figure 1, includes authenticity stamp 60. Appx86 at 2:54–61.

The Glazer Patents describe using an authentication server in the authentication process. Appx72 at Abstract. A web server at a website receives a request for a webpage from the user's web browser, retrieves the requested webpage, and forwards the webpage to an authentication server. Appx72 at Abstract. The authentication server inserts an authenticity key into the webpage. Appx72 at Abstract. For example, "[i]f the [web] page is to be authenticated, the page is dynamically signed with a private key and other information." Appx87 at 4:14–16. After the authenticity key is inserted, the webpage (including the authenticity key) is returned to the user's computer, where the user's computer authenticates the page. Appx72 at Abstract. Next, the system either decrypts or locates[5] a "preferences file," which includes the user's authenticity stamp. The authenticity stamp is known to and indicative of the user; thus, if the user

---

[5] The differences between the two Glazer Patents are discussed below.

recognizes his or her authenticity stamp, he or she will know that the page has been authenticated and is from a valid source.

### 2.    Important Teachings in the Glazer Patents

A person of ordinary skill in the art reviewing the Glazer Patents would understand that the specifications teach certain things that are embodied in the claims. For example:

> The present invention provides for an icon with an additional level of functionality that allows a user to validate that current information (e.g., a web page) originates from the true owner of the icon and is not merely a copy. The method includes a user requesting a web page from a web site using a web browser. The web server receives the request, retrieves the web page and forwards it to an authentication server. The authentication server inserts an authenticity key into the web page, then the page (including the authenticity key) is returned to the user. If the page includes an authenticity key, the authenticity is verified at the user's computer because the user computer includes logic (e.g., software) to verify the authenticity. During the user configuration process, the user defines an authenticity stamp which determines the format of an authenticated page.

Appx72 at Abstract.

The specifications teach the use of an authenticity stamp to verify the authenticity and determine the validity of a webpage. *See* Appx72 at Abstract. Verifying the authenticity and determining the validity of "information (e.g., a web page)" is not the same as verifying the authenticity or determining the validity of a device, of software running on that device, or authenticating a user.

The specifications also teach that the authentication is performed at the user's computer. Appx72 at Abstract. Importantly, the user's visual verification of the authenticity stamp is a separate part of the security method taught in the '191 Patent and is *not* part of the authentication process. This is consistent with Judge Davis's claim construction Order in the Eastern District of Texas, which stated: "Accordingly, the presentation of the authenticity stamp to the user is not part of the authentication process, and the authentication process is accomplished by the user's device (or plug-in software)." Appx360.

The specifications teach that the authenticity stamp is known to and indicative of the user and, as such, provides an indication of the validity of the page:

> As part of the configuration process, an authenticity stamp is defined by the user. This authenticity stamp will be displayed whenever an authenticated page is loaded. The stamp can take several forms, for example, a user-selected keyword, color, etc. Preferably, the determination of the look of the authenticity stamp is under complete control of the user. Preferably, the user is also able to determine where the stamp will be displayed, for example in a separate pop-up box or in a selected area of the webpage. By requiring the user to configure the visual qualities of the stamp, the possibility of a counterfeit stamp being displayed is reduced. The user will expect to see his or her stamp and will begin to associate the stamp with security.

Appx88 at 6:1–13.

> Unlike Secure Sockets Layer (SSL) or other "security session" protocols, the present invention validates aspects of the screen display independent of the communications channel between the user and the

> web site (however, security session protocols may be used in addition
> to the present invention).

Appx86 at 2:46–51. Thus, according to the specifications, aspects of the screen are validated through the use of an authenticity stamp independent of the authentication mechanism the invention uses.

> However, if additional security is desired, page authentication performed in accordance with the present invention can be used in combination with other known or future security measures, for example, in conjunction with a secure protocol, such as HTTPS, along with the requirement for a UserID and password, etc.

Appx88 at 6:41–47.

The specifications teach that the invention may employ a specific type of machine-level or below-the-user authentication (disclosed in the Glazer Patents as a preferred embodiment), a known authentication mechanism such as SSL, or both (*i.e.*, a layered approach). For example, the specifications state that "[m]any algorithms can be used to verify the authenticity." Appx88 at 6:28–29. Independent of the algorithm chosen to verify authenticity, the inventions disclosed in the Glazer Patents provide for additional security by validating "aspect[s] of the screen display independent of the communications channel," Appx86 at 2:48–49, and indicate to the user (through the secret stamp indicative of the user) that the user is at a valid website and not a malicious site.

### 3. The Importance of Securing the Preferences File in the Glazer Patents

The authenticity stamp in the Glazer Patents is stored in a preferences file. As discussed above, the stamp is known to and indicative of a user. In other words, the stamp is a secret that is known to the user but not to potential fraudsters or malicious sites. Thus, the security of the file that contains the stamp (*i.e.*, the preferences file) is an important aspect of the Glazer Patents.

A preferred embodiment of the Glazer Patents involves the use of a plug-in to facilitate certain processing aspects of the invention. *See, e.g.*, Appx87 at 4:22–43. Among these functions are two key security aspects of the preferences file. First, the system "decrypts" the preferences file using a "preferences key." Appx87 at 4:34–35. Second, the system "determine[s] the location of the preferences file." Appx87 at 4:39–40; *see also* Appx90 at 9:53–57 ("Preferably, the preferences file is placed in a random directory to help obscure the location of the preferences file . . . ."). Thus, in a preferred embodiment, the preferences file is secured by (1) encrypting it, thus requiring a key (*e.g.*, preferences key) to decrypt it; and (2) hiding it, thus requiring a key (*e.g.*, authenticity key) to locate or enable the system to locate it. Neither the '838 Patent nor the '191 Patent claims solely the preferred embodiment. Thus, the claims of either patent should not be limited to the preferred embodiment. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (en banc). Specifically, neither patent claims the use of a plug-in for

17

performing the processing functions of the disclosed inventions; nor does either patent claim the protection of the preferences file by *both* encrypting and hiding it. Instead, each of the Glazer Patents achieves the goal of securing the preferences file differently.

The distinctions between the two Glazer Patents in how their claims differ with regard to securing the preferences file is of importance in construing the claims of the '191 Patent. A District Court recognized this particular distinction when construing the term "authenticity key":

> Defendants also argue that the authentication key controls encryption and decryption at the user device. Secure acknowledges that the preferred embodiment protects the preferences file by encrypting it and by hiding its location. The '838 claims are directed to embodiments that employ the encryption and decryption approach to protection, *See, e.g.*, [Appx1192 at] 12:52–53 (claiming the method step of "decrypting a preferences file having an authenticity stamp instruction using the preferences key"). Claim 12 of the '838 Patent discusses how the authenticity key is used by the client to "verify the source of the data"; the same claim later clarifies that the "preferences key is . . . used to decrypt a preferences file." *Id.* col. 13:38–50. The '191 claims, however, do not address encryption or decryption. They do claim an embodiment where the authenticity key "enables location of a preferences file." [Appx92 at] 14:7–8.

Appx355–56.

### 4.    The Embodiment Claimed in the '838 Patent: Encryption

The '838 Patent claims a system and method whereby the preferences file is secured by encrypting it. Each of the independent claims of the '838 Patent explicitly requires the use of a preferences key to "decrypt" the preferences file:

**Claim 1:**    "decrypting a preferences file having an authenticity stamp instruction using a preferences key"

**Claim 12:**    "wherein the preferences key is retrieved from the authentication server and is used to decrypt a preferences file"

**Claim 19:**    "decrypting a preferences file having a visual signature instruction using the preferences key"

**Claim 27:**    "decrypting a preferences file using the preferences key"

Appx1192–94 (Claims 1, 12, 19, 27).

### 5.    The Embodiment Claimed in the '191 Patent: Location

The '191 Patent, on the other hand, secures the preferences file by requiring the system "to locate" it. Each of the independent claims of the '191 Patent explicitly requires that the preferences file be "located" or that data (*e.g.*, the authenticity key) enable location of the preferences file:

**Claim 1:**    "to enable the authenticity key to be retrieved from the formatted data and to locate a preferences file"

**Claim 17:**    "to insert an authenticity key into formatted data . . . to retrieve an authenticity stamp from a preferences file"

**Claim 29:**    "wherein the authenticity key enables location of a preferences file"

**Claim 31:**    "wherein the authenticity key is retrieved from the formatted data to locate a preferences file"

**Claim 32:**    "retrieving, by the client computer, the authenticity key from the formatted data to locate a preferences file"

Appx91–92 (Claims 1, 17, 29, 31, 32).

### 6.    The Challenged '191 Patent Claims

Each of the challenged claims at issue in this appeal concerns a method, "authentication system," or "computer readable medium" with instructions for formatting content (*e.g.*, a webpage) by inserting an "authenticity key" and sending the data to a client device where the authenticity key is retrieved, the content is authenticated, and the key locates or enables location of a "preferences file," from which the client device retrieves an "authenticity stamp" that is known to and indicative of the user. The '191 Patent has five independent claims, the validity of each of which was challenged in the IPR, and each of which includes the claim language that is the focus of this appeal. The independent claims read:

> **1.** A method comprising:
> transforming, at an authentication host computer, received data by inserting an authenticity key to create formatted data; and
> returning, from the authentication host computer, the formatted data to enable the authenticity key to be retrieved from the formatted data and to locate a preferences file,

wherein an authenticity stamp is retrieved from the preferences file.[6]

**17.** An authentication system comprising:

an authentication processor configured to insert an authenticity key into formatted data to enable authentication of the authenticity key to verify a source of the formatted data and to retrieve an authenticity stamp from a preferences file.[7]

**29.** An authentication system comprising:

an authentication processor configured to send formatted data having an authenticity key to a client, wherein the authenticity key enables location of a preferences file, and wherein an authenticity stamp is retrieved from the preferences file.

**31.** A computer readable medium having stored thereon a plurality of instructions, the plurality of instructions comprising:

instructions to format received data by inserting an authenticity key to create formatted data; and

instructions to return the formatted data to a client, wherein the authenticity key is retrieved from the formatted data to locate a preferences file, and wherein an authenticity stamp is retrieved from the preferences file.

**32.** A method comprising:

receiving, at a client computer, formatted data from an authentication host computer wherein the authentication host computer receives the data to create received data, and transforms the received data by inserting an authenticity key to create the formatted data;

---

[6] Language reflects errors corrected via Certificate of Correction dated May 11, 2010. *See* Appx93.

[7] Language reflects errors corrected via Certificate of Correction dated May 11, 2010. *See* Appx93.

> retrieving, by the client computer, the authenticity key from the formatted data to locate a preferences file; and,
>
> retrieving an authenticity stamp from the preferences file.[8]

## B.   THE IPR PROCEEDINGS

This case began in 2014 when EMC and RSA filed a petition for *inter partes* review challenging the patentability of every claim of the '191 Patent. Secure Axcess had asserted the '191 Patent against several Defendants in District Court litigation. Appx104. RSA and EMC were not then and have never been named Defendants in District Court litigation involving the '191 Patent. The Board agreed to consider challenges to Claims 1–23 and 25–32 of the '191 Patent under 35 U.S.C. §§ 102 and 103. *See* Appx1233–34.

### 1.   The Prior Art References at Issue

The IPR as instituted by the Board focused on five prior art references: (1) U.S. Patent No. 6,018,724 ("Arent"); (2) BRUCE SCHNEIER, APPLIED CRYPTOGRAPHY: PROTOCOLS, ALGORITHMS AND SOURCE CODE IN C (2d ed. 1996) ("Schneier"); (3) U.S. Patent No. 5,475,756 ("Merritt"); (4) J.D. TYGAR & ALMA WHITTEN, *WWW Electronic Commerce and Java Trojan Horses*, in PROCEEDINGS OF THE 2ND USENIX WORKSHOP ON ELECTRONIC COMMERCE (Nov. 18–21, 1996) ("Tygar"); and (5) European Patent Application Publication No. EP 0 883 284 A2

---

[8] Language reflects errors corrected via Certificate of Correction dated May 11, 2010. *See* Appx93.

("Yoshiura"). *See* Appx1233–34. The two primary references (*i.e.*, upon which the Board found anticipation under 35 U.S.C. § 102 and that formed the two base references for the obviousness findings under 35 U.S.C. § 103) were Arent and Tygar. *See* Appx1234.

### a.    Arent

Arent is a U.S. patent that describes a method and apparatus for authenticating data related to online transactions using a background validation process where the user's device sends a request for proof of certification. Once the background validation process completes, the client displays a certification indicator to the user. Appx312 at Abstract; Appx324 at 3:32–33. The Board found that Arent anticipated Claims 1–9, 11, 12, 14–22, 25, and 27–32, which include each of the independent claims at issue in this appeal. *See* Appx69. Regarding the claim elements at issue, the Board found that a digital signature described in Arent discloses the recited "authenticity key" of the claims. The Board did not cite to any language in Arent (or any argument by Appellees) to suggest that Arent discloses using the authenticity key to locate or enable location of a preferences file, holding instead that the claims did not require such an element. *See, e.g.*, Appx27–28.

### b.    Tygar

Tygar is a paper that describes a general method—window personalization—to thwart or prevent local (*i.e.*, client-machine) Trojan horse

attacks. The user interface of a program is personalized (*e.g.*, using an image) such that a rogue program cannot easily copy the interface. *See* Appx341–42. The Board found that Tygar anticipated Claims 1, 3, 5, 6, 9, 11, 12, 14–22, 25, and 27–32, which include each of the independent claims at issue in this appeal. *See* Appx69. Regarding the claim elements at issue, the Board found that a signed applet described in Tygar discloses the recited "authenticity key" of the claims. The Board did not cite to any language in Tygar (or any argument by Appellees) to suggest that Tygar discloses using the authenticity key to locate or enable location of a preferences file, holding instead that the claims did not require such an element. *See, e.g.*, Appx58.

### c.    Schneier

Schneier is a cryptography textbook published in 1996. The excerpt relied upon by Appellees and the Board discusses the use of multiple digital signatures applied to a single document. *See* Appx677–78. Schneier was cited only for the claim element "inserting a second authenticity key into the formatted data" from Claims 10, 13, 23, and 26. *See, e.g.*, Appx47–50 (combination with Arent), Appx67–68 (combination with Tygar). Schneier was not cited for the "location" elements. Thus, the Appellees' and the Board's citations to Schneier are not relevant to the issues addressed in this appeal.

### d.   Merritt

Merritt is an U.S. patent that describes a method for authenticating a terminal to a user via a two-way challenge-response process where an ATM authenticates itself to the host and the host authenticates itself to the ATM. Once the terminal is authenticated, the host sends a personal security phrase to the terminal. *See* Appx933 at Abstract; Appx936 at Fig. 3. Merritt was cited only for the claim element "image selection based on a selection from a plurality of images, wherein the plurality of images are only known by a client and a challenge server" from Claims 14, 15, and 27. *See, e.g.*, Appx51–52 (combination with Arent), JAppx68 (combination with Tygar). Merritt was not cited for the "location" elements. Thus, the Appellees' and the Board's citations to Merritt are not relevant to the issues addressed in this appeal.

### e.   Yoshiura

Yoshiura is a European patent application published on December 9, 1998. Yoshiura describes validation of a digital signature that is embedded in a webpage. *See* Appx389 at 37:19–30, 37:49–38:4. If the digital signature is valid, the system displays a message saying that the mark was validated; if it is not valid, the system displays a message that the mark was not validated. *See* Appx389 at 37:56–38:8; Appx400 at Fig. 9. Yoshiura was only cited in combination with Tygar. It was cited for the claim elements "the formatted data is a web page" from Claim 2,

"displaying the formatted data in response to the verification of the authenticity key" from Claim 4, and "a non-authenticity stamp is displayed for formatted data that is verified" from Claim 7. *See, e.g.*, Appx65–67. Yoshiura was not cited for the "location" elements. Thus, the Appellees' and the Board's citations to Yoshiura are not relevant to the issues addressed in this appeal.

### 2. The Parties Disputed the Role of the Authenticity Key in Determining or Enabling the Location of the Preferences File.

In Secure Axcess's Response to Appellees' Petition and the Board's Institution of the IPR, Secure Axcess argued, *inter alia*, that Appellees had not met their burden of proving the unpatentability of the challenged claims because none of the prior art of record disclosed that the alleged authenticity key was used to locate or enable location of a hidden preferences file. *See, e.g.*, Appx1277–80 (role of the authenticity key); Appx1289–90 (Arent); Appx1305–06 (Tygar).

Throughout the IPR, the parties disputed the role of the authenticity key in determining or enabling the location of the preferences file. Secure Axcess argued that all the independent claims of the '191 Patent required that the preferences file be hidden or that the authenticity key be used to locate, or enable the location of, the preferences file. *See, e.g.*, Appx1277–80. Secure Axcess referenced the differences between the '838 and the '191 Patent and noted the absence of the

"location" elements in the '838 Patent's claims and the absence of the "encryption" elements in the '191 Patent's claims. *See* Appx1264.

Appellees opposed Secure Axcess's proposed construction, citing a dictionary definition of "locate" as "to find or fix the place of" and arguing that the claims and definition of "locate" did not require that the preferences file be hidden or its location obscured. *See* Appx118–19.

### 3.    The Board's Final Written Decision

In its final decision, the Board declined to construe the claims in such a way that the authenticity key must locate or enable location of the preferences file. Instead, the Board construed the phrases to "require only certain action to be a precondition to the action of locating the preferences file." Appx20. Relying on that construction, the Board determined that Claims 1–23 and 25–32 were unpatentable as anticipated and/or obvious in light of the five prior art references discussed herein. Appx69. Specifically, the Board held that Claims 1–9, 11, 12, 14–22, 25, and 27–32 were anticipated by Arent; Claims 1, 3, 5, 6, 9, 11, 12, 14–22, 25, and 27–32 were anticipated by Tygar; Claims 10, 13, 23, and 26 were obvious in view of Arent and Schneier; Claims 14, 15, and 27 were obvious in view of Arent and Merritt; Claims 2, 4, and 7 were obvious in view of Tygar and Yoshiura; Claims 10, 13, 23, and 26 were obvious in view of Tygar and Schneier;

and Claims 14, 15, and 27 were obvious in view of Tygar and Merritt. The Board accordingly issued an order canceling Claims 1–23 and 25–32. Appx69.

## IV.    SUMMARY OF THE ARGUMENT

The Board committed several errors of law in determining that the authenticity key need not be involved in the location of the preferences file. First, the Board ignored the distinctions between the '838 and the '191 Patent, relying instead on an overly broad definition of "locate" to find that the preferences file need not be hidden or obscured in the '191 Patent's claims and that the authenticity key not be required to locate or enable location of the preferences file, despite the explicit recitation of this requirement in the claim language.

Second, ignoring its own cited definition of "locate" as "to find," the Board read the location terms out of the claims entirely, instead applying a construction that equates "locate" with "retrieve" or "receive."

These errors of law were not harmless. Rather, the Board expressly relied on its legally erroneous interpretation of the claim phrases at issue, reading the "location" elements out of the claims and finding that each independent claim was invalid in light of the prior art of record.

The Court should reject the Board's erroneous interpretation and instead give the claim phrases at issue the more reasonable interpretation that Secure Axcess proposed and that the District Court adopted. The Court should also vacate

28

the Board's resulting ruling that Appellees showed unpatentability of Claims 1–23 and 25–32 and remand for the Board to determine patentability under the correct claim interpretation.

## V.    ARGUMENT

### A.    THE APPLICABLE STANDARDS OF REVIEW

The Court reviews the Board's BRI and other legal conclusions *de novo*. *Tempo Lighting, Inc. v. Tivoli, LLC*, 742 F.3d 973, 976–77 (Fed. Cir. 2014). Applying that standard, the Court should reverse the Board's interpretation of the "location" elements in the challenged claims and remand for the Board to reconsider the patentability of claims 1–23 and 25–32.

### B.    THE CORRECT CLAIM CONSTRUCTION STANDARD

Claim terms are given their ordinary and customary meaning, as would be understood by a person of ordinary skill in the art at the time of the invention, in light of the language of the claims, the specification, and the prosecution history of record. *Phillips*, 415 F.3d at 1313–17; *see also Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014); *accord Wowza Media Sys., LLC v. Adobe Sys. Inc.*, IPR2013-00054, Paper 12 at 5 (P.T.A.B. Apr. 8, 2013); *Intellectual Ventures Mgmt., LLC v. Xilinx, Inc.*, IPR2012-00019, Paper 33 at 8 (P.T.A.B. Feb. 10, 2014) (same analysis under BRI standard).

Under the BRI standard, there is "a 'heavy presumption' that a claim term carries its ordinary and customary meaning." *Starhome GmbH v. AT&T Mobility LLC*, 743 F.3d 849, 857 (Fed. Cir. 2014); *Intellectual Ventures*, IPR 2012-00019, Paper 33 at 8. Likewise, a claim term may be construed contrary to its ordinary meaning only where there is clear and unambiguous evidence that the patentee, acting as his own lexicographer, provided a special definition for the claim term, or the patentee otherwise disavowed the full scope of the claim term either in the specification or during prosecution. *Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1330 (Fed. Cir. 2012); *Hill-Rom*, 755 F.3d at 1371; *accord Ericsson, Inc. v. Intellectual Ventures I LLC*, IPR2014-00921, Paper 8 at 8 (P.T.A.B. Dec. 16, 2014); *Becton, Dickinson and Co. v. One StockDuq Holdings, LLC*, IPR2013-00235, Paper 30 at 6 (P.T.A.B. Sept. 25, 2014). Neither exception applies here, and the Board was required to construe the phrases at issue in accordance with their plain and ordinary meaning to one of ordinary skill in the art. *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1369 (Fed. Cir. 2012) ("Absent disclaimer or lexicography, the plain meaning of the claim controls").

## C. SECURE AXCESS'S CONSTRUCTION OF THE "LOCATION" TERMS IS THE BROADEST REASONABLE INTERPRETATION.

Under the Board's regulations governing *inter partes* reviews, "[a] claim in an unexpired patent shall be given its broadest reasonable construction in light of the specification of the patent in which it appears." 37 C.F.R. § 42.100(b). The BRI

of the location elements is that proffered by Secure Axcess—the authenticity key should be used to locate—or enable location of—the preferences file.

Secure Axcess's interpretation is consistent with the claims and the specification, consistent with the testimony of Dr. Katz, and consistent with the dictionary definitions in the record—including those cited by the Board.

### 1.    The Claim Language Supports Secure Axcess's Proposed Construction.

For claim construction, the analytical starting point is the language of the claims. The limitations required of the authenticity key are spelled out in the claims themselves. *See, e.g.*, Appx91 at Claim 1 ("to enable the authenticity key to be retrieved from the formatted data and to locate a preferences file"); Appx 91 at Claim 17 ("to insert an authenticity key into formatted data . . . to retrieve an authenticity stamp from a preferences file"); Appx 92 at Claim 29 ("wherein the authenticity key enables location of a preferences file"); Appx 92 at Claim 31 ("wherein the authenticity key is retrieved from the formatted data to locate a preferences file"); Appx 92 at Claim 32 ("retrieving, by the client computer, the authenticity key from the formatted data to locate a preferences file"). Thus, the claims themselves support Secure Axcess's proposed requirement that the authenticity key locate, or enable location of, the preferences file. *See Digital Biometrics, Inc. v. Idendix, Inc.*, 149 F.3d 1335, 1344 (Fed. Cir. 1988) ("The actual words of the claim are the controlling focus.").

Appellees actually proposed a definition of "preferences key" in their Petition—a term that is not even claimed in the independent claims of the '191 Patent. *See* Appx119. The words "encrypt" and "decrypt" appear nowhere in any claim of the '191 Patent. Nor does the "preferences key" appear in the independent claims of the '191 Patent. *See Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1334 (Fed. Cir. 2009) ("[W]e do not ordinarily construe words that are not in claims."). Conversely, the word "locate" does not appear in any claim of the '838 Patent—though it is used extensively in the '191 Patent claims as a critical function of the authenticity key.

### 2. The Specification Supports Secure Axcess's Proposed Construction.

Each claim, of course, is part of the specification. 35 U.S.C. § 112, ¶ 2. As discussed above, the preferences file is secured in the '191 Patent by "hiding" it, or causing the system to have to "locate" it to retrieve the authenticity stamp. This is consistent with the specification—and even with the preferred embodiment—which states, "the location of the [preferences] file is not readily known." Appx87 at 4:37–38. According to the claims of the '191 Patent, it is the authenticity key that is used to locate—or enables location of—the preferences file. *See Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) (finding it "entirely proper to consider the functions of an invention in seeking to determine the meaning of particular claim language").

The idea that the preferences file must be "located" comports with the purpose of the preferences file in the '191 Patent and the importance of securing it in some way. "Properly viewed, the 'ordinary meaning' of a claim term is its meaning to the ordinary artisan *after* reading the entire patent." *Phillips*, 415 F.3d at 1321 (emphasis added); *see also Lexion Med., LLC v. Northgate Tech., Inc.*, 641 F.3d 1352, 1356 (Fed. Cir. 2011) ("The customary meaning of a claim term is not determined in a vacuum and should be harmonized, to the extent possible, with the intrinsic record, as understood within the technological field of the invention."); *Medrad*, 401 F.3d at 1319 ("We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."); *cf. Towne v. Eisner*, 245 U.S. 418, 425 (1918) ("A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used.").

All the reasons why "plain meaning" is determined *in context* in the courts apply equally to the Patent Office. Indeed, the Patent Office recognizes this in its guidance to Examiners:

> The ordinary and customary meaning of a term may be evidenced by a variety of sources, including the words of the claims themselves, the specification, drawings, and prior art. However, the best source for determining the meaning of a claim term is the specification—the greatest clarity is obtained when the specification serves as a glossary for the claim terms.

MPEP § 2111.01(I). Indeed, the Patent Office's own rules for IPR proceedings explicitly require that the Patent Trial and Appeal Board use a "broadest reasonable construction in light of the specification of the patent in which it appears" standard when performing claim construction. 37 C.F.R. § 42.100(b).

Reading claim language in context is especially important where that language has multiple meanings or connotations. "Locate" is such a term.

In *Phillips*, this Court *en banc* explained the central role of the specification's disclosure in determining the meaning of claim language:

> The pertinence of the specification to claim construction is reinforced by the manner in which a patent is issued. The Patent and Trademark Office ("PTO") determines the scope of claims in patent applications not solely on the basis of the claim language, but upon giving claims their broadest reasonable construction "in light of the specification as it would be interpreted by one of ordinary skill in the art." *In re Am. Acad. of Sci. Tech. Ctr.*, 367 F.3d 1359, 1364 (Fed. Cir. 2004). Indeed, the rules of the PTO require that application claims must "conform to the invention as set forth in the remainder of the specification and the terms and phrases used in the claims must find clear support or antecedent basis in the description so that the meaning of the terms in the claims may be ascertainable by reference to the description." 37 C.F.R. § 1.75(d)(1).

415 F.3d at 1316–17. *Accord Markman v. Westview Instruments*, 517 U.S. 370, 389 (1996) ("the standard construction rule [is] that a term can be defined only in a way that comports with the instrument as a whole"); *United States v. Adams*, 383 U.S. 39, 48–49 (1966) ("While the claims of a patent limit the invention, and specifications cannot be utilized to expand the patent monopoly, it is fundamental

that claims are to be construed in light of the specifications and both are to be read with a view to ascertaining the invention.").

The MPEP likewise explains that a specification may inform a claim term's meaning *implicitly*: "The specification should also be relied on for more than just explicit lexicography or clear disavowal of claim scope to determine the meaning of a claim term when applicant acts as his or her own lexicographer; the meaning of a particular claim term may be defined by implication, that is, according to the usage of the term in the context in the specification." MPEP § 2111.01(IV).

Dr. Tygar, Appellees' expert in the IPR, states in his declaration that he disagrees that "the formatted data or the authenticity key" must be used in the location of the preferences file. *See* Appx223, ¶ 48. Dr. Tygar argues, "the patent is explicit that a preferences key (not an authenticity key) ***must be*** used to locate the preferences file." Appx223, ¶ 48 (citing '191 Patent at 4:38–41) (emphasis in original). Dr. Tygar's opinion suffered from two critical flaws. First, the portion of the specification that he cited to argue that a preferences key "must be" used is discussing a preferred embodiment. Second, the claim language does not consistently say—and Secure Axcess is not arguing—that the authenticity key itself must directly locate the preferences file. Rather, as Secure Axcess has argued, and the claim language recites, the authenticity key must locate ***or enable location of*** the preferences file. Secure Axcess's reading of the claims and

proposed construction for authenticity key is consistent with the claim language and with the preferred embodiment. In the preferred embodiment, "the plug-in **114** must get the preferences key to determine the location of the preferences file." Appx87 at 4:38–40. But in that preferred embodiment, the plug-in does not request the preferences key until the authenticity key has been used to authenticate the page. *See* Appx87 at 4:22–26. Thus, the authenticity key "enables" location of the preferences file by triggering the retrieval of the preferences key.

### 3. The Testimony of Dr. Katz Supports Secure Axcess's Proposed Construction.

Secure Axcess's expert, Dr. Jonathan Katz, submitted a declaration in support of Secure Axcess's opposition to the IPR. *See* Appx1321–76. In it, Dr. Katz provided his opinions about the general teachings of the '191 Patent, including the importance of securing the preferences file. *See, e.g.*, Appx1323–27. Specifically, Dr. Katz opined that the preferences file is secured in the preferred embodiment in two ways—*i.e.*, by "encrypting and hiding" the file—and that the claims of the '191 Patent recite the latter approach. *See* Appx1326–27, Appx1334–35].

### 4. The Board's Dictionary Definitions Support Secure Axcess's Proposed Constructions.

Even the dictionary cited by Appellees and relied on in the Board's Final Written Decision supports Secure Axcess's proposed construction. Although

extrinsic evidence can be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc. v. United States Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)). Technical dictionaries and treatises may help a court or agency understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318.

Here, even the Board's construction supports Secure Axcess's interpretation of the claims. The Board acknowledged that "locate" includes as an acceptable definition "to find." *See* Appx16. But if the system requires that certain information (*e.g.*, the authenticity key) be received at the client device before the preferences file can be located (or "found"), then it is undisputed that the location of the preferences file is not readily known—as Secure Axcess has always contended is the case in the claims of the '191 Patent.

Interestingly, Appellees cited—and the Board adopted—the *last* definition of "locate" in the cited dictionary, and even then only part of the definition. The full definition used in the Board's construction is "to find or fix the place of esp. in a sequence : CLASSIFY." *See* Appx689. A better definition in the context of the '191 Patent is the definition immediately preceding that one: "to seek out and determine

the location of." *See* Appx689. The terms "seek out" and "determine" indicate that the location is not previously known—as does the term "find" in the Board's definition.

### D. THE BOARD COMMITTED LEGAL ERROR BY READING THE "LOCATION" TERMS OUT OF THE CLAIMS.

The Board's decision ignored the "location" elements altogether. Notably, the Board's recitation of the "illustrative claims" of the Patents mentions nothing about location of the preferences file, despite the fact that the term (or a derivation of the term) appears in every claim cited by the Board:

> Claims 1, 17, 29, 31, and 32 of the '191 patent are independent and generally relate to methods, authentication systems, and a computer-readable medium for inserting an authenticity key into formatted data or inserting an authenticity key to create formatted data (claims 1, 17, 31, 32), and sending (or returning) formatted data having an authenticity key (claims 1, 29, 31). . . .

Appx6. The Board's failure even to reference the "location" elements in its summary of the claims is illustrative of its erroneous approach to construing the claim terms at issue.

Similarly, in its Final Written Decision, the Board ignored the "location" elements altogether when comparing the claim language to the prior art references at issue. For example, with respect to Arent and Claim 1, the Board discussed "transforming or formatting received data," Appx28–29, "inserting an authenticity key," Appx30–33, and "retrieving an authenticity stamp from the preferences file,"

Appx33–36. But the Board did not address how Arent allegedly disclosed "to locate a preferences file," as explicitly recited in Claim 1 of the '191 Patent and as similarly described in Claims 17, 29, 31, and 32. Similarly, with respect to Tygar, the Board discussed inserting an authenticity key into data to create formatted data, Appx54–57, an authentication host computer or processor, Appx54–55, and retrieving an authenticity stamp from a preferences file, Appx58, but did not address how, if at all, Tygar allegedly disclosed using the authenticity key to locate or enable location of a preferences file as described in Claims 1, 17, 29, 31, and 32 of the '191 Patent.

As discussed above, even relying on the dictionary definitions cited in the Board's decision, the claim language requires that information be required to determine the location of the preferences file before it can be retrieved. Even Dr. Tygar, Appellees' expert, acknowledged the "location" aspect of the claims. Although he disagrees that the authenticity key must locate—or enable location of—the preferences file, Dr. Tygar acknowledges that *something* "***must be*** used to locate the preferences file." *See* Appx223, ¶ 48.

But the Board applied an overly narrow interpretation of even its own cited reference, adopting a flawed analogy proposed by the Appellees. In their Petition, EMC and RSA cited to (part of) the last definition of "locate" and argued that a person can "locate" a word in a dictionary even if the word is not hidden. This

analogy is flawed. A user looking a word up in a dictionary has the benefit of certain information, including the knowledge that the dictionary is arranged alphabetically and that the words included in the dictionary will appear in a given, pre-defined sequence. Indeed, the complete definition the Appellees and Board relied on stated that "locate" meant "to find or fix the place of **esp. in a sequence**." *See* Appx689 (emphasis added).

The location of the preferences file in the '191 Patent is not in a predetermined location or placed within a given sequence. In fact, the specification teaches the opposite:

> Preferably, the preferences file is placed in a random directory to help obscure the location of the preferences file and facilitate the creation of unique user configurations. This increases the difficulty in creating a general purpose rogue program for extracting preferences and keys.

Appx90 at 9:53–57.

The Board's decision here aptly illustrates why relying on dictionary definitions divorced from the context of the patent is an unreliable approach to claim interpretation. *See Tempo Lighting*, 742 F.3d at 977–78 (rejecting the Examiner's interpretation based on dictionary definitions and noting "the examiner erred by resorting to extrinsic evidence that was inconsistent with the more reliable intrinsic evidence"); *Phillips*, 415 F.3d at 1321 ("Properly viewed, the 'ordinary meaning' of a claim term is its meaning to the ordinary artisan *after* reading the entire patent." (emphasis added); *Lexion Med.*, 641 F.3d at 1356 (Fed. Cir. 2011)

40

("The customary meaning of a claim term is not determined in a vacuum and should be harmonized, to the extent possible, with the intrinsic record, as understood within the technological field of the invention."); *Medrad*, 401 F.3d at 1319 ("We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."); *cf. Towne*, 245 U.S. at 425 ("A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used.").

The Board did not merely fail to consider the specification in arriving at the term's "plain meaning"; it failed to consider the specification in its claim-interpretation analysis other than to note the absence of an express definition. This demotion of the specification was also legal error.

Here, by ignoring the distinctions between the '838 and '191 Patents' claims and the importance of securing the preferences file to the inventions of the '191 Patent, and by relying on an improper definition of "locate" that is divorced from the specification and the actual teachings of the Glazer Patents, the Board read the "location" limitations completely out of the claims. That demotion of the specification's role cannot be reconciled with this Court's precedents, the U.S. Supreme Court's precedents, or the MPEP.

### E. THE BOARD'S ERROR AFFECTED ITS DECISION AND REQUIRES REMAND.

By reading the location elements out of the claims, the Board committed error that caused it to find that the prior art of record invalidated the claims at issue. In its Final Written Decision, the Board ignored the "location" elements altogether when comparing the claim language to the prior art references at issue. For example, with respect to Arent and Claim 1, the Board discussed "transforming or formatting received data," Appx28–29, "inserting an authenticity key," Appx30–33, and "retrieving an authenticity stamp from the preferences file," Appx33–36. But the Board did not address how Arent allegedly disclosed "to locate a preferences file," as explicitly recited in Claim 1 of the '191 Patent. Similarly, Dr. Tygar states, with respect to Arent, that "[a] person of ordinary skill in the art would have appreciated that the wallet must first be located before any contents, such as the stamp, can be retrieved from it." *See* Appx228–29, ¶ 58. But he does not point to anything in Arent to suggest that the alleged authenticity key is used in the location process or to suggest that the location of the wallet is not known before the authentication occurs.

Likewise, although he disagrees that the authenticity key must locate—or enable location of—the preferences file, Dr. Tygar acknowledges that *something* "***must be*** used to locate the preferences file." *See* Appx223, ¶ 48. The only thing Dr. Tygar cites to as allegedly disclosing "using a web page with an authenticity

key to locate a preferences file" is the Palage reference. *See* Appx223, ¶ 48. Dr. Tygar relied on Palage to supply the missing element to Arent and Tygar, the two primary references at issue in the IPR. *See* Appx223, ¶ 48. ("In my analysis I combined [Palage] with Arent and Tygar separately, but it could have been used individually as well."); *see also* Appx252, ¶ 108 ("Even if the claims were interpreted to require the formatted data or the authenticity stamp [sic] to locate the preferences file, it would still be my opinion that the claims are invalid. The claims would still be obvious for the reasons stated for grounds 1–4 when considered further in view of Palage (Ex 1024)."). While Secure Axcess disagrees that Palage discloses the claim elements of the '191 Patent, the Board did not consider Palage at all in its analysis. Thus, if Secure Axcess's proposed construction is correct, there was no basis left in the instituted IPR to invalidate the claims.

Because the Board's ruling that Appellees established unpatentability depended on the Board's erroneous interpretation of the location elements, the Court should vacate that determination and remand for further proceedings under the correct BRI. *In re Abbott Diabetes Care Inc.*, 696 F.3d 1142, 1151 (Fed. Cir. 2012) (remanding for the Board to apply the correct BRI).

## VI.    CONCLUSION

By construing the "location" terms as it did, the Board negated the security aspect of the preferences file in the '191 Patent, reading limitations out of the

claims and ignoring the distinction between how the '838 and '191 Patents protect a user's authenticity stamp. A proper construction would have focused on the claim language in the context of the specification—including the security aspect of the preferences file and how each patent achieves that security.

The Court should adopt Secure Axcess's proposed BRI and remand to the Board to use that BRI in its analysis of the patentability of claims 1–23 and 25–32.

Respectfully submitted,

_____

ANDREW J. WRIGHT

ANTHONY K. BRUSTER
ANDREW J. WRIGHT
BRUSTER PLLC
P.O. Box 92091
Southlake, Texas 76092
871.601.9564
akbruster@brusterpllc.com
andrew@brusterpllc.com

ERIC M. ALBRITTON
ALBRITTON LAW FIRM
P.O. Box 2649
Longview, Texas 75606
903.757.8449
ema@emafirm.com

GREGORY GONSALVES
GONSALVES LAW FIRM
2216 Beacon Lane
Falls Church, Virginia 22043
571.419.7252
gonsalves@gonsalveslawfirm.com

ANDRÉ J. BAHOU
SECURE AXCESS, LLC
VICE PRESIDENT & CHIEF LEGAL OFFICER
555 Republic Drive, Suite 200
Plano, Texas 75074
972.767.9856
aj.bahou@secureaxcess.com

*Counsel for Appellant*
*Secure Axcess, LLC*

February 19, 2016.

**ADDENDUM**

Trials@uspto.gov                          Paper 30
571-272-7822                              Entered:  September 8, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE
————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD
————————

EMC CORPORATION and RSA SECURITY LLC,
Petitioner,

v.

SECURE AXCESS, LLC,
Patent Owner.
————————

Case IPR2014-00475
Patent 7,631,191 B2
————————

Before BARBARA A. BENOIT, TRENTON A. WARD, and
GEORGIANNA W. BRADEN, *Administrative Patent Judges*.

BENOIT, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

IPR2014-00475
Patent 7,631,191 B2

# I.  INTRODUCTION

We have jurisdiction to hear this *inter partes* review under 35 U.S.C. § 6(c).  This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.  This Final Written Decision is entered concurrently with a final written decision in *PNC Bank, N.A. v. Secure Axcess, LLC*, Case CBM2014-00100, a covered business method patent review of claims 1–32 of U.S. Patent No. 7,631,191 B2 (Ex. 1001; "the '191 patent").  For the reasons that follow, we determine that Petitioner has shown by a preponderance of the evidence that claims 1–23 and 25–32 of the '191 patent are unpatentable.

## A.  Procedural History

EMC Corporation and RSA Security LLC (collectively, "Petitioner") filed a Petition (Paper 3; "Pet.") requesting an *inter partes* review of claims 1–32 (the "challenged claims") of the '191 patent.  Patent Owner, Secure Axcess, LLC, filed a Preliminary Response opposing institution of a review.  Paper 7.  On September 9, 2014, pursuant to 35 U.S.C. § 314(a), we instituted an *inter partes* review for claims 1–23 and 25–32 of the '191 patent as unpatentable under 35 U.S.C. § 103(a) over the following references.

2

IPR2014-00475
Patent 7,631,191 B2

| Reference(s) | Basis | Claims Challenged |
|---|---|---|
| Arent[1] | § 102 | 1–9, 11, 12, 14–22, 25, 27–32 |
| Arent and Schneier[2] | § 103 | 10, 13, 23, 26 |
| Arent and Merritt[3] | § 103 | 14, 15, 27 |
| Tygar[4] | § 102 | 1–6, 8, 9, 11, 12, 14–22, 25, 27–32 |
| Tygar and Yoshiura[5] | § 103 | 2, 4, 7 |
| Tygar and Schneier | § 103 | 10, 13, 23, 26 |
| Tygar and Merritt | § 103 | 14, 15, 27 |

Paper 10 ("Inst. Dec.") 33.

Subsequent to institution, Patent Owner filed a Patent Owner Response (Paper 15; "PO Resp."), and Petitioner filed a Reply (Paper 18; "Reply"). Patent Owner filed observations on the cross-examination of Petitioner's declarant (Paper 23), to which Petitioner filed a response (Paper 27).

An oral hearing was held on May 20, 2015. Paper 29 ("Hearing Tr.").

## B. Related Matters

Patent Owner has asserted the '191 patent in numerous district court actions, but none against Petitioner. Pet. 1; *see also* Paper 6 (Patent Owner's

---

[1] U.S. Patent No. 6,018,724, issued Jan. 25, 2000, filed June 30, 1997 (Ex. 1003; "Arent").

[2] BRUCE SCHNEIER, APPLIED CRYPTOGRAPHY: PROTOCOLS, ALGORITHMS AND SOURCE CODE IN C 39-41 (2d ed. 1996) (Ex. 1009; "Schneier").

[3] U.S. Patent No. 5,475,756, issued Dec. 12, 1995 (Ex. 1022; "Merritt").

[4] J.D. TYGAR & ALMA WHITTEN, *WWW Electronic Commerce and Java Trojan Horses* in PROCEEDINGS OF THE 2ND USENIX WORKSHOP ON ELECTRONIC COMMERCE 243-50 (Nov. 18-21, 1996) (Ex. 1004; "the Tygar paper" or "Tygar").

[5] European Patent Application Publication Number EP 0 883 284 A2, published Dec. 9, 1998 (Ex. 1006; "Yoshiura").

3

IPR2014-00475
Patent 7,631,191 B2

Mandatory Notice).  In addition to *PNC Bank, N.A. v. Secure Axcess, LLC*, Case CBM2014-00100, the '191 patent has been the subject of petitions for covered business method patent reviews brought by other petitioners.  In *Bank of the West v. Secure Axcess, LLC*, Case CBM2015-00009, the Board instituted review of claims 1–32 and then consolidated that review with ongoing CBM2014-00100.  *Bank of the West v. Secure Axcess, LLC*, Case CBM2015-00009 (PTAB April 13, 2015; Paper 21) and (PTAB May 12, 2015; Paper 27).

On June 22, 2015, the Board further instituted a covered business method patent review of claims 1–5, 16, and 29–32 of the '191 patent brought by yet another petitioner.  *See T. Rowe Price Inv. Servs., Inc. v. Secure Axcess, LLC*, Case CBM2015-00027 (PTAB June 22, 2015; Paper 9).  On July 10, 2015, the Board denied institution of a second petition by PNC Bank seeking another covered business method patent review of the '191 patent.  *See PNC Bank, N.A. v. Secure Axcess, LLC*, Case CBM2015-00039 (PTAB July 10, 2015; Paper 9).

## C.  The '191 Patent

The '191 patent relates to authenticating data, such as a web page. Ex. 1001, Abstract, 1:16–18, 12:9–18 (claim 1).  The '191 patent explains that customers can be deceived by web pages that appear to be authentic but are not.  *See id.* at 1:28–34.  A web page that has been authenticated according to the techniques described by the '191 patent includes "all of the information in the same format as the non-authenticated page."  *Id.* at 2:58–

4

IPR2014-00475
Patent 7,631,191 B2

60. The authenticated web page, however, also includes an "authenticity stamp." *Id.* at 2:60–62.

Figures 1 and 2 are set forth below:



Figure 1                    Figure 2

Figures 1 and 2 each show web page 50 having title 52, hyperlinks 54A, 54B, 54C, and 54D, textual information 56, and graphical images 58A and 58B. *Id.* at 2:54–57. Figure 1 shows web page 50 has not been authenticated, whereas Figure 2 shows web page 50 has been authenticated. *Id.* at 2:54–61. The authenticated web page shown in Figure 2, unlike the non-authenticated web page shown in Figure 1, includes authenticity stamp 60. *Id.*

The '191 patent discloses an exemplary environment using an authentication server. *Id.* at Abstract, 3:26–55, Fig. 4. In that embodiment, a web server at a web site receives a request for information from user's web browser and, prior to sending the requested web page to the user's computer, the web server submits information to an authentication server. *Id.* at 3:41–51. The authentication server adds authentication information to the request for information. *Id.* at 3:50–53. "The information which includes the

5

IPR2014-00475
Patent 7,631,191 B2

authentication information is returned to the web server[,] which then sends the web page including the authentication information to the user [computer]." *Id.* at 3:52–55. The '191 patent also describes combining the logic of an authentication server with the logic of a web server. *Id.* at 4:57–58.

The '191 patent further discloses that an authentication server is not always necessary. *Id.* at 8:17–18 ("In alternative embodiments, there is no authentication server."). In such an embodiment, for example, a web server receives a request for a web page. *Id.* at 4:5–14. "If the [web] page is to be authenticated, the page is dynamically signed with a private key and additional information. . . ." *Id.* at 4:14–16. The signed web page then is returned to the user's computer, and the user's computer verifies the authenticity of the web page, using a public key to verify the digital signature. *Id.* at 4:18–23. After verification of the digital signature, the user computer "can validate the authentication of the [web] page." *Id.* at 4:23–24.

### D.  Illustrative Claims of the '191 Patent

Claims 1, 17, 29, 31, and 32 of the '191 patent are independent and generally relate to methods, authentication systems, and a computer-readable medium for inserting an authenticity key into formatted data (claim 17) or to create formatted data (claims 1, 31, 32), and sending (or returning) formatted data having an authenticity key (claims 1, 29, 31). Claims 1 and 17, reproduced below, are illustrative of the claimed subject matter:

6

IPR2014-00475
Patent 7,631,191 B2

1.  A method comprising:

transforming, at an authentication host computer, received data by inserting an authenticity key to create formatted data; and

returning, from the authentication host computer, the formatted data to enable the authenticity key to be retrieved from the formatted data and to locate a preferences file,

wherein an authenticity stamp is retrieved from the preferences file.

17. An authentication system comprising:

an authentication processor configured to insert an authenticity key into formatted data to enable authentication of the authenticity key to verify a source of the formatted data and to retrieve an authenticity stamp from a preferences file.

Ex. 1001, 12:9–18, 12:62–67.

## II.  DISCUSSION

### A.  *Claim Construction*

In an *inter partes* review, claim terms in an unexpired patent are interpreted according to their broadest reasonable construction in light of the specification of the patent in which they appear.  37 C.F.R. § 42.100(b); *see* Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012); *see also In re Cuozzo Speed Techs., LLC,* 793 F.3d 1268, 1278, 1279 (Fed. Cir. 2015) ("Congress implicitly approved the broadest reasonable interpretation standard in enacting the AIA," and "the standard was properly adopted by PTO regulation."), *reh'g en banc denied*, 793 F.3d 1297 (Fed. Cir. 2015).  Under that standard, claim terms are presumed to be given their

7

IPR2014-00475
Patent 7,631,191 B2

ordinary and customary meaning as would be understood by one of ordinary skill in the art in the context of the entire disclosure. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). Any special definition for a claim term must be set forth in the specification with reasonable clarity, deliberateness, and precision. *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). A particular embodiment appearing in the written description should not be read into the claim if the claim language is broader than the embodiment. *In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993). We construe the terms below and discuss terms relative to prior art disclosures in accordance with these principles.

The parties each propose constructions for various claim terms and oppose several of one another's proposed constructions. We address disputed terms as necessary for this decision.

The parties also refer to claim constructions from prior litigation involving the '191 patent. Pet. 11–16; PO Resp. 8–22; Reply 1, 2, 6, 8, 9, 11, 12; *see also* Ex. 1005 (Mem. Op. and Order, *Secure Axcess, LLC v. Bank of Am. Corp.,* No. 6:10-cv-00670 (E.D. Tex. July 9, 2012, ECF No. 461) ("Markman Order"). We apply a different claim construction standard than that applied by a district court and are not generally bound by a judicial construction of a claim term. *Power Integrations, Inc. v. Lee*, No. 2014-1123, 2015 WL 4757642, at *6 (Fed. Cir. Aug. 12, 2015). Nonetheless, we are mindful of the judicial constructions of the terms "authenticity key," "preferences file," and "authenticity stamp." Markman Order 21. Those terms, however, need not be construed expressly for this decision, so we

8

IPR2014-00475
Patent 7,631,191 B2

need not determine whether those constructions are consistent with the broadest reasonable construction of the terms. *Cf. Power Integrations*, 2015 WL 4757642, at *7 ("We do not hold that the board must in all cases assess a previous judicial interpretation of a disputed claim term.").

### 1. *"Received Data"*

Independent claims 1, 31, and 32 recite "received data."[6] Patent Owner proposes, with support of its declarant, that "transforming, at an authentication host computer, received data" (recited in independent claim 1), "instructions to format received data by inserting an authenticity key to create formatted data" (recited in independent claim 31), and "the authentication host computer receives the data to create received data" (recited in independent claim 32) require the authentication host computer "to receive data from outside of itself." PO Resp. 14; Ex. 2007 ¶¶ 19, 24.

As made clear by Patent Owner's arguments concerning prior art references, Patent Owner further proposes that each of independent claims 1, 31, and 32, which recite "received data," be construed additionally to require "data sent from a device other than the authentication host computer." PO Resp. 14, 30–31, 46–47. Petitioner, with support from its declarant, opposes construing "received data" and the limitations which recite "received data"

---

[6] The district court determined that no construction was necessary for "received data." Markman Order 13–14. The district court also rejected both Patent Owner's proposed construction of "data indicative of at least part of a web page" and the defendants' proposed construction of "a webpage or other document requested by the user." *Id.*

9

IPR2014-00475
Patent 7,631,191 B2

as data sent from a device other than the authentication host computer.
Reply 8–9.

As an initial matter, in accordance with the plain language of the
claims and because the '191 patent does not provide any special meaning for
the term "received data," we construe "received data" to mean "data that has
been received." The term "received data" implies data has been received but
does not itself require the data to be received at a particular time, in a
particular manner, by a particular device (such as an authentication host
computer), or from a particular device (such as a device other than an
authentication host computer).

None of independent claims 1, 31, or 32 expressly recites from where
the received data is sent, much less recite expressly that the data is sent from
a device other than the authentication host computer. Of independent claims
1, 31, and 32, only independent claim 32 expressly requires a particular
device—"an authentication host computer"—to receive data. Independent
claims 1 and 31 require acting on received data in a certain manner—to
transform (claim 1), or format (claim 31), received data in a certain manner
to create formatted data. Thus, none of claims 1, 31, or 32 expressly
requires an authentication host computer to receive data from a device other
than the authentication host computer, as Patent Owner contends.

Moreover, independent claim 31 does not require an authentication
host computer. Initially, Patent Owner contended in its Response that
independent claim 31 requires an authentication host computer to receive
data outside of itself and further requires the authentication host computer to

10

IPR2014-00475
Patent 7,631,191 B2

receive data from another device.  PO Resp. 30 ("Arent does not disclose 'transforming, at an authentication host computer, received data'. . . *as similarly recited in independent claims 31* and 32") (initial capitalization removed; emphasis added).

Independent claim 31 does not recite an "authentication host computer" but rather recites a "computer readable medium having . . . instructions to format received data."  We are not persuaded that the recited instructions must be executed by an authentication host computer because other embodiments are described by the '191 patent, among them an embodiment using a web server that digitally signs without involving separate authentication server (Ex. 1001, 4:5–43, Fig. 5) and a combined web server and authentication server (*id.* at 4:57–58).  Furthermore, at the Hearing, Patent Owner apparently abandoned its position and acknowledged that claim 31 does not require an authentication host computer.  Hearing Tr. 47:1–2 (stating "I don't think I'm arguing that claim 31 requires an authentication computer").

In reciting "transforming, at an authentication host computer, received data," independent claim 1 requires the transforming be performed by a particular device—"an authentication host computer."  In reciting "received data," claim 1 impliedly requires data have been received but does not require the data to be received by a particular device, such as an authentication host computer.

This construction is consistent with the '191 patent because claim 1 recites "an authentication host computer," a term that does not appear in the

11

IPR2014-00475
Patent 7,631,191 B2

'191 patent other than in the claims and does not recite "an authentication server," a term that does appear in the written description of the '191 patent.[7] Because the '191 patent discloses embodiments that do not require an authentication server, we will not equate the claim term "authentication host computer" with the disclosed authentication server.  *See* Ex. 1001, 4:5–43, Fig. 5 (using a web server that digitally signs without involving a separate authentication server), *id.* at 4:57–58 (describing a combined web server and authentication server).  This view is confirmed by the prosecution history of the '191 patent.  *See Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1298 (Fed. Cir. 2015) ("The PTO should also consult the patent's prosecution history in proceedings in which the patent has been brought back to the agency for a second review.").  The applicants during examination deliberately removed "authentication server" from a pending claim.  Ex. 3001, 11 (deleting "authentication server" from application claim 8 in response to the Office action dated July 16, 2008).  Later to address a rejection that the claim did not recite patent-eligible subject matter, the applicants added "an authentication host computer"—not "authentication server"—to claim 1.  Ex 3001, 2 (adding "authentication host computer" to application claim 1 in response to the Office action dated January 9, 2009).

---

[7] Patent Owner apparently equates the recited "authentication host computer" with the "authentication server" disclosed in the '191 patent.  *See, e.g.,* PO Resp. 15–18 (relying on an "authentication server" depicted in Ex. 1001, Figs. 9, 10 for support of Patent Owner's contention that the recited "authentication host computer" receives data from a web server).

12

IPR2014-00475
Patent 7,631,191 B2

Further, Petitioner's declarant J. Douglas Tygar, Ph.D., testifies that the recited "authentication host computer" could read on the disclosed embodiment that combines the logic of the web server and the logic of the authentication server. Ex. 1035 ¶ 61 (testifying that the embodiment combining the logic of the web server and the logic of the authentication server indicates that the authentication host computer may receive the information from other software on the authentication host computer).

Additionally, during examination, the applicants removed from claim 1 a limitation specifying a source from which the data was received and then deleting the receiving step entirely. Ex. 3001, 25 (changing "receiving data *from* a client" to "receiving data *for* a client" in claim 1 in response to the Office action dated October 18, 2007), 10 (deleting "receiving data for a client to create received data" in application claim 1 in response to the Office action dated July 16, 2008).

Thus, the applicants deliberately broadened claim 1 by removing a limitation specifying from where the data is received. This further confirms our determination that the transformation limitation in claim 1 should not be construed to require the authentication host computer to receive data from outside of itself or from another device (such as a client computer or a web server), which is a more narrow construction than the plain language of the claim requires.

Turning to independent claim 32, the plain language "the authentication host computer receives the data to create received data" requires the authentication host computer to receive data. We are not

13

IPR2014-00475
Patent 7,631,191 B2

persuaded, however, that independent claim 32 requires the authentication host computer to receive data from outside of itself or from another device, as Patent Owner contends.

We credit Dr. Tygar's testimony, based on the disclosure of the '191 patent of an embodiment combining the logic of the authentication server and the web server (Ex. 1001, 4:57–58), that the authentication host computer may receive the web page from other software on the authentication host computer (Ex. 1035 ¶ 61).

Neither Patent Owner nor its declarant addresses persuasively this embodiment disclosed in the '191 patent. Although Patent Owner's declarant Jonathan Katz, Ph.D., testifies that "'received data' means the authentication host computer receives data from outside itself," Dr. Katz does not go as far as Patent Owner's proposed additional construction, which limits received data to data sent from a device other than the authentication host computer. *See, e.g.*, Ex. 2007 ¶¶ 19, 24. Nor does Dr. Katz address how the disclosure of a combined web server and authentication server (*id.* at 4:57–58) and use of the term authentication server in the '191 patent (as opposed to "an authentication host computer") would affect how one of ordinary skill in the art would understand the scope of independent claim 32.

We, therefore, are not persuaded that independent claims 1, 31, or 32 require an authentication host computer to receive data from outside of itself or from a device other than the authentication host computer.

14

IPR2014-00475
Patent 7,631,191 B2

### 2. *"Authenticity Key" and "Locating a Preferences File"*

Independent claims 1, 29, 31, and 32 each recites some limitation regarding the authenticity key and locating a preferences file. Independent claim 1 recites "returning . . . the formatted data to enable the authenticity key to be retrieved from the formatted data and to locate a preferences file." Independent claim 29 recites "the authenticity key enables location of a preferences file." Independent claim 31 recites "the authenticity key is retrieved from the formatted data to locate a preferences file." Similarly, independent claim 32 recites "retrieving, by the client computer, the authenticity key from the formatted data to locate a preferences file."

Independent claim 17 does not recite locating a preferences file but recites retrieving something from a preferences file. Specifically, independent claim 17 recites "an authentication processor configured to insert an authenticity key into formatted data to enable authentication of the authenticity key to verify a source of the formatted data and to retrieve an authenticity stamp from a preferences file."

The parties dispute whether these claims require the preferences file to be hidden and require "the authentication key to provide the ability to determine a location of a preference file," as Patent Owner contends (PO Resp. 19–22). For the following reasons, we do not construe the independent claims 1, 17, 29, 31, and 32 to require the preferences file to be hidden or to require the authentication key be used to, or provides the ability to, determine a location of a preference file.

15

IPR2014-00475
Patent 7,631,191 B2

*Preferences File Need Not Be Hidden*

Turning first to whether the claims require the recited "preferences file" to be hidden, Patent Owner contends that all of the challenged claims require the "preferences file" to be hidden—its location not to be known. None of the independent claims recite expressly hiding or obscuring the location of the preferences file, or that the location of the preferences file is hidden or obscured. In support of its position, Patent Owner relies on a preferred embodiment disclosed in the written description in which the location of the preferences file is obscured. *See, e.g.,* PO Resp. 20 (citing Ex. 1001, 4:37–40). Patent Owner's contentions seem to require the location of the preferences file to be concealed, rather than merely not being known. PO Resp. 21, 31–32, 47–48.

Petitioner opposes, indicating "to enable the authenticity key . . . to locate a preferences file" and similar claim terms do not require the location of the preferences file to be hidden. Pet. 15–16. Petitioner contends the ordinary and customary meaning of the word "locate" means "to find" and does not require deliberate obscuring or hiding. Pet. 15–16 (citing Ex. 1011 (Merriam-Webster's Collegiate Dictionary at 684) (defining "locate" as "to find or fix the place of")). Petitioner further provides an example of the ordinary meaning of "locating" that does not require locating something that is hidden. Petitioner explains "locating a word in a dictionary" requires one to find the page on which the word resides to locate the word's definition in the dictionary. Pet. 15. Petitioner correctly points out that the location of the word in the dictionary is not hidden or obscured. *Id.*

16

IPR2014-00475
Patent 7,631,191 B2

Moreover, Petitioner correctly notes that the '191 patent does not require a preferences file be hidden but only discloses the location may be obscured or not readily known in preferred, but not all, embodiments. Pet. 16 (quoting Ex. 1001, 9:53–55) ("[p]referably, the preferences file is placed in a random directory to help obscure the location of the preferences file"); *see also* Ex. 1001, 4:5–7, 37–40 (indicating in an exemplary embodiment, "the location of the preferences file is not readily known" to the user computer, so the user computer "must get the preferences key to determine the location of the preferences file").

The term "to locate a preferences file" in claims 1, 31, and 32, as well as enabling "location of a preferences file" in claim 29, does not require the location of the preferences file be obscured or hidden. Nor does "enabl[ing] authentication of the authenticity key . . . to retrieve an authenticity stamp from a preferences file," as recited in independent claim 17, require the preferences file to be obscured or hidden.[8]

We agree with Petitioner. None of the independent claims requires that the location of the preferences file be obscured or hidden; the ordinary and customary meaning of "to locate" is "to find," which does not require something to be hidden; and the '191 patent describes the location of the preferences file as being obscured or not readily known only as preferred embodiments. *See* Ex. 1001, 4:37–40, 9:53–57.

---

[8] Patent Owner includes this limitation of claim 17 in the heading of its argument but does not explain why this particular limitation would require locating a preferences file. PO Resp. 19–22.

17

IPR2014-00475
Patent 7,631,191 B2

We decline to read limitations into a claim from these preferred embodiments described in the Specification when the claim language is broader than the embodiment. *In re Am. Acad. of Sci. Tech Ctr.*, 367 F.3d 1359, 1364 (Fed. Cir. 2004); *In re Van Geuns*, 988 F.2d at 1184. Here, the claim language is broader than the preferred embodiments describing the location of the preferences file as obscured or not readily known and, therefore, should not be narrowed by embodiments in the '191 patent. Further, the '191 patent does not set forth a special definition for that claim term with reasonable clarity, deliberateness, or precision that would impose a special meaning requiring the location of the preferences file be obscured or hidden. *See In re Paulsen*, 30 F.3d at 1480. Moreover, Patent Owner's declarant acknowledges that the written description of the '191 patent does not require hiding the preferences file. Ex. 1034, 86:17–87:1.

## *Enabling the Authenticity Key to Locate a Preferences File*

Petitioner contends that none of the claims requires the formatted data or the authenticity key be used to locate the preferences file. Pet. 13–14. Rather, Petitioner contends independent claims 1, 17, 29, 31, and 32 only require some action as a precondition to locating the preferences file. Pet. 13–14. For instance, Petitioner contends the broadest reasonable construction of "returning . . . the formatted data to enable the authenticity key to be retrieved from the formatted data and to locate the preferences file," as recited in claim 1, means returning the formatted data is "a precondition" to locating the preferences file. Pet. 13.

18

IPR2014-00475
Patent 7,631,191 B2

Patent Owner does not challenge directly whether the authenticity key must be used to locate the preferences file. Patent Owner, however, contends that the claims require "the authentication key to provide the ability to determine a location of a preference file."[9] PO Resp. 19–22.

We agree with Petitioner that none of the claims requires the authenticity key to locate the preferences file or have the ability to determine the location of a preferences file. First, none of the independent claims recites the authenticity key being used to locate the preferences file.[10] Nor is there evidence of written description support for such an interpretation— the '191 patent does not disclose using an authenticity key to locate the preferences file. Rather, as noted previously, the '191 patent discloses in a preferred embodiment that a preferences key, which is different than an authenticity key, is used to locate the preferences file. *See* Ex. 1001, 4:38– 40. This understanding is confirmed by Patent Owner's declarant Dr. Katz. *See* Ex. 1034, 164:20–165:5. Further, Dr. Katz acknowledges the

---

[9] To the extent that Patent Owner argues Dr. Tygar's testimony concerning a particular embodiment disclosed in the '191 patent acknowledges Patent Owner's proposed construction here is correct (Paper 23, 2–4), we disagree. Dr. Tygar did not provide testimony about the meaning of the claims, only what a particular embodiment in the '191 patent described. *See* Paper 27, 1– 3.

[10] Claim 1 recites "returning. . . the formatted data to enable the authenticity key to be retrieved from the formatted data and to locate a preferences file"; independent claim 29 recites "the authenticity key *enables* location of a preferences file"; independent claims 31 and 32 require retrieving the authenticity key to locate a preferences file. Independent claim 17 does not recite the location of a preferences file.

19

IPR2014-00475
Patent 7,631,191 B2

authenticity key does not have information to locate the preferences file.
*See, e.g.*, Ex. 1034, 165:6–9.

Petitioner's proposed construction of independent claims 1, 17, 29,
31, and 32 as only requiring some action as a precondition to locating the
preferences file better comports with the claims and written description of
the '191 patent.  For example, the '191 patent discloses that after verification
of a received digital signature, the preferences key is requested and
subsequently used to determine the location of the preferences file.
*See* Ex. 1001, 4:22–40 (referring to Fig. 5).  The verification of the received
digital signature must occur before the preferences key can be requested and
used to determine the location of the preferences file.  In other words,
verification of the received digital signature is a precondition of requesting
and using the preferences key to determine the location of the preferences
file.  Thus, verification of the received digital signature enables—supplies
the opportunity for[11]—the requested preferences key.

We, therefore, adopt Petitioner's proposed construction that the
independent claims require only certain action to be a precondition to the
action of locating the preferences file.

---

[11] AMERICAN HERITAGE DICTIONARY 605 (3d ed. 1992) (defining "enable"
as "1.  To supply the means, knowledge, or opportunity; make able")
(Ex. 3002).

20

IPR2014-00475
Patent 7,631,191 B2

### B. *Principles of Law Regarding Anticipation and Obviousness*

To prevail in challenging claims 1–23 and 25–32 of the '191 patent, Petitioner must demonstrate by a preponderance of the evidence that the claims are unpatentable. 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d).

To establish anticipation under 35 U.S.C. § 102, each and every element in a claim, arranged as recited in the claim, must be found in a single prior art reference. *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008); *Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1383 (Fed. Cir. 2001). To anticipate, a prior art reference must disclose more than "multiple, distinct teachings that the artisan might somehow combine to achieve the claimed invention." *Net MoneyIN*, 545 F.3d at 1371; *see also In re Arkley*, 455 F.2d 586, 587 (CCPA 1972) ("The [prior art] reference must clearly and unequivocally disclose the claimed [invention] or direct those skilled in the art to the [invention] without *any* need for picking, choosing, and combining various disclosures not directly related to each other by the teachings of the cited reference."). Although the elements must be arranged or combined in the same way as in the claim, "the reference need not satisfy an *ipsissimis verbis* test," i.e., identity of terminology is not required. *In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009); *In re Bond*, 910 F.2d 831, 832 (Fed. Cir. 1990). Moreover, the prior art reference is read from the perspective of one with ordinary skill in the art. *In re Graves*, 69 F.3d 1147, 1152 (Fed. Cir. 1995) ("A reference anticipates a claim if it discloses the claimed invention such that a skilled artisan could take its teachings in combination with his own knowledge of the particular

21

IPR2014-00475
Patent 7,631,191 B2

art and be in possession of the invention."); *In re Preda*, 401 F.2d 825, 826 (CCPA 1968) ("[I]t is proper to take into account not only specific teachings of the reference but also the inferences which one skilled in the art would reasonably be expected to draw therefrom.").

Under 35 U.S.C. § 103(a), a claim is unpatentable if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *KSR Int'l Co. v. Teleflex Inc*., 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including the following: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) objective evidence of nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

### C.  Level of Ordinary Skill in the Art

In determining whether an invention would have been obvious at the time it was made, 35 U.S.C. § 103 requires us to determine the level of ordinary skill in the pertinent art at the time of the invention. *Graham v. John Deere,* 383 U.S. at 17.  "The importance of resolving the level of ordinary skill in the art lies in the necessity of maintaining objectivity in the obviousness inquiry." *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 718 (Fed. Cir. 1991).  The person of ordinary skill in the art is a hypothetical person who is presumed to have known the relevant art at the time of the invention.  *In re GPAC, Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995).  Factors

22

IPR2014-00475
Patent 7,631,191 B2

that may be considered in determining the level of ordinary skill in the art
include, but are not limited to, the types of problems encountered in the art,
the sophistication of the technology, and educational level of active workers
in the field. *Id.* In a given case, one or more factors may predominate. *Id.*
Generally, it is easier to establish obviousness under a higher level of
ordinary skill in the art. *Innovention Toys, LLC v. MGA Entm't, Inc.*,
637 F.3d 1314, 1323 (Fed. Cir. 2011) ("A less sophisticated level of skill
generally favors a determination of nonobviousness . . . while a higher level
of skill favors the reverse.").

The parties propose similar levels of ordinary skill in the art and do
not directly challenge the other's proposal. Ex. 1002 ¶ 12 (testimony by
Petitioner's declarant); Ex. 2007 ¶ 8 (testimony by Patent Owner's
declarant). The parties' declarants differ in the amount of work experience
one with ordinary skill in the art with a bachelor's degree would have.
Patent Owner's declarant opines two years of work experience would be
sufficient, whereas Petitioner's declarant opines five years of work
experience would be necessary for one of ordinary skill in the art with a
bachelor's degree. *Id.* Despite these initial differences, Petitioner later
acknowledged that record evidence supports a level of ordinary skill having
two years of work experience. Hearing Tr. 32:1–16; *see also Okajima v.
Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (indicating the level of
ordinary skill in the art is reflected by the prior art of record).

We adopt the areas of agreement in the parties' proposals. Therefore,
one of ordinary skill in the art would have a bachelor's degree in computer

23

IPR2014-00475
Patent 7,631,191 B2

science (or an equivalent field) and least two years of work experience in the area of information technology.

### D. Anticipation by Arent

Petitioner contends 1–9, 11, 12, 14–22, 25, and 27–32 are unpatentable under 35 U.S.C. § 102 as anticipated by Arent.[12]  To support its contentions, Petitioner provides detailed analysis, relying on declaration testimony of Dr. Tygar.  Pet. 28–38 (citing Ex. 1002).  Patent Owner responds, relying on declaration testimony of Dr. Katz.  PO Resp. 25–37 (citing Ex. 2007).

Petitioner represents that Arent is prior art at least under 35 U.S.C. § 102(e)[13] to the challenged claims.  Pet. 28.  Arent is a patent, which issued from an application filed on June 30, 1997—a date prior to the earliest effective filing date claimed by the '191 patent—September 9, 1999.

---

[12] Petitioner points to acknowledgements by Patent Owner's declarant that it was known prior to the invention of the '191 patent (1) to sign and authenticate a web page (citing Ex. 1034, 127:22–128:3, 131:17–20); (2) to show some indication that a web page was authenticated and verified (*id.* at 155:14–21); and (3) that the indication could be user customized (*id.* at 157:2–13).  Reply 1.  Such general acknowledgements, however, do not establish anticipation, which requires each and every limitation in a claim to be found in a single prior art reference as arranged in the claim.

[13] We are mindful that Arent also is asserted by a different petitioner in a covered business method patent review to be prior art under § 102(a), based on the petitioner's assertion that the provisional application to which the '191 patent claims priority does not provide written description support for the claims of the '191 patent.  *See* CBM2014-00100, Paper 3, 19–20.

24

IPR2014-00475
Patent 7,631,191 B2

Patent Owner does not dispute that Arent is prior art to the challenged claims.

### *1. Summary of Arent*

Arent describes authenticating online transaction data.  Ex. 1003, Abstract.  A validation process is initiated when a user starts an electronic transaction, and the validation process "determin[es] authenticity of data related to the transaction, such as the identity of a transaction party."  *Id.*  If the data are authentic, Arent's process displays a "certification indicator," which may be a graphic with user defined text and may be customized by a user.  *Id.*

Arent's Figure 6 is set forth below:



*FIG. 6*

Figure 6 illustrates an example of certification indicator with a user-defined component.  Certification indicator 500 includes standard component 510 and user-defined component 520 consisting of a text string

25

IPR2014-00475
Patent 7,631,191 B2

selected by the user and stored in a database with user preference information. *Id.* at 4:51–60, 7:24–25, 7:33–37. After the merchant has been authenticated, components 510 and 520 of the certification indicator are retrieved from storage and combined to form certification indicator 500, which is displayed on top of merchant's web page 100 offering computers for sale. *Id.* at 4:67–5:7, Fig. 6.

Arent also describes computer program instructions "for performing authentication tests on web site proprietors and on other on-line transaction parties, and for authenticating data related to on-line transactions." *Id.* at 5:63–67. "The instructions also have the ability to determine whether or not an offer presented to a user (e.g. via a web site) has been digitally signed by the party making the offer, as well as whether or not other information displayed to the user . . . is authentic." *Id.* at 6:2–6.

## 2. *Independent Claims 1, 17, 29, 31, and 32*

Similarly to embodiments in the '191 patent that describe a web server digitally signing a web page (*see* Ex. 1001, 4:13–24) and using user-configurable authenticity stamps (*see id.* at 3:1–4), Arent describes techniques for authenticating web-page based offers to sell computers by using digital signatures and user-customized certification indicators. Ex. 1003, Fig. 3. Also, similarly to the authenticity stamp of the '191 patent (*see* Ex. 1001, 1:28–34, 2:58–60), Arent's user-customized certification indicator stored on the user's device helps protect a user from an unscrupulous merchant counterfeiting a certification indicator. *See* Ex. 1003, 4:34–50.

26

IPR2014-00475
Patent 7,631,191 B2

According to Petitioner, Arent's digital signature discloses the recited "authenticity key"; Arent's digitally signed web page offer discloses the recited "formatted data"; Arent's user-customizable certification indicator discloses the recited "authenticity stamp"; and Arent's wallet database file, which stores user preferences, discloses the recited "preferences file," from which the certification indicator (corresponding to the recited "authenticity stamp") is retrieved.  Pet. 32–33.

Petitioner, relying on testimony by its declarant, asserts that a person skilled in the art would have understood that "Arent inserts the authenticity key at an 'authentication host' or 'authentication processor,'" as recited in claim 1.  *Id.* (citing Ex. 1002 ¶¶ 51–55).  As Dr. Tygar explains, the web server of Arent's merchant includes authentication logic and so meets the limitations to be an authentication host computer recited in claim 1. Ex. 1002 ¶ 51.  Petitioner's declarant also testifies that a digitally signed web page offer necessarily discloses a digital signature is inserted into the web page.  Ex. 1035 ¶ 50 (stating one of ordinary skill in the art "would appreciate that Arent's 'signed offer' was a conventionally signed web page (formatted data), containing both the web page (received data) and the signature (authenticity key) for the signed web page.").

### *Patent Owner's Contentions Based on Overly Narrow Claim Constructions*

As an initial matter, we are not persuaded by Patent Owner's contentions that are predicated on claim constructions narrower than the broadest reasonable construction of claim terms in light of the Specification. For example, Patent Owner asserts that Arent does not disclose that the act

27

IPR2014-00475
Patent 7,631,191 B2

of inserting an authentication key into formatted data enables the authenticity key to locate a preferences file and retrieve an authenticity stamp.  PO Resp. 28–30, 31–32; Hearing Tr. 50:1–9 (Patent Owner asserting Arent does not disclose determining the location of the wallet and Arent does not disclose how an authenticity key provides the ability to determine the location of the wallet).  According to Patent Owner, this is because the challenged claims require an authentication key to be used to locate the preferences file, which must be obscured or hidden.  PO Resp. 29, 32.  As discussed above, the claims do not require the location of a preferences file to be obscured or hidden.

Patent Owner also relies on overly narrow construction of "transforming, at an authentication host computer, received data," contending the claims purportedly require data to be sent from outside itself or from a device other than the authentication host computer.  PO Resp. 30–31.  As discussed above, the independent claims do not require data to be sent from outside the authentication host computer or from a device other than the authentication host computer.

*Transforming or Formatting Received Data*

Independent claims 1, 31, and 32 each require transforming or formatting received data by inserting an authenticity key to create formatted or received data.  There is no dispute that Arent discloses a digitally signed web page offer from a merchant web server.  *See, e.g.,* Ex. 1003, 6:2–6. This is substantially similar to the embodiment using a web server that digitally signs information and does not use a separate authentication server

28

IPR2014-00475
Patent 7,631,191 B2

disclosed in the '191 patent. Ex. 1001, 4:13–21, Fig. 5. As explained by Dr. Tygar, Arent's merchant web server includes the requisite authentication logic and so discloses the "authentication host computer" recited in claim 1. Ex. 1002 ¶¶ 51, 54, 55. As discussed previously, Dr. Tygar testifies that the authentication host computer receives data from another component on the server (Ex. 1002 ¶ 61), which is not precluded by the claims and comports with the embodiment of the '191 patent that combines the authentication server logic with web server logic (Ex. 1001, 4:57–58).

Patent Owner contends that Arent does not disclose these limitations based on its incorrect interpretation of the transforming limitation requiring receiving data sent from outside the authentication host computer or from a device other than the authentication host computer. PO Resp. 30–31. Testimony by Patent Owner's declarant is based on the same incorrect interpretation (Ex. 2007 ¶ 24) and so is not persuasive.

We credit Dr. Tygar's testimony that Arent's merchant web server discloses the "authentication host computer" required by claim 1 (Ex. 1002 ¶¶ 51, 54, 55), as well as his testimony that one of ordinary skill in the art would understand Arent to disclose the requisite transformation and formatting required by claims 1, 31, and 32 (*id.*).

For the foregoing reasons, we are persuaded that Petitioner has demonstrated sufficiently that one of ordinary skill in the art would understand Arent to disclose, expressly or inherently, transforming and formatting received data as arranged in the independent claims 1, 31, and 32.

29

IPR2014-00475
Patent 7,631,191 B2

*Inserting an Authenticity Key*

Independent claims 1, 17, 31, and 32 each recite "inserting an authenticity key."  Independent claims 1, 31, and 32 require inserting an authenticity key *to create* formatted (or received) data, whereas independent claim 17 recites "insert[ing] an authenticity key *into* formatted data." Independent claim 29 does not require an authenticity key be inserted, only that formatted data has an authenticity key.

For these limitations, Petitioner relies on Arent's disclosure of a signed web page offer.  There is no dispute that Arent describes a signed web page offer.  The dispute is whether, as Petitioner contends, a signed web page offer discloses "inserting an authenticity key" as required by independent claims 1, 17, 29, 31, and 32.  Petitioner's position, with support of its declarant, is that Arent's digital signature discloses the recited "authenticity key" and Arent's digitally signed web page offer discloses the recited "formatted data."

Patent Owner, with support from its declarant, contends that Arent merely sends a proof of certification (which may be a digital signature) separately from the message.  According to Patent Owner, this is insufficient to disclose inserting an authenticity key, which must be placed within the formatted data.  PO Resp. 18–19, 26–28.

Petitioner's declarant counters, testifying that one of ordinary skill in the art would understand "Arent's 'signed offer' was a conventionally signed web page (formatted data), containing both the web page (received data) and the signature (authenticity key)."  Ex. 1035 ¶ 50; *see* Reply 3

30

IPR2014-00475
Patent 7,631,191 B2

(citing Ex. 1035 ¶¶ 50, 55; Ex. 1002 ¶¶ 51,121).  Thus, according to
Dr. Tygar, a signed web offer (disclosing the recited "formatted data")
necessarily includes a digital signature (disclosing the recited authenticity
key) that is within the signed offer.

As initial matter, other than the claims, the '191 patent refers to
inserting an authenticity key only once and does so without providing details
as to how the insertion occurs.  Ex. 1001, 8:1–3 (describing block 610 in
Fig. 10).  For example, the '191 patent does not describe whether the
authenticity key is inserted into the middle of the data and cannot be inserted
at the beginning or end of the data into which the authenticity key is
inserted.  The '191 patent, however, refers to an authentication server
"adding" authentication information to information received from a web
server.  *Id.* at 3:50–55.

The '191 patent describes a web server digitally signing a web page
with a private key and returning the signed page to the web browser, where
the signature is verified and subsequently an authenticity stamp is displayed.
*Id.* at 4:13–43.  Here, again, the '191 patent does not provide details as to
how the web page is signed digitally.

Weighing the testimony of the declarants, as discussed above, we
credit Dr. Tygar's testimony over Dr. Katz's testimony that Arent discloses
sending the digital signature separately from the message.  *See, e.g.*, *Yorkey
v. Diab*, 601 F.3d 1279, 1284 (Fed. Cir. 2010) (holding the Board has
discretion to give more weight to one item of evidence over another "unless
no reasonable trier of fact could have done so"); *In re Am. Acad. of Sci. Tech*

31

IPR2014-00475
Patent 7,631,191 B2

*Ctr.*, 367 F.3d at 1368 ("[T]he Board is entitled to weigh the declarations and conclude that the lack of factual corroboration warrants discounting the opinions expressed in the declarations.").

First, Dr. Katz does not address sufficiently the Petitioner's position regarding the *signed web offer* being the formatted data recited in claims 1, 31, and 32. Rather, Dr. Katz focuses his testimony on Arent's technology for authentication of a merchant, whereas Petitioner relies on Arent's authentication of the offer. *Compare* Pet. 29–32, Reply 3–4 *with* Ex. 1034 153:10–154:21, 159:17–160:19; *see also* Ex. 1035 ¶ 52 (Dr. Tygar confirming Dr. Katz based his understanding on Arent's discussion of the authentication of a merchant).

Second, Dr. Tygar directly counters Dr. Katz's testimony. Dr. Tygar testifies that "[c]onventional digital signature techniques would not have sent the message and signature separately, especially in the context of signing web pages." Ex. 1035 ¶ 53 (explaining how "an elaborate system would be needed to correlate specific instances of web pages for specific user/browser combinations and specific moments in time and the corresponding digital signatures" if digital signatures were sent separately from messages/web pages).

Third, Dr. Katz was unable to identify a system that sends a digital signature for a message separately from the message itself, as he contends Arent describes. Ex. 1034, 147:9–18. This testimony undercuts Dr. Katz's testimony concerning one of ordinary skill in the art would understand Arent to send the digital signature separately from the message.

32

IPR2014-00475
Patent 7,631,191 B2

Fourth, in determining how one of ordinary skill in the art at the time of the invention would understand Arent, we give some weight to Dr. Katz' authorship of a book on digital signatures published in 2010 (Ex. 2009, 2), a decade after the time of the invention. *See* Paper 23, 9–10 (Patent Owner's observation 6 on Dr. Tygar's testimony).

We also note Arent's embodiment of a signed web page offer is substantially similar to the embodiment of a digitally signed web page in the '191 patent. Although the '191 patent does not state this embodiment "inserts" an authenticity key, neither does the '191 patent give any indication that a signed web page is precluded from being considered an example of inserting an authenticity key. The dearth of details in the '191 patent describing how an authenticity key is inserted further supports the view that the digital signature may be an example of inserting an authenticity key.

For the foregoing reasons, we are persuaded that Petitioner has demonstrated sufficiently that one of ordinary skill in the art would understand Arent to disclose, expressly or inherently, inserting an authenticity key or having an authenticity key, as required in independent claims 1, 17, 29, 31, and 32.

*Retrieving an Authenticity Stamp from the Preferences File*

Regarding independent claims 1, 17, 29, 31, and 32, Patent Owner additionally contends, without apparent support from its declarant, that Arent does not disclose "retrieving an authenticity stamp from the preferences file." PO Resp. 33–34. According to Petitioner, Arent's

33

IPR2014-00475
Patent 7,631,191 B2

certification indicator (which Petitioner alleges corresponds to the recited "authenticity stamp") is generated dynamically from components stored separately in a software wallet (which Petitioner alleges corresponds to the recited "file") and, therefore, is not retrieved from a file as purported required by all of the independent claims. *Id.*

The parties do not dispute that Arent's certification indicator is stored as components, which are retrieved from storage, assembled, and displayed as a certification indicator.[14] *See* PO Resp. 33 (citing Ex. 1003, 6:35–37); Ex. 2008, 26:12–18 (transcript of Dr. Tygar's deposition);  Hearing Tr. 50:22–51:6 (Patent Owner indicating that it does not contest that Arent's wallet stores information in a file).  Petitioner's declarant Dr. Tygar testifies that one of ordinary skill in the art would have understood "retrieving an authenticity stamp from the preferences file" to include retrieving a single component or separate components. Ex. 1035 ¶ 66.  Dr. Tygar further testifies that the '191 patent does not preclude storing the authenticity stamp as separate components. *Id.*

The '191 patent comports with Dr. Tygar's testimony.  First, the independent claims do not limit how the authenticity stamp is stored within the preferences file and so, the claim language itself does not preclude storing the authenticity stamp as multiple components that are retrieved and then assembled.

_____

[14] We do not agree with Patent Owner (Paper 23, 7–8) that Dr. Tygar's acknowledgement that Arent's certification indicator is stored as components equates with an admission that Arent does not disclose the limitation "an authenticity stamp is retrieved from the preferences file."

34

IPR2014-00475
Patent 7,631,191 B2

Moreover, claim 15, which depends indirectly from claim 1, additionally requires the retrieval of an image selection that is "*at least one* of:  a graphic, text, video, or audio."  Ex. 1001, 12:56–57 (emphasis added).  Although claim 15 does not link expressly the selected image with the authenticity stamp, the selected image, in the context of the '191 patent, is an example of an authenticity stamp and is treated as such by Petitioner and its declarant Dr. Tygar, without challenge by Patent Owner.
*See, e.g.,* Pet. 40 (equating selected images in claims 14, 15, and 27 with authenticity stamps) (citing Ex. 1002 ¶ 98); *see generally* PO Resp. 40–41 (addressing asserted ground against claims 14, 15, and 27 without contesting that the selected images are examples of authenticity stamps).  By reciting "the image selection is at least one of" several options, claim 15 expressly contemplates a multiple-component authenticity stamp.  This further supports Dr. Tygar's position (Ex. 1035 ¶ 66).

Additionally, the '191 patent describes that the preferences file is read "to determine the authenticity stamp and how it is to be displayed."  Ex. 1001, 4:38–41.  This further provides support for Dr. Tygar's position that a person of ordinary skill in the art would have understood "retrieving an authenticity stamp from the preferences file" to include retrieving a single component or separate components (Ex. 1035 ¶ 66) because it does not preclude storing the authenticity stamp as separate components and indicating processing is required to determine how to display the authenticity stamp.

35

IPR2014-00475
Patent 7,631,191 B2

Finally, the '191 patent describes "an unlimited number of variations" for authenticity stamps, as well as describing the ability of a user to configure the visual qualities and display location of an authentication stamp.  The breadth of these descriptions also provides some support that an authenticity stamp can be comprised of, and stored, as multiple components. *See, e.g.,* Ex. 1001, 2:67–3:5, 6:13–16 (describing an authenticity stamp as having "an unlimited number of variations," including graphics only, text only, a combination of graphics and text, blinking, various colors, and an audio indication); *id.* at 6:1–11 (describing the ability of a user to configure the visual appearance and location of an authenticity stamp).

For these reasons, we are persuaded that Petitioner has demonstrated sufficiently that one of ordinary skill in the art would understand Arent to disclose, expressly or inherently, retrieving an authenticity stamp from a preferences file.

*Other Contentions Regarding Independent Claims 1, 17, 29, 31, and 32*

Many of Patent Owner's other contentions concerning the independent claims flow from its incorrect position that Arent does not disclose, expressly or inherently, the required inserting the authentication key, the required retrieval of the authenticity stamp, or hiding the location of the preferences file.  PO Resp. 28–29.

Patent Owner further contends that Arent does not disclose the act of inserting the digital signature (disclosing the recited "authenticity key") enables authentication of the digital signature to retrieve the certification indicator (disclosing the recited "authenticity stamp") from the wallet file

36

IPR2014-00475
Patent 7,631,191 B2

(disclosing the recited "preferences file").  PO Resp. 30.  Thus, Patent
Owner contends Arent does not disclose "insert[ing] an authenticity key into
formatted data to enable authentication of the authenticity key to verify a
source of the formatted data and to retrieve an authenticity stamp from a
preferences file," as recited in claim 17.  For support, Patent Owner indicates
this position is "[e]xplained by Dr. Katz."  PO Resp. 30 (citing Ex. 2007
¶¶ 22–23).  In the testimony by Dr. Katz cited by Patent Owner, however,
Dr. Katz testifies concerning inserting an authenticity key but does not
testify concerning the enabling limitation.  *See* Ex. 2007 ¶¶ 22–23.

*Conclusion Regarding Independent Claims 1, 17, 29, 31, and 32*

For these reasons, having considered the parties' contentions and
supporting evidence, we determine that Petitioner has demonstrated by a
preponderance of the evidence that one of ordinary skill in the art would
understand Arent to disclose, expressly or inherently, every limitation of
independent claims 1, 17, 29, 31, and 32 as arranged in the claims.

*3. Dependent Claims 4–6, 18, and 21*

Claims 4–6, 18, and 21 depend from independent claims 1 or 17 and
each recites additional limitations concerning displaying the authenticity
stamp or the formatted data.  Petitioner contends, with support from its
declarant, that Arent's certification stamp (corresponding to the recited
"authenticity stamp") is displayed if Arent's web page offer (corresponding
to the recited "formatted data") is determined to be authentic.  Pet. 34–35
(citing Ex. 1002 ¶¶ 38–39, 69–74).  As Dr. Tygar correctly indicates, Arent

37

IPR2014-00475
Patent 7,631,191 B2

describes displaying the certification indicator for a signed web page offer
that has been verified and displays a different indicator when the offer is not
signed. Ex. 1002 ¶ 71 (citing Ex. 1003, 6:6–37, 6:44–57, Fig. 8). Dr. Tygar
also testifies that Arent describes verifying the authenticity of a web page
based on a digital signature and displaying a symbol to indicate whether the
web page offer is verified. Ex. 1002 ¶¶ 37–40. Dr. Tygar opines that
Arent's logic is "virtually identical" to that of the '191 patent and provides,
among other analysis, annotations of Arent's Figure 2 and Figure 8 of the
'191 patent showing the similarities. Ex. 1002 ¶¶ 38–39.

Concerning claim 6, which depends indirectly from independent
claim 1, Patent Owner further contends that Arent does not disclose that "the
authenticity stamp is displayed for a graphical image within the formatted
data." PO Resp. 34. Thus, a central issue of the parties' dispute concerning
claim 6 is whether the recited authenticity stamp is required to be displayed
*within the formatted data* (as Patent Owner contends) or whether the recited
authenticity stamp is required to be displayed *for a graphical image* and the
graphical image, in turn, is within the formatted data (as Petitioner
contends). PO Resp. 34 (citing Ex. 1003, 4:17–24); Pet. 34–35 (citing
Ex. 1002 ¶ 72); Reply 11.

We agree with Petitioner's interpretation, which is supported by its
declarant and the disclosure of the '191 patent, and is confirmed by the
prosecution history of the '191 patent. As noted above, Petitioner's
declarant testifies that one of ordinary skill in the art would understand
Arent's web page 100 (corresponding to the recited formatted data) shown in

38

IPR2014-00475
Patent 7,631,191 B2

Figure 6 to include the graphical image 150 (corresponding to the recited graphical image). *See* Pet. 34–35 (citing Ex. 1002 ¶ 72); Reply 11; Ex. 1002 ¶ 72 (testifying). Further, the applicants amended claim 6 during examination to add the phrase "within the formatted data" immediately after the phrase "graphical image." Ex. 3001, 10 (amendment in response to the Office action dated July 16, 2008). *See Microsoft Corp.,* 789 F.3d at 1298 ("The PTO should also consult the patent's prosecution history in proceedings in which the patent has been brought back to the agency for a second review.").

In accordance with the precepts of English grammar, the position of the words in a sentence is the principal means of showing their relationships, and modifiers should be placed next to the words that they modify. William Strunk, Jr. & E.B. White, *The Elements of Style* 28, 30 (4th ed. 2000); *In re Hyatt,* 708 F.2d 712, 714 (Fed. Cir. 1983) ("A claim must be read in accordance with the precepts of English grammar."); *see, e.g., HTC Corp. v. IPCom GmbH & Co., KG,* 667 F.3d 1270, 1274–75 (Fed. Cir. 2012) (citing Strunk & White for the proposition that, in interpreting claim language, modifiers should be placed next to the words that they modify). Thus, a reader may assume that the graphical image is within the formatted data and the authenticity stamp is displayed for a graphical image. Claim 5, from which claim 6 directly depends, supports this assumption, because claim 5 recites "the authenticity stamp is displayed for formatted data that is verified." Thus, in claim 5, the authenticity stamp is displayed *for*

39

IPR2014-00475
Patent 7,631,191 B2

something ("formatted data that is verified") and not *within the formatted data*.

Further, the '191 patent describes "an alternative embodiment" in which a web page includes graphical images of a car and a globe, and authenticity stamps also are displayed on the web page and "embedded" in each of the graphical images." Ex. 1001, 3:16–20 (referring to Fig. 3); *id.* at 2:54–57, 64–67 (referring to Fig. 2 depicting a web page 50 having an authenticity stamp 60 (depicting a diamond with text "Joe's Seal of Approval") and graphical images 58A, 58B of a car and a globe). Figure 3 of the '191 patent depicts two authenticity stamps, one for each of the two graphical images. Notably, in Figure 3 both the authenticity stamps and graphics are depicted on the web page. Thus, this alternative embodiment is consistent with an authentication stamp that is displayed for a graphical image and the graphical image is within the formatted data.

Petitioner, with support of its declarant, asserts Arent's Figure 6 discloses "the authenticity stamp is displayed for a graphical image within the formatted data," because the user-defined component 520 of the certification indicator 500 (corresponding to the recited "authenticity key") is displayed for the "Buy!" image 150 (corresponding to the recited "graphical image") within the signed web page offer 100 (corresponding to the recited "formatted data"). Pet. 34–35 (citing Ex. 1002 ¶ 72); Reply 11. Dr. Tygar indicates that the graphical image is "Buy!" image 150 on the displayed web page and one of ordinary skill in the art would understand

40

IPR2014-00475
Patent 7,631,191 B2

Arent's web page 100 shown in Figure 6 includes the graphical image 150.
Ex. 1002 ¶ 72.

Patent Owner opposes, contending that the certification indicator is an
image that "floats above the merchant web page" and so does not disclose an
authenticity stamp displayed within the formatted data.  PO Resp. 34 (citing
Ex. 1003, 4:17–24).  We are not persuaded by Patent Owner's contention
because it is predicated on an incorrect understanding of the scope of
claim 6.

For the foregoing reasons, we determine that Petitioner has
demonstrated by a preponderance of the evidence that one of ordinary skill
in the art would understand Arent to disclose, expressly or inherently, every
limitation as arranged in claims 4–6, 18, and 21.

### 4.  Dependent Claims 12 and 25

Claims 12 and 25 each concern retrieving or receiving additional data
based on received or formatted data.  Specifically, claim 12, which depends
from claim 1, recites "retrieving additional data based on the received data."
Claim 25, which depends from independent claim 17, requires that "the
authentication processor is further configured to receive additional data
based on the formatted data."  For these additional limitations, Petitioner,
with support from its declarant, relies on Arent's description of requesting
additional data from the user (name, address, and credit card information)
through a form displayed on the web page with the web page offer.  Pet. 37
(citing Ex. 1003, Figs. 4, 6 (depicting web pages with fill-in forms for
receiving additional data); Ex. 1002 ¶¶ 80–82).  According to Petitioner's

41

IPR2014-00475
Patent 7,631,191 B2

declarant, the other information requested through the fill-in forms displayed the web page is based on Arent's signed web page offer, because the data is collected from the fields on fill-in forms displayed on the web page. *Id.*; Reply 12.

Patent Owner, with support from its declarant, contends otherwise. PO Resp. 36. According to Dr. Katz, the additional data sought from the user is not based on the data on the web pages because the data on the web pages concern computers and the additional data sought concerns the user, not computers. *Id.* (citing Ex. 2007 ¶ 26).

Weighing the testimony of the declarants, we credit Dr. Tygar's testimony over Dr. Katz's testimony. *See, e.g.*, *Yorkey*, 601 F.3d at 1284 (holding the Board has discretion to give more weight to one item of evidence over another "unless no reasonable trier of fact could have done so"); *In re Am. Acad. of Sci. Tech Ctr.*, 367 F.3d at 1368 ("[T]he Board is entitled to weigh the declarations and conclude that the lack of factual corroboration warrants discounting the opinions expressed in the declarations."). Dr. Katz does not explain persuasively why information about a buyer and credit card information sought through a fill-in form on a web page presenting an offer to sell computers is about "something entirely different" than the computer information on the web pages. PO Resp. 36. Dr. Katz's testimony seems unduly narrow in view of the broad claim language "based on." Rather, we find Dr. Tygar's testimony credible that buyer and credit card information is based on the fill-in form fields displayed on the webpage offering computers for sale more aligned with the

42

IPR2014-00475
Patent 7,631,191 B2

broad claim language "based on." Reply 12 (citing Ex. 1035 ¶ 72). Both Arent's computer information and buyer information relate to the financial transaction of purchasing a computer.

For these reasons, we determine that Petitioner has demonstrated by a preponderance of the evidence that one of ordinary skill in the art would understand Arent to disclose, expressly or inherently, every limitation as arranged in claims 12 and 25.

### 5. Dependent Claims 14 and 27

Claims 14 and 27 each recite "the plurality of images are only known by a client and a challenge server." More specifically, claim 14, which depends from claim 1, additionally recites "retrieving an image selection based on a selection from a plurality of images, wherein the plurality of images are only known by a client and a challenge server." Claim 27, which depends from independent claim 17, additionally recites "the authentication processor is further configured to receive an image selection that is at least one of: a graphic, text, video, or audio from the source based on a selection from a plurality of images, wherein the plurality of images are only known by a client and a challenge server."

For the limitation "the plurality of images are only known by a client and a challenge server," Petitioner asserts, with support from its declarant, that Arent's description of allowing a user to select a certification indicator out of a pool of media items discloses the plurality of images, as recited in claims 14 and 27. Pet. 37 (citing Ex. 1003, 5:36–42; Ex. 1002 ¶ 84). Dr. Tygar explains that one of ordinary skill in the art would have

43

IPR2014-00475
Patent 7,631,191 B2

understood that Arent's pool of media items would have been only known by the consumer and the server providing the pool of supplied standard media items "to make it difficult for an unscrupulous merchant to forge a certification indicator." Ex. 1002 ¶ 84 (citing Ex. 1003, 4:47–50). Patent Owner contends that "a plurality of images are only known by a client and challenge server" is not disclosed by Arent, because Arent's pool of media items would be known to many clients. PO Resp. 37.[15]

A central dispute between the parties concerning claims 14 and 27 is whether the language "the plurality of images are only known by a client and a challenge server" requires a unique set of images be provided to each client (as Patent Owner contends), or whether the plurality of images would have been understood by one of ordinary skill in the art to be a "shared secret" between the client and challenge server (as Petitioner contends). PO Resp. 37; Reply 13 (citing Ex. 1035 ¶¶ 77–81). According to Dr. Tygar, the '191 patent does not describe "challenge servers" and one of ordinary skill in the art "would understand the term [challenge server] to be used in the conventional manner, *i.e.,* to implement a shared secret between a user and a challenge server." Ex. 1035 ¶ 81. Dr. Tygar testifies that "only known to the client and the challenge server" means that the recited "plurality of images" are secrets shared between a client and a challenge server, and not

---

[15] Patent Owner cites to Dr. Katz's declaration. PO Resp. 37 (citing Ex. 2007 ¶¶ 29–30). The citation to Dr. Katz's declaration is unavailing, however, because the cited portion relates to a different asserted ground—obviousness over Arent and Merritt—and contends that Merritt (not Arent) does not teach the recited challenge server. *See* Ex. 2007 ¶¶ 29–30.

IPR2014-00475
Patent 7,631,191 B2

shared with others. *Id.* Dr. Tygar's testimony describes the historical context of such a shared secret, beginning with ancient Roman soldiers and continuing to conventional computer contexts of shared secrets. *Id.* ¶¶ 77–80. Thus, according to Dr. Tygar, the ordinary and customary meaning of the term of "only known by a client and challenge server" does not require a shared secret to be unique across all users. *Id.* ¶ 81.

We weigh Dr. Tygar's testimony that one of ordinary skill in the art would have understood "only known by a client and a server" to mean a shared, but not necessarily a unique, secret known to the client and the challenge server, but not third parties, against Patent Owner's argument that "only known by a client and challenge server" requires a unique pool of images across all clients. We give more weight to Dr. Tygar's testimony, which provides facts supporting his testimony, than to Patent Owner's assertions that are not supported by testimony or other persuasive evidence. *See, e.g.*, *Yorkey* , 601 F.3d at 1284; *In re Am. Acad. of Sci. Tech Ctr.*, 367 F.3d at 1368.

The prosecution history of the '191 patent confirms Dr. Tygar's position. In response to an Office action mailed October 18, 2007, the applicants represented that the prior art reference (Houser) applied in the rejection failed to disclose "using a key that is shared (and known only by a client computer and a server) to locate and open a preferences file located at the client computer." Ex. 3001, 30–31. Notably, the applicants equated a key that is shared between a client computer and a server equates to "known only by a client computer and a server." This supports Dr. Tygar's

45

IPR2014-00475
Patent 7,631,191 B2

testimony that the "known only" term would be understood by one of ordinary skill in the art to be a "shared secret" and not a plurality of images that are unique across all clients.

We further note that the '191 patent refers to a "shared secret" in the request for a preferences key sent from the user computer to the web server. Ex. 1001, 4:26–28.

For the foregoing reasons, we determine that Petitioner has demonstrated by a preponderance of the evidence that one of ordinary skill in the art would understand Arent to disclose, expressly or inherently, every limitation as arranged in claims 14 and 27.

### 6. Conclusion Regarding Anticipation by Arent

Having reviewed both parties' arguments and evidence, we also are persuaded that one of ordinary skill in the art would understand Arent to disclose, expressly or inherently, every limitation as arranged in dependent claims 2, 3, 7–9, 11, 15, 16, 19, 20, 22, 28, and 30.

We, therefore, determine that Petitioner has demonstrated by a preponderance of the evidence that claims 1–9, 11, 12, 14–22, 25, and 27–32 are anticipated by Arent.

### E. Obviousness over Arent and Other References

Petitioner asserts claims 10, 13, 23, and 26, each of which depends directly or indirectly from independent claim 1 or 17, would have been obvious over Arent and Schneier (Ex. 1009), a cryptography textbook published in 1996, in combination with Arent. Pet. 39. For the additional

46

IPR2014-00475
Patent 7,631,191 B2

limitations recited by claims 14, 15, and 27, which also depend from either independent claim 1 or independent claim 17, Petitioner relies on Merritt, a patent issued December 12, 1995, in combination with Arent. Pet. 40. The parties do not dispute whether Schneier or Merritt are prior art to the claims challenged by these asserted grounds.

For these grounds of obviousness relying on Arent and other references, Petitioner substantially relies on the same analysis and supporting evidence described previously with regard to the ground that Arent anticipates independent claims 1 and 17. *See* Pet. 38–39, 40. For the reasons we explained previously, we determine that Petitioner has demonstrated by a preponderance of the evidence that Arent discloses all of the limitations recited by independent claims 1 and 17.

### *1. Obviousness over Arent and Schneier*

Claims 10, 13, 23, and 26 each require "inserting a second authenticity key into the formatted data." For these limitations, Petitioner, with support from its declarant, relies on Schneier's description that two parties could digitally sign separately the same document, which would result in multiple signatures being in the same document. Pet. 38–39 (citing Ex. 1009, 39–40; Ex. 1002 ¶ 92). Thus, each of the two digital signatures for the document corresponds to a recited authenticity key inserted into formatted data. Claim 13 and 26 each further require "validating the formatted data based on the authenticity key." For these additional limitations, Petitioner relies on Arent. Pet. 38.

47

IPR2014-00475
Patent 7,631,191 B2

As an initial matter, claims 10, 13, 23, and 26 each requires performing the step of inserting an authenticity key a second time. There is insufficient evidence that repeating the inserting step is more difficult or, even, substantially different technically, than performing the inserting step the first time. Nor is there sufficient evidence that performing the step a second time would yield a new or unexpected result than performing the inserting step the first time. *Cf. In re Harza*, 274 F.2d 669, 671 (CCPA 1960) ("It is well settled that the mere duplication of parts has no patentable significance unless a new and unexpected result is produced.").

Patent Owner asserts claims 13 and 26 require "*first* validating formatted data with one authenticity key and then inserting a second authenticity key into the formatted data." PO Resp. 39, 56 (emphasis added). Patent Owner does not cite to the '191 patent or otherwise provide sufficient evidence regarding why a temporal requirement is required by these claims. Petitioner's declarant disagrees with Patent Owner's interpretation and testifies that one of ordinary skill in the art would not understand claims 13 and 26 to require "a temporal requirement that one signature be authenticated before another signature is inserted." Ex. 1035 ¶ 74; Reply 14 (citing Ex. 1035 ¶ 74).

We are not persuaded that claims 13 and 26 have a temporal requirement as Patent Owner contends. As a general rule, steps are not construed ordinarily to require a particular order unless "the claim language, as a matter of logic or grammar, requires the steps to be performed in the order written, or the specification directly or implicitly requires an order of

48

IPR2014-00475
Patent 7,631,191 B2

steps." *Mformation Technologies, Inc. v. Research in Motion Ltd.*, 764 F.3d 1392, 1398–99 (Fed. Cir. 2014) (citation omitted); *see also Interactive Gift Express, Inc. v. Compuserve Inc.,* 256 F.3d 1323, 1342 (Fed. Cir. 2001) (citation omitted) ("Unless the steps of a method [claim] actually recite an order, the steps are not ordinarily construed to require one.").  The plain language of claims 13 and 26 does not require expressly a particular order.  Rather, claims 13 and 26 only require two actions be taken—validating and inserting—requiring one action be taken before the other.  Claim 13 recites "further transforming by inserting a second authenticity key into the formatted data" and so, based on "further transforming" may be said to require the second authenticity key be inserted after the received data is transformed by inserting a first key.  Even so, the claims do not require a second authenticity key to be inserted after the first key *is validated*.

We determine, therefore, that Petitioner has established by a preponderance of the evidence that Arent and Schneier would have conveyed to one of ordinary skill in the art the limitations recited in claims 10, 13, 23, and 26.  Our inquiry continues because "rejections on obviousness grounds cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness."  *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006).  Dr. Tygar explains that one of ordinary skill in the art would have reason to combine Schneier's multiple signature techniques with Arent's technology based on reasons described by Schneier

49

IPR2014-00475
Patent 7,631,191 B2

itself—to allow two parties to sign the same document. Ex. 1002 ¶¶ 93–96 (citing Ex. 1009, 39–40).

We find Dr. Tygar's articulated reasoning has some rational underpinning. *See KSR*, 550 U.S. at 418 ("there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness"). Although the rote application of the teaching-suggestion-motivation test (or TSM test), requiring an express teaching in the prior art, is inappropriate, "[t]here is no necessary inconsistency between the idea underlying the TSM test and the *Graham* analysis." *KSR*, 550 U.S. at 419.

Moreover, as noted by the Court in *KSR*, "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *KSR*, 550 U.S. at 416. There is no evidence that adding a second digital signature, as described in Schneider, to Arent's web page offer that has a digital signature would be beyond the level of one of ordinary skill in the art. As another factor favoring a finding of obviousness, we note the rather high level of ordinary skill in the art, which requires a bachelor's degree in computer science and at least two years of work experience. *Innovention Toys*, 637 F.3d at 1323 ("A less sophisticated level of skill generally favors a determination of nonobviousness . . . while a higher level of skill favors the reverse.").

Therefore, we determine that Petitioner has established by a preponderance of the evidence that the subject matter recited in claims 10, 13, 23, and 26 as a whole would have been obvious to one of ordinary skill in the art in view of Arent and Schneier.

50

IPR2014-00475
Patent 7,631,191 B2

### 2. Obviousness over Arent and Merritt

As discussed above with respect to the asserted ground of anticipation by Arent, claims 14, 15, and 27, which depend from either independent claim 1 or independent claim 17, additionally require "image selection based on a selection from a plurality of images, wherein the plurality of images are only known by a client and a challenge server." Similarly to Petitioner's contention regarding anticipation by Arent, Petitioner relies on Merritt's pool of images. Pet. 40. Specifically, Petitioner relies on Merritt's description of a challenge server that uses personal security phrases that include "still images" or a "sequence of images" known to a challenge server and a client (automatic teller machine or ATM). *Id.* (citing Ex. 1022, Fig. 3 (element 315), 4:13–21, 4:58–67, 6:2–20, 6:37–40). Merritt teaches that, only if a customer recognizes the customer's personal security phrase in a response displayed by the ATM, does the customer enter sensitive information, such as the customer's personal identification number (or PIN). Ex. 1022, 6:35–40.

Patent Owner contends that Merritt has the same purported flaw as Arent—that the plurality of images are not only known to one client and not another. PO Resp. 41. As discussed previously, we do not agree with the Patent Owner's interpretation. Rather, for the reasons discussed previously, we are persuaded that the preponderance of the evidence demonstrates the "known only" term would be understood by one of ordinary skill in the art to be a "shared secret" and not a plurality of images that are unique across all clients.

51

IPR2014-00475
Patent 7,631,191 B2

Thus, we are persuaded that the combination of Arent and Merritt would have conveyed to one of ordinary skill in the art all of the limitations recited in claims 14, 15, and 27.

Regarding a reason to combine, Dr. Tygar testifies that using a challenge server in an application involving security would be predictable and obvious, because the challenge server provides an extra security mechanism to manage the selection of images that could be used as "authenticity stamps" taught by Arent.  Ex. 1002 ¶ 98; Pet. 40 (citing Ex. 1002 ¶ 98).  We are satisfied that Petitioner, with support of its declarant, has provided articulated reasoning with some rational underpinning.

Therefore, we determine that Petitioner has established by a preponderance of the evidence that the subject matter recited in claims 14, 15, and 27 as a whole would have been obvious to one of ordinary skill in the art in view of Arent and Merritt.

## F.  Anticipation by the Tygar Paper

Petitioner contends claims 1–6, 8, 9, 11, 12, 14–22, 25, and 27–32 are unpatentable under 35 U.S.C. § 102 as anticipated by the Tygar paper.  To support its contentions, Petitioner provides detailed analysis, relying on declaration testimony of Dr. Tygar.  Pet. 47–49 (citing Ex. 1002).  Patent Owner responds, relying on declaration testimony of Dr. Katz. PO Resp. 42–55 (citing Ex. 2007).

Petitioner represents that the Tygar paper was published November 1996 and so qualifies as prior art under 35 U.S.C. § 102(b) to the

52

IPR2014-00475
Patent 7,631,191 B2

challenged claims.  Pet. 3, 27, 28, 47.  Patent Owner does not dispute that
the Tygar paper is prior art to the challenged claims.

### 1.  Summary of the Tygar Paper

The Tygar paper is titled "WWW Electronic Commerce and Java
Trojan Horses" and co-authored by Petitioner's declarant Dr. Tygar.  The
Tygar paper describes a "window personalization" technique to address the
problem of fraudulent web pages, particularly in the context of electronic
commerce.  Ex. 1004, 243, 244, Abstract.  The appearance of user interface
windows is "personalized" based on a user's choice, to show "window
appearances which are easily recognizable to the consumer yet difficult to
predict."  *Id.* at 247.  The personalized appearance of the standard user
interface window indicates to the user that the window can be trusted.  *Id.* at
247–48.  Figures 1 and 3 of the Tygar paper are set forth below:

 

Figure 1                                        Figure 2

Figure 1 shows a conventional user interface window displayed by an
Internet browser, whereas Figure 3 shows the same user interface window
that includes a personalization in the form of a logo graphic.  *Id.* at 246, 247.

53

IPR2014-00475
Patent 7,631,191 B2

The Tygar paper describes an example of window personalization using a Java applet, which is executable code embedded on a web page. *Id.* at 244–45, § 2. The Tygar paper also indicates that the known security practice of using applets that are "certified and digitally signed by some trusted authority" "is best used in conjunction with . . . the window personalization technique." *Id.* at 246, § 2.1.

*2. Independent Claims 1, 17, 29, 31, and 32*

Similar to the '191 patent, the Tygar paper describes techniques for presenting a user-selected graphic in a web site user interface window to indicate the window can be trusted. Ex. 1004, Abstract, 247–48, § 4. The Tygar paper also describes the program code (applet) that creates web pages that can be digitally signed. Ex. 1004, 246, § 2.1. The Tygar paper further describes that the window personalization techniques are complementary to applet signing. *Id.*

In general, Petitioner relies on the Tygar paper's disclosure of a signed applet in a substantially similar manner as Arent's signed web page offer. Patent Owner raises issues regarding the Tygar paper similar to those it raised regarding Arent.

More particularly, Petitioner asserts the Tygar paper's signed applet discloses an authenticity key has been inserted to create formatted data (claims 1, 31, and 32), an authenticity key inserted into formatted data (claim 17), or formatted data having an authenticity key (claim 29). Pet. 49–50. Addressing "authentication host computer" recited in claim 1, Petitioner's declarant testifies that one of ordinary skill in the art would

54

IPR2014-00475
Patent 7,631,191 B2

understand the Tygar paper's disclosure of a trusted authority that digitally signs an applet, as disclosing an "authentication host computer" inserting a digital signature into applet.  Ex. 1002 ¶¶ 120–21; Pet. 50 (citing Ex. 1002 ¶ 120).

Petitioner asserts the window personalization (i.e., the logo graphic) described in the Tygar paper discloses the recited "authenticity stamp." Petitioner's declarant testifies that a person of ordinary skill in the art would understand the window personalization (i.e., the logo graphic) would be stored as files on a computer system and, in order to display the window personalization, the file first would need to be located and the window personalization retrieved.  Pet. 51–52 (citing Ex. 1002 ¶ 132).

As an initial matter, we consider whether Petitioner's position combining the description in the Tygar paper of window personalization (i.e., the logo graphic) with description of the signed applet impermissibly combines distinct disclosures.  *See Net MoneyIN,* 545 F.3d at 1371.  We determine that the disclosures in the Tygar paper concerning window personalization and signed applets are not unrelated, mutually exclusive disclosures.  Rather, we determine those disclosures are directly related to one another.  *See In re Arkley*, 455 F.2d at 587 ("The [prior art] reference must clearly and unequivocally disclose the claimed [invention] or direct those skilled in the art to the [invention] without any need for picking, choosing, and combining various disclosures not directly related to each other by the teachings of the cited reference.").  The Tygar paper itself indicates that the two techniques "are complementary" and that the known

55

IPR2014-00475
Patent 7,631,191 B2

security practice of using applets that are "certified and digitally signed by some trusted authority" "is best used in conjunction with . . . the window personalization technique." *Id.* at 246, § 2.1. Further, Patent Owner's declarant confirms windows personalization and applet signing are complementary, not mutually exclusive, and that the Tygar paper discloses "windows personalization in the context of applets." Ex. 1034, 158:19–22.

A central dispute between the parties is whether the Tygar paper discloses, expressly or inherently, the trusted authority would necessarily insert the digital signature to create the described signed applet. Patent Owner contends the Tygar paper does not do so and, therefore, does not disclose inserting an authenticity key or other claim limitations enabled by the insertion. PO Resp. 43.

According to Dr. Katz, the Tygar paper "only discloses the fact that an applet may be signed" and "does not mention an authenticity key, or an authentication processor inserting an authenticity key into formatted data at all." Ex. 2007 ¶ 32; PO Resp. 44 (citing Ex. 2007 ¶ 32). Nor, according to Dr. Katz, does the Tygar paper disclose that the signature is inserted into the applet. Ex. 1034, 151:8–11.

Weighing the testimony of the declarants, we credit Dr. Tygar's testimony over Dr. Katz's testimony. *See, e.g.*, *Yorkey*, 601 F.3d at 1284; *In re Am. Acad. of Sci. Tech Ctr.*, 367 F.3d at 1368. First, in indicating the Tygar paper "does not mention an authenticity key, or an authentication processor inserting an authenticity key into formatted data at all," Dr. Katz's testimony appears to require the precise claim terms to be used in an

56

IPR2014-00475
Patent 7,631,191 B2

anticipating reference. This is incorrect—"the reference need not satisfy an *ipsissimis verbis* test," i.e., identity of terminology is not required. *In re Gleave*, 560 F.3d at 1334; *In re Bond*, 910 F.2d at 832.

Second, the Tygar paper discloses more than "only . . . that an applet may be signed," as Dr. Katz's maintains. Rather, as Dr. Tygar testifies based on directly quoting the reference, the Tygar paper teaches "having applets certified and digitally signed by some trusted authority." Ex. 1002 ¶ 121 (quoting Ex. 1004, 246, § 2.1). Moreover, Dr. Katz acknowledges that he understands only "that applet signing was done" before the time of the Tygar paper and does not understand the "low-level details" about how applet signing was done. Ex. 1034, 149:14–150:2. Dr. Katz also indicated he did not review external resources, such as prior art references of record, to investigate how one of ordinary skill in the art would understand at the time of invention a signed applet. Ex. 1034, 151:12–153:9. Thus, we weigh Dr. Katz's testimony, taking into account the extent of Dr. Katz's familiarity with signed applets.

By contrast, Dr. Tygar supports his testimony with evidence, including citing to references explaining how applets were signed (Ex. 1015)[16] and a United States government standard for digital signatures (Ex. 1021)[17], as well as providing analysis as to what one of ordinary skill in

---

[16] PETER VAN DER LINDEN, NOT JUST JAVA, pp. 111–12 (Sun Microsystems Press 1997) (Ex. 1015, "Linden").
[17] FIPS Publication 186-1, "Digital Signature Standard (DSS)," U.S. Dept. of Commerce/Nat'l Institute of Standards and Technology pp. 1–21 (Dec. 15, 1998) (Ex. 1021, "FIPS Pub.186-1").

57

IPR2014-00475
Patent 7,631,191 B2

the art would have understood about signed applets at the time of the invention. *See* Ex. 1002 ¶¶ 121–22.

Patent Owner also disputes that the Tygar paper discloses a hidden preferences file. PO Resp. 47–48. Patent Owner's contention is not persuasive because, for the reasons discussed previously, the recited "preferences file" is not required to be hidden.

Patent Owner further contests Dr. Tygar's testimony (Ex. 1002 ¶ 132) that one of ordinary skill in the art would understand the logo graphic (corresponding to the recited "authenticity stamp") described in Tygar to be stored in files on a computer system. Patent Owner asserts, without persuasive argument or evidence, that storing an authenticity stamp in a file is not present necessarily in the Tygar paper "because the authenticity stamps could be dynamically generated as in Arent, rather than stored as claimed in the '191 patent." PO Resp. 49.

Tellingly, Dr. Katz does not provide support for Patent Owner's position. *Id.* Moreover, Arent's certification indicator (corresponding to the recited "authenticity stamp") is assembled from components stored in a file. Thus, we are not persuaded by Patent Owner's argument that the logo graphics (corresponding to the recited "authentication stamps") described in the Tygar paper are not necessarily stored in a file because they might be dynamically generated. Rather, we are persuaded by Dr. Tygar's testimony that such logo graphics necessarily would be stored in a file on a computer system. Ex. 1002 ¶ 132.

58

IPR2014-00475
Patent 7,631,191 B2

Thus, we determine that Petitioner has established by a preponderance of the evidence that one of ordinary skill in the art would understand the Tygar paper to disclose, explicitly or inherently, "transforming, at an authentication host computer, received data by inserting an authenticity key to create formatted data," as arranged in claim 1 and in similar limitations regarding "inserting an authenticity key" recited in independent claims 17, 29, 31, and 32.  For these reasons, we determine that Petitioner has established by a preponderance of the evidence that claims 1, 17, 29, 31, and 32 are anticipated by the Tygar paper.

### 3. Dependent Claims 2, 4, and 8

Claims 2, 4, and 8 depend from claim 1 and further recite "formatted data is a web page" (claim 2), "formatted data is at least one of: a screen display or a Uniform Resource Locator (URL)" (claim 8), and "displaying the formatted data in response to the verification of the authenticity key" (claim 4).

Relying on its declarant, Petitioner asserts the Tygar paper discloses Java applets (which, according to Petitioner, discloses the recited "formatted data") are embedded in web pages and such web pages would constitute screen displays.  Pet. 52 (citing Ex. 1002 ¶¶ 144–45).  Patent Owner responds that Petitioner's position with regard to claim 1 is inconsistent with Petitioner's position regarding claim 2.  Specifically, Petitioner's reliance on the *signed applet* in the Tygar paper as disclosing the formatted data in claim 1 is inconsistent with Petitioner's position that the web page on which

59

IPR2014-00475
Patent 7,631,191 B2

the Java applet is embedded as disclosing the formatted data in claim 2.  PO Resp. 49–50.

We agree with Patent Owner.  The signed applet of the Tygar paper may be embedded in a web page and the web page displayed, which makes the displayed web page a screen display.  That disclosure, however, is not arranged as in the claim, which requires the formatted data to be a web page (claim 2) and the formatted data to be a screen display or URL (claim 8).  The signed applet, which Petitioner contends discloses the formatted data, is computer code, rather than a web page.  The signed applet itself is not displayed as required by claims 4 and 8.  Thus, we are not persuaded that the Tygar paper anticipates claims 2, 4, and 8.  *See Net MoneyIN,* 545 F.3d at 1369.

Petitioner alternatively contends that a web page having an embedded signed applet, which purportedly is disclosed by the Tygar paper, discloses the recited "formatted data."  Pet. 50.  Under this position of Petitioner, the recited "formatted data" is a web page that is displayed and so meets the additional limitations recited in claim 2 ("the formatted data is a web page"), claim 8 ("the formatted data is . . . a screen display"), and claim 4 ("displaying the formatted data").  Pet. 52–53.  Using this reasoning, however, the Tygar paper does not meet the transforming limitation of independent claim 1 from which each of claims 2, 4, and 8 depend.  This is because the Tygar paper's trusted authority (which Petitioner indicates corresponds to the recited "authentication host computer") inserts a digital signature into an applet.  Ex. 1004, 245, § 2.  There is insufficient record

60

IPR2014-00475
Patent 7,631,191 B2

evidence for us to conclude the trusted authority also embeds the signed applet into the web page. Accordingly, Petitioner's alternative position—a web page having an embedded signed applet discloses the recited "formatted data"—is not arranged in the same way as the claim; therefore, the Tygar paper does not anticipate claim 2, 4, or 8 under this position.

For these reasons, we determine that Petitioner has not established by a preponderance of the evidence that claims 2, 4, and 8 are anticipated by the Tygar paper.

### 4. Dependent Claims 5 and 6

Claims 5 and 6, each of which depends from independent claim 1, additionally require "the authenticity stamp is displayed." According to Petitioner the logo graphic of the user-customized window personalization corresponds to the recited "authenticity stamp" and is displayed only if the applet is verified. Pet. 53–54. Also Petitioner asserts the logo graphic is displayed for the dialogue box of Figure 3 in the Tygar paper. *Id.* Petitioner's contention is supported by testimony of its declarant. Ex. 1035 ¶ 71.

Patent Owner challenges Petitioner's position, relying on its overly narrow interpretation of claim 6 that the authenticity stamp must be displayed within the formatted data. PO Resp. 52. For the reasons discussed with respect to claim 6 earlier, we are not persuaded by Patent Owner's contention.

Moreover, the Tygar paper expressly discloses that the logo graphic is displayed for the "windows and dialogue boxes" (Ex. 1004, 244) and does

61

IPR2014-00475
Patent 7,631,191 B2

so only when the applet has been verified. Thus, we are persuaded that Petitioner has established by a preponderance of the evidence that one of ordinary skill in the art would understand the Tygar paper to disclose, explicitly or inherently, claims 5 and 6.

### 5. *Dependent Claims 12 and 25*

Claim 12, which depends from claim 1, further recites "retrieving additional data based on the received data." Claim 25, which depends from independent claim 17, additionally recites "receive additional data based on the formatted data." Petitioner, with support from its declarant, contends the Tygar paper discloses these additional limitations because the dialogue box of Figure 3 is created from the signed applet, which corresponds to the recited "formatted data" and the dialogue box requires a username and password to be entered, thus disclosing the recited "additional data." Pet. 54–55 (citing Ex. 1002 ¶¶ 157–59).

Patent Owner contends that the Tygar paper does not anticipate these claims because the username and password are supplied by a user and so are not "based on any applet." PO Resp. 53–54. Patent Owner further contends that claim 12 is not anticipated by the Tygar paper because "the dialog box on the user's machine" receives the additional data (username and password), rather than the authentication host computer. PO Resp. 54. Dr. Katz's testimony, using nearly identical language as the Patent Owner, does not provide additional or sufficient explanation. Ex. 2007 ¶ 39.

We are not persuaded that claims 12 and 25 preclude additional data being entered by a user, as Patent Owner contends. In the Tygar paper, as

62

IPR2014-00475
Patent 7,631,191 B2

Dr. Tygar testifies, the applet displays the dialog box in which the username and password are entered and so the entry of the username and password (corresponding to the recited "additional data") is based on the applet displaying the dialogue box in which the username and password are entered. Ex. 1035 ¶ 72. Nor are we persuaded that claim 12 requires the authentication host computer to receive the additional data. Rather, the plain language of claim 12 recites "retrieving additional data based on the received data," which does not require a particular computer to perform the retrieving step.

Therefore, we are persuaded that Petitioner has established by a preponderance of the evidence that one of ordinary skill in the art would understand the Tygar paper to disclose, explicitly or inherently, claims 12 and 25.

*6. Dependent Claims 14 and 27*

Claims 14 and 27 each recite "the plurality of images are only known by a client and a challenge server." There is no dispute that the Tygar paper discloses a pool of images. PO Resp. 55 (acknowledging the Tygar paper "mentions only one such pool" of images). Rather, Patent Owner argues that claims 14 and 27 require a unique set of images be provided to each client. For the reasons discussed previously, we are not persuaded.

We, therefore, are persuaded that Petitioner has established by a preponderance of the evidence that one of ordinary skill in the art would understand the Tygar paper to disclose, explicitly or inherently, claims 14 and 27.

63

IPR2014-00475
Patent 7,631,191 B2

### 7. Conclusion Regarding Anticipation by the Tygar Paper

Having reviewed both parties' arguments and evidence, we also are persuaded that one of ordinary skill in the art would understand the Tygar paper to disclose, expressly or inherently, every limitation as arranged in dependent claims 3, 9, 11, 15, 16, 18–22[18], 28, and 30.

We, therefore, determine that Petitioner has demonstrated by a preponderance of the evidence that claims 1, 3, 5, 6, 9, 11, 12, 14–22, 25, and 27–32 are anticipated by the Tygar paper. We also have determined that Petitioner has not demonstrated by a preponderance of the evidence that claims 2, 4, and 8 are anticipated by the Tygar paper.

### G. Obviousness over the Tygar Paper and Other References

For asserted grounds of obviousness relying on the Tygar paper and other references, Petitioner substantially relies on the same analysis and supporting evidence described previously with regard to the ground that the Tygar paper anticipates independent claims 1 and 17. *See* Pet. 56–60. For the reasons we explained previously, we determine that Petitioner has demonstrated by a preponderance of the evidence that the Tygar paper discloses all of the limitations recited by independent claims 1 and 17.

---

[18] Patent Owner asserts Dr. Tygar's testimony regarding a particular embodiment described in Arent is an acknowledgment that Arent does not disclose a limitation recited in claim 22, a claim that Patent Owner did not provide separate arguments in its Response. Paper 23, 6. We disagree with that characterization of Dr. Tygar's testimony (Ex. 2010, 93:21–94:13). *See* Paper 27, 7–8.

64

IPR2014-00475
Patent 7,631,191 B2

### *1. Obviousness over the Tygar Paper and Yoshiura*

Petitioner challenges claims 2, 4, and 7, each of which depends from independent claim 1, as obvious over Tygar and Yoshiura.  Pet. 56–58 (citing Ex. 1006, 37:8–31, 37:42–38:8, Figs. 9, 28, 29).  Claim 2 additionally recites "the formatted data is a web page."  Claim 4 additionally recites "displaying the formatted data in response to the verification of the authenticity key."  Claim 7 additionally recites "a non-authenticity stamp is displayed for formatted data that is not verified."

Yoshiura (Ex. 1006) is a European patent application published December 9, 1998.  The parties do not dispute that Yoshiura is prior art to claims 2, 4, and 7.

Yoshiura checks the validity of a web page by checking the validity of a "mark."  *See* Ex. 1006, 37:42–45, 37:56–38:1.  To do so, a digital signature, which is embedded in the mark displayed on the web page, is validated.  *See id.* at 37:19–30, 37:49–38:4.  If the digital signature is valid, a message is displayed that the mark was validated; but if the digital signature is not valid, a message is displayed that the mark was not validated.  *See id.* at 37:56–38:8, Fig. 9 (display unit 1102).

Petitioner, with support from its declarant, relies on that Yoshiura's teaching checking the validity of a web page by using a digital signature embedded in a mark on the web page and displaying a message that the mark was validated.  Pet. 56–57 (citing Ex. 1002 ¶¶ 169–72).  Petitioner contends that Yoshiura's teachings, in combination with Tygar as applied to the limitations in claim 1, would have conveyed to one of ordinary skill in

65

IPR2014-00475
Patent 7,631,191 B2

the art all of the limitations recited in claims 2, 4, and 7.  *Id.*  Petitioner contends that Yoshiura's description of checking the validity corresponds to the recited "authenticating"; Yoshiura's "Web page" corresponds to the recited "formatted data"; Yoshiura's digital signature corresponds to the recited "authenticity key"; and Yoshiura's displayed message stating that the mark was validated corresponds to the recited "authenticity stamp."  *Id.* at 56–58.  Patent Owner relies on its arguments regarding anticipation of the Tygar paper.  PO Resp. 59.

Having reviewed both parties' arguments and evidence, we are persuaded, based on the Petition and the testimony from Dr. Tygar, that the Tygar paper in combination with Yoshiura would have conveyed to one of ordinary skill in the art all of the limitations recited in dependent claims 2, 4, and 7.  For instance, and in contrast to the asserted ground of anticipation by the Tygar paper which relied on a signed applet for the received formatted data, Petitioner further relies on Yoshiura's disclosure concerning web pages for formatted data.  Moreover, the standards of patentability for proving anticipation are different than the standards for proving obviousness.

Petitioner also contends, with support of Dr. Tygar, one of ordinary skill in the art would have reason to combine the references "to give consumers greater assurance when authenticating a web page."  Pet. 57 (citing Ex. 1002 ¶170).  Petitioner has articulated reasoning that has some rational underpinning to support the legal conclusion of obviousness.

For these reasons, we determine that Petitioner has demonstrated by a preponderance of the evidence that the subject matter recited in claims 2, 4,

66

IPR2014-00475
Patent 7,631,191 B2

and 7 as a whole would have been obvious to one of ordinary skill in the art
in view of the Tygar paper and Yoshiura.

### 2. *Obviousness over the Tygar Paper and Schneier*

Referring to arguments advanced with regard to Arent and Schneier,
Petitioner contends, again with support from its declarant, that claims 10, 13,
23, and 26 are unpatentable for obviousness under 35 U.S.C. § 103 over
Tygar and Schneier.  Pet. 58 (indicting the combination would result in a
signed applet having multiple signatures); *see id.* at 38–39 (asserting a
reason one of ordinary skill in the art would combine Schneier with Arent
would be "so that Arent's web page offers could be signed with multiple
digital signatures," among other contentions).

The additional limitations recited in these claims concern inserting a
second authenticity key and validation (claims 13 and 26).  Similarly to the
ground of obviousness over Arent and Schneier, Petitioner relies on
Schneier's teaching two parties signing the same document, resulting in
multiple signatures in the same document, which Patent Owner does not
challenge (*see* PO Resp. 56).

Patent Owner relies on its arguments regarding anticipation of the
Tygar paper (PO Resp. 56–57), which we do not find persuasive for the
reasons noted previously.  PO Resp. 56.  Patent Owner also challenges this
ground because "Schneier makes no mention of signing applets."  *Id.*

We are not persuaded by Patent Owner's argument, which amounts to
a challenge to an individual element in Schneier without sufficient
consideration of what the teachings of the Tygar paper and Schneier would

67

IPR2014-00475
Patent 7,631,191 B2

have suggested to one of ordinary skill in the art regarding the claimed subject matter as a whole. *In re Mouttet*, 686 F.3d 1322, 1333 (Fed. Cir. 2012) ("[T]he test for obviousness is what the combined teachings of the references would have suggested to those having ordinary skill in the art." (citing *In re Keller*, 642 F.2d 413, 425 (CCPA 1981))).

For the reasons previously given, therefore, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 10, 13, 23, and 26 would have been obvious over Tygar and Schneier.

### 3. Obviousness over the Tygar Paper and Merritt

Referring to arguments advanced with regard to Arent and Merritt, Petitioner contends, again with support from its declarant, that claims 14, 15, and 27 are unpatentable for obviousness under 35 U.S.C. § 103 over Tygar and Merritt. Pet. 58–59 (indicting the challenge server of Merritt could be used in the selection of background displays in the Tygar paper); *see id.* at 40 (asserting a reason one of ordinary skill in the art would combine Merritt with "an application involving security [because Merritt's challenge server] provides an extra security mechanism," among other contentions). The additional limitations recited in claims 14, 15, and 27 concern a challenge server. Patent Owner relies on its arguments regarding anticipation of the Tygar paper (PO Resp. 56–58), which we do not find persuasive for the reasons we explained previously.

Therefore, we determine that Petitioner has demonstrated by a preponderance of the evidence that the subject matter of claims 14, 15, and 27 as a whole would have been obvious over Tygar and Merritt.

68

IPR2014-00475
Patent 7,631,191 B2

## III.  CONCLUSION

Petitioner has proven by a preponderance of the evidence that claims 1–9, 11, 12, 14–22, 25, and 27–32 of the '191 patent are unpatentable under 35 U.S.C. § 102 as anticipated by Arent and claims 1, 3, 5, 6, 9, 11, 12, 14–22, 25, and 27–32 of the '191 patent are anticipated by Tygar. Petitioner has not demonstrated, however, that claims 2, 4, and 8 are unpatentable under 35 U.S.C. § 102 as anticipated by Tygar.

We have resolved the questions of obviousness based on factual determinations of (1) the scope and content of the prior art; (2) differences between the subject matter of challenged claims and the teachings of the prior art; and (3) the level of ordinary skill in the art.  *Graham*, 383 U.S. at 17–18.  Patent Owner did not put forth any objective evidence of nonobviousness.  Petitioner has proven by a preponderance of the evidence that the subject matter of claims 10, 13, 23, and 26 of the '191 patent would have been obvious to a person of ordinary skill in the art in view of the teachings of Arent and Schneier; claims 14, 15, and 27 would have been obvious in view of the teachings of Arent and Merritt; claims 2, 4, and 7 would have been obvious in view of the teachings of Tygar and Yoshiura; claims 10, 13, 23, and 26 would have been obvious in view of the teachings of Tygar and Schneier; and claims 14, 15, and 27 would have been obvious in view of the teachings of Tygar and Merritt.

69

IPR2014-00475
Patent 7,631,191 B2

## IV.  ORDER

Accordingly, it is hereby

ORDERED that, based on a preponderance of the evidence, claims 1–23 and 25–32 of U.S. Patent No. 7,631,191 B2 are held unpatentable; and

FURTHER ORDERED that, because this is a Final Written Decision, the parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

70

IPR2014-00475
Patent 7,631,191 B2

PETITIONER:

Peter Dichiara
peter.dichiara@wilmerhale.com

David Cavanaugh
david.cavanaugh@wilmerhale.com

Michael Smith
MichaelH.Smith@wilmerhale.com

PATENT OWNER:

Gregory Gonsalves
gonsalves@gonsalveslawfirm.com

André Bahou
aj.bahou@secureaxcess.com

71

US007631191B2

## (12) United States Patent
### Glazer et al.

(10) **Patent No.:** **US 7,631,191 B2**

(45) **Date of Patent:** *Dec. 8, 2009

(54) **SYSTEM AND METHOD FOR AUTHENTICATING A WEB PAGE**

(76) Inventors: **Elliott Glazer**, 14107 Chiasso Ter., Chesterfield, VA (US) 23838; **Dirk White**, 6638 W. Via Montoya, Glendale, AZ (US) 85310; **David Armes**, 4035 W. Banff La., Phoenix, AZ (US) 85033; **Fred Alan Bishop**, 2811 W. Dynamite Blvd., Phoenix, AZ (US) 85085; **Michael Barrett**, 9182 E. Carribean La., Scottsdale, AZ (US) 85260

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 182 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **11/423,340**

(22) Filed: **Jun. 9, 2006**

(65) **Prior Publication Data**

US 2006/0218391 A1     Sep. 28, 2006

**Related U.S. Application Data**

(63) Continuation of application No. 09/656,074, filed on Sep. 6, 2000, now Pat. No. 7,203,838.

(60) Provisional application No. 60/153,004, filed on Sep. 9, 1999.

(51) **Int. Cl.**
*H04L 9/32* (2006.01)

(52) **U.S. Cl.** .................................................... **713/176**

(58) **Field of Classification Search** ................. 713/201, 713/180, 176

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 5,261,043 | A | 11/1993 | Wolber et al. |
| 5,365,360 | A | 11/1994 | Torres |

(Continued)

FOREIGN PATENT DOCUMENTS

WO        WO9750036        12/1997

OTHER PUBLICATIONS

Nayeem Isiam, Rangachari Anand, Trent Jaeger, and Josyula R. Rao; "A Flexible Security Model for Using Internet Content"; Jun. 28, 1997.

(Continued)

*Primary Examiner*—Kambiz Zand
*Assistant Examiner*—William S Powers
(74) *Attorney, Agent, or Firm*—Snell & Wilmer L.L.P.

(57) **ABSTRACT**

The present invention provides for an icon with an additional level of functionality that allows a user to validate that current information (e.g., a web page) originates from the true owner of the icon and is not merely a copy. The method includes a user requesting a web page from a web site using a web browser. The web server receives the request, retrieves the web page and forwards it to an authentication server. The authentication server inserts an authenticity key into the web page, then the page (including the authenticity key) is returned to the user. If the page includes an authenticity key, the authenticity is verified at the user's computer because the user computer includes logic (e.g., software) to verify the authenticity. During the user configuration process, the user defines an authenticity stamp which determines the format of an authenticated page.

**32 Claims, 12 Drawing Sheets**



**US 7,631,191 B2**

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,497,422 A | | 3/1996 | Tysen et al. |
| 5,530,856 A | | 6/1996 | Dahod et al. |
| 5,606,609 A | * | 2/1997 | Houser et al. ............... 713/179 |
| 5,752,022 A | | 5/1998 | Chiu et al. |
| 5,765,176 A | | 6/1998 | Bloomberg |
| 5,809,317 A | | 9/1998 | Kogan et al. |
| 5,872,850 A | * | 2/1999 | Klein et al. .................... 705/51 |
| 5,889,868 A | | 3/1999 | Moskowitz et al. |
| 5,890,170 A | | 3/1999 | Sidana |
| 5,892,904 A | | 4/1999 | Atkinson et al. |
| 5,893,127 A | | 4/1999 | Tyan et al. |
| 5,905,800 A | | 5/1999 | Moskowitz |
| 5,907,619 A | | 5/1999 | Davis |
| 5,930,792 A | | 7/1999 | Polcyn |
| RE36,444 E | | 12/1999 | Sanches Frank et al. |
| 6,016,491 A | | 1/2000 | Kou |
| 6,247,047 B1 | | 6/2001 | Wolff |
| 6,286,001 B1 | * | 9/2001 | Walker et al. .................. 707/9 |
| 6,366,912 B1 | * | 4/2002 | Wallent et al. ................. 707/9 |
| 6,453,416 B1 | * | 9/2002 | Epstein ....................... 713/170 |
| 6,539,093 B1 | | 3/2003 | Asad et al. |
| 6,618,717 B1 | | 9/2003 | Karadimitriou et al. |
| 6,681,017 B1 | * | 1/2004 | Matias et al. ............... 380/277 |
| 6,735,694 B1 | | 5/2004 | Berstis et al. |
| 6,778,986 B1 | | 8/2004 | Stern et al. |
| 6,785,717 B1 | | 8/2004 | Nickerson et al. |
| 2001/0056487 A1 | | 12/2001 | Yoo |
| 2002/0002543 A1 | | 1/2002 | Spooren et al. |
| 2002/0029252 A1 | | 3/2002 | Segan et al. |
| 2002/0124172 A1 | | 9/2002 | Manahan |
| 2003/0023878 A1 | | 1/2003 | Rosenberg et al. |
| 2003/0093699 A1 | | 5/2003 | Banning et al. |
| 2003/0110384 A1 | | 6/2003 | Carro |
| 2003/0131048 A1 | | 7/2003 | Najork |
| 2003/0158823 A1 | | 8/2003 | Fulton et al. |
| 2004/0078452 A1 | | 4/2004 | Jamieson |

### OTHER PUBLICATIONS

Network Working Group; "The Secure HyperText Transfer Protocol"; also available on http://www.landfield/com/rfcs/rfc2660.html.
"Test of Signal HTML"; also available on http://www.crafeidl.ac.uk/docs/email/pgp/html/signed_html.html.
"PGP Signed Web-Pages"; also available on http://www.pobox.com/~ejnbell/pgp-www.html.
http://www-server.bcc.ac.uk/~ccaamrg/seal/seal.html (site not accessible).

* cited by examiner



**FIG. 1**



**FIG. 2**



**FIG. 3**



**FIG. 4**

U.S. Patent

Dec. 8, 2009

Sheet 5 of 12

US 7,631,191 B2

Appx78



**FIG. 5**



**FIG. 6A**

U.S. Patent

Dec. 8, 2009

Sheet 7 of 12

US 7,631,191 B2

Appx80



**FIG. 6B**



**FIG. 7**



**FIG. 8**



START WEB SERVER AUTHENTICATE PAGE
500
WAIT FOR REQUEST
501
IS REQUEST FOR VALIDATION OF A USERID/ PASSWORD?
NO
504
IS REQUEST A PAGE REQUEST?
NO
512
PROCESS REQUEST
YES
502
FORWARD USERID/ PASSWORD TO AUTHENTICATION SERVER
505
YES
READ PAGE REQUEST
506
RETRIEVE REQUESTED PAGE
507
FORWARD RETRIEVED PAGE TO AUTHENTICATION SERVER
508
WAIT FOR AUTHENTICATED PAGE
510
SEND AUTHENTICATED PAGE TO USER
514
EXIT?
NO
YES
END

FIG. 9



FIG. 10

<OBJECT ID="Checker" CLASSID="CLSID:B2157787-7492-11D4-8296-
00609430A416"
CODEBASE="APge.dll"
SIGN="Tud9LuaH9v5QMQcHGUAmtDNhvZ3nGtUEHUMiGIsORV8v7JF9fp
IBiq3Jod0SvdCqQxq+4DzXc
SDK+5r6dbpJMTKiZQWLJpwNJuJSS+cfywEXdQHxcOpRt8Hryi833Bg41s
AIT+SCg5j7DBlzsvIVwohe
chGYv5476AOavkoJrD4="></OBJECT>

# FIG. 11

US 7,631,191 B2

## SYSTEM AND METHOD FOR AUTHENTICATING A WEB PAGE

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of and claims priority to U.S. application Ser. No. 09/656,074 filed on Sep. 6, 2000, which application is a non-provisional of and claims priority to U.S. Provisional Application No. 60/153,004, filed Sep. 9, 1999, the entire contents of which are hereby incorporated by reference.

### FIELD OF THE INVENTION

The present invention relates generally to computer security, and more particularly, to systems and methods for authenticating a web page.

### BACKGROUND OF THE INVENTION

Web pages often include icons, such as, corporate logos, patterns, characters, symbols or other indicators, that a user associates with a particular offering in the real world. A trust or goodwill is often associated with the recognition of a given set of icons. These icons are implemented, for example, as bitmaps, but unfortunately, these bitmaps can be copied and used to defraud a prospective customer. Additionally, customers rely on the accuracy of a URL of a web page. However, it is relatively easy for a "fraudster" to register a URL that is like the one the user is expecting, but is not quite the same. For example, "www.bigbank.com" vs. "www.bigbank.com" (with an "I" instead of an "i"). Thus, a user may retrieve an unwanted webpage that appears authentic. Therefore, the user may not always be confident that the web page being viewed is authentic and the true owner of a web page may be uncertain.

In addition to a user's lack of confidence in the true owner of a web page, there currently exists a problem (either real or perceived) in the transport of UserIDs/Passwords across the Internet. While most sites provide security, for example by using a secure protocol such as Secure Hypertext Transfer Protocol (HTTPS) for sensitive data, most consumers are complacent about checking for this security. Thus, a need exists for a system and method that allow a page to be authenticated so that a user feels secure in the authenticity of pages displayed from Internet sites.

### SUMMARY OF THE INVENTION

In exemplary embodiments of the invention, a user requests a web page from a web site using a web browser. The web server receives the request, retrieves the web page and forwards it to an authentication server. The authentication server inserts an authenticity key into the web page, then the page (including the authenticity key) is returned to the user. If the page includes an authenticity key, the authenticity is verified at the user's computer because the user computer includes logic (e.g., software) to verify the authenticity.

In exemplary embodiments, the authenticity verification software is a browser plug-in and is configured by the user after it is downloaded to the user's computer. During the user configuration process, the user defines an authenticity stamp which determines the format of an authenticated page. In alternative embodiments, the user defines a non-authenticity stamp which will appear on non-authenticated pages.

### BRIEF DESCRIPTION OF THE DRAWINGS

The above and other features and advantages of the present invention are hereinafter described in the following detailed description of illustrative embodiments to be read in conjunction with the accompanying drawing figures, wherein like reference numerals are used to identify the same or similar parts in the similar views, and:

FIG. **1** is an exemplary web page that has not been authenticated;

FIG. **2** is the exemplary web page of FIG. **1** that has been authenticated in accordance with the present invention;

FIG. **3** is the exemplary web page of FIG. **1** that has been authenticated using an alternative embodiment of the present invention;

FIG. **4** is a block diagram of an exemplary system configuration suitable for implementing the present invention;

FIG. **5** is a message sequence diagram for performing page authentication in accordance with the present invention;

FIGS. **6**A and **6**B are a flow diagram illustrating exemplary logic performed by a user computer for performing authentication in accordance with the present invention;

FIG. **7** is a flow diagram illustrating exemplary logic for loading an authentication module in accordance with the present invention;

FIG. **8** is a flow diagram illustrating exemplary logic for verifying authenticity and displaying an authenticated page in accordance with the present invention;

FIG. **9** is a flow diagram illustrating exemplary logic performed by a web server for performing authentication in accordance with the present invention;

FIG. **10** is a flow diagram illustrating exemplary logic performed by an authentication server in accordance with the present invention; and

FIG. **11** is an exemplary authenticity key.

### DETAILED DESCRIPTION

The present invention provides for an icon with an additional level of functionality that allows a user to validate that current information (e.g., a web page) originates from the true owner of the icon and is not merely a copy. In various exemplary embodiments of the invention, a hierarchy of validations exists which allow not only for the validation of an individual icon, but also for the validation of screens and Uniform Resource Locators (URLs). Unlike Secure Sockets Layer (SSL) or other "security session" protocols, the present invention validates aspects of the screen display independent of the communications channel between the user and the web site (however, security session protocols may be used in addition to the present invention). The validation is performed using only information that the true owner of the icon can possess.

FIG. **1** is an example of a simple web page. The web page **50** includes a title **52**, several hyperlinks **54**A, **54**B, **54**C and **54**D, some textual information **56** and two graphical images **58**A and **58**B.

A web page that has been authenticated using the present invention will include all of the information in the same format as the non-authenticated page. As shown in FIG. **2**, in addition to the information that would normally be displayed, an authenticated page includes an authenticity stamp **60** in which the user can specify the appearance of the authenticity stamp. For example, the user of the example shown in FIG. **2** defined the authenticity stamps to be a diamond shape which includes text (bold and italicized) that states "JOE'S SEAL OF APPROVAL." it will be appreciated that an unlimited

US 7,631,191 B2

**3**

number of variations of an authenticity stamp are possible. A user can configure the stamp to be graphics only, text only or a combination thereof. The user also specifies the color and other attributes of the stamp, for example, a blinking stamp. The user also specifies the location of the stamp, e.g., bottom right corner of the web page, pop-up dialog box, etc. In exemplary embodiments, the authenticity stamp can be audio instead of or in addition to visual. In alternative embodiments, a non-authenticated page is stamped and an authenticated page is not stamped. For example, the stamp is configured to be a red, flashing icon that reads "PAGE NOT AUTHENTI-CATED" in the upper right-hand corner, while a page that is authenticated does not include this stamp. In alternative examples, the user can define both an authenticity stamp and a non-authenticity stamp.

FIG. **3** illustrates an alternative embodiment wherein each graphical image includes an embedded authenticity stamp **62**A and **62**B. In the example illustrated in FIG. **3**, each graphical element has an authenticity stamp containing the text "A-OKAY" embedded in the graphical image. In exemplary embodiments, the authenticity stamp is defined by the user. In other embodiments, the authenticity stamp is defined by the owner of the page being displayed (e.g., the web server). In such embodiments, the stamp can include the name of the trusted entity (i.e., the true owner of the page).

FIG. **4** is a block diagram of an exemplary environment **100** suitable for implementing the present invention. The system **100** includes one or more clients (e.g., users) **110** that communicate with one or more servers (e.g., web servers) **120**. The users **110** can use any type of computing device that includes a display device, for example, a Personal Computer. It will be appreciated that other computing devices can be used, for example, a Personal Digital Assistant (PDA), a hand-held computing device, a cellular telephone, etc. The web server can be any site, for example a commercial web site, such as a merchant site, a government site, an educational site, etc. The user **110** establishes a connection to the web server **120** via a network **130**, such as the Internet. The user **110** and web server **120** can communicate using a secure protocol (e.g., HTTPS) or a non-secure protocol (e.g., HTTP). The user **110** requests information from the web server **120**, and in exemplary embodiments, the information is communicated using web pages, for example using Hyper-Text Markup Language (HTML). The web pages are displayed on the user's computer **110**, for example, using a browser, such as, Netscape Communicator available from the Netscape Corporation of Mountain View, Calif. or Internet Explorer available from the Microsoft Corporation of Redmond, Wash. Prior to sending the requested web page to user **110**, web server **120** submits the information to authentication server **140** where authenticating information is added. The information which includes the authenticating information is returned to the web server **120** which then sends the web page including the authentication information to the user **110**.

In various exemplary embodiments, the authentication server **140** communicates with a security engine **150**, for example to verify UserID/Password logons or single use passwords or identifiers. In exemplary embodiments, the security engine **150** is a commercially available security engine, such a, Siteminder available from Netegrity Corporation, of Waltham, Mass.

The examples illustrated and described herein are directed to exemplary embodiments in which a user utilizes a web browser to request web pages from a web server. However, it will be appreciated that various embodiments are possible wherein a client (e.g., web browser) requests content (e.g., a

**4**

web page) from a server (e.g., a web server). The present invention allows the server to provide the client with assurance as to the authenticity of the content (e.g., assure the client as to the true owner of the content).

FIG. **5** is a message sequence diagram illustrating exemplary communications among various components to assure a user of the authenticity of a page. User **110** includes a web browser **112** and a plug-in **114**. A user requests a page **180**, but the user (e.g., user computer) **110** has no knowledge that the page requested is "special" (e.g., is subject to page authentication). Thus, the page request **180** is a normal page request (e.g., a HTTP or HTTPS request for a page).

The web server **120** receiving the page request **180** determines whether the request is for an authenticated page. If the page is to be authenticated, the page is dynamically signed with a private key and additional information, such as a salt with a time stamp is also included as described in further detail later. The signed page is returned with a special authenticated page MIME type and returned to the web browser **112**. Based on the MIME type, the web browser activates the appropriate plug-in **114**.

The plug-in **114** uses a public key to verify the signature, and upon verification of the signature, the plug-in can validate the authenticity of the page. The plug-in **114** requests the user's preferences key **186** so that the page can be displayed with an authenticity stamp. In exemplary embodiments, the request for preferences key includes a shared secret and is encrypted with the public key and salt. Upon receipt of the request for preferences key **186**, the web server **120** decrypts the request using the private key, validates the shared secret and encrypts the preferences key with the private key, shared secret and salt from the request **186**. The encrypted preferences key is then returned to the plug-in **114**.

The plug-in **114** reads the preferences file and decrypts it using the preferences key from the web server **120**. In exemplary embodiments, the preferences file is stored on the user's **110** file system. However, the location of the file is not readily known to the plug-in **114**. Thus, the plug-in **114** must get the preferences key to determine the location of the preferences file. The plug-in **114** reads the preferences file to determine the authenticity stamp and how it is to be displayed. The page is then displayed with the user's preferred authenticity stamp **190**.

FIGS. **6A-10** illustrate exemplary logic for performing page authentication in accordance with the present invention. The flow diagrams illustrate in further detail the logic illustrated in the message sequence diagram of FIG. **5**. In addition to authenticating a page, the present invention provides for additional security wherein a UserID/Password are encrypted with the public key to prevent "man in the middle" attacks. FIGS. **6A-8** illustrate exemplary logic performed by a user computer **110** as described below. FIG. **9** illustrates exemplary logic performed by a web server **120** as described below. FIG. **10** illustrates exemplary logic performed by an authentication server **140** as described below. It will be appreciated that various configurations are possible. For example, the logic of the authentication server **140** can be combined with the logic of the web server **120**.

FIGS. **6A** and **6B** are a flow diagram illustrating exemplary logic performed by a user **110** for performing authentication in accordance with the present invention. The logic described herein is directed to web pages, however it will be appreciated that the information requested can be of various formats. The logic of FIG. **6A** moves from a start block to block **200** to wait for a page request. It will be appreciated that a page request is known in the art, for example, a user enters a Uniform Resource Locator (URL) or clicks on a hyperlink. The logic

US 7,631,191 B2

**5**

then moves to block **201** where a received page request is sent to a web Server **120** to retrieve the requested page. The logic then moves to block **202** where the user (e.g., the user's browser) waits for the requested page. The logic of retrieving and formatting the requested page is described below with reference to FIGS. **9** and **10**. When the requested page is received, the logic moves to block **204** where the page is read.

After a page is read, the logic moves to decision block **205** where a test is made to determine if a UserID/Password is required. It will be appreciated that a UserID/Password may be required for both pages requiring authentication and pages not requiring authentication. If a UserID/Password is required, the logic moves to block **206** where a UserID/Password is obtained. If a UserID/Password is required, a suitable logon screen is displayed on the user's computer. The UserID/Password entry display can be of varying formats, for example, a web page or a pop-up dialog box. Upon entry of a UserID/Password, the user indicates completion (for example, by pressing an "OK" or "Submit" button). Upon completion of the logon, the logic moves to block **207** where the UserID/Password is encrypted to prevent man in the middle attacks. The logic then moves to block **208** where the encrypted UserID/Password is sent to the web Server.

If a UserID/Password is not required, the logic moves to decision block **209** (FIG. **6B**) where a test is made to determine if authentication is required. In exemplary embodiments, an authenticity key will be hidden in any page that should be authenticated. In order to determine if the page should be authenticated, the page source is read to determine if an authenticity key is included in the page. If authentication is not required, the logic moves to block **210** where the non-authenticated page is displayed. A non-authenticated page is a traditional web page (i.e., the way the web page would be displayed without the authentication of the present invention, such as the example shown in FIG. **1**).

If authentication is required (yes in decision block **209**), the logic moves to decision block **211** where a test is made to determine if the authentication module is loaded. In exemplary embodiments, the authentication module is a plug-in module for the web browser. In exemplary embodiments, if the authentication module has not been loaded, a message will be displayed. For example, "This page protected by AuthentiPage. To get a free copy, go to Authentipage.com." Alternatively, the message may ask the user if a download of the authentication module is desired. If the authentication module is not loaded, the logic moves to decision block **214** where a test is made to determine if the authentication module should be loaded. If the authentication module is not to be loaded, the logic moves to block **218** where the page is displayed without authentication. In exemplary embodiments, the user will be notified that the page could not be authenticated, for example via a pop-up window displaying a warning message. In alternative embodiments, the user defines a non-authenticity stamp which is displayed for a page that has not been authenticated.

If the authentication module is to be loaded (yes in decision block **214**), the logic moves to block **216** where the authentication module is loaded as shown in FIG. **7** and described next. If a download of the authentication module is desired, the user may be automatically redirected to the download site.

FIG. **7** illustrates exemplary logic for loading an authentication module (block **216** of FIG. **6B**). The logic of FIG. **7** moves from a start block to block **300** where the authentication module (e.g., plug-in) is downloaded. The download is accomplished using techniques known in the art. After the authentication module is downloaded to the user's computer, the logic moves to block **302** where the authentication module

**6**

is configured. As part of the configuration process, an authenticity stamp is defined by the user. This authenticity stamp will be displayed whenever an authenticated page is loaded. The stamp can take several forms, for example, a user-selected keyword, color, etc. Preferably, the determination of the look of the authenticity stamp is under complete control of the user. Preferably, the user is also able to determine where the stamp will be displayed, for example in a separate pop-up box or in a selected area of the web page. By requiring the user to configure the visual qualities of the stamp, the possibility of a counterfeit stamp being displayed is reduced. The user will expect to see his or her stamp and will begin to associate the stamp with security. It will be appreciated that while the stamp is defined in terms of visual qualities herein, embodiments of the invention can include defining the stamp in other ways, for example, by an audio indication specified by the user. After the authentication module has been configured, the logic of FIG. **7** ends and processing returns to FIG. **6B**.

Returning to FIG. **6B**, after the authentication module is loaded (block **216**), or if it has been determined that the authentication module is already loaded (yes in decision block **211**), the logic moves to block **212** to verify the authenticity of the page and display the page, as shown in detail in FIG. **8** and described next.

FIG. **8** illustrates exemplary logic for verifying the authenticity of a page and displaying the page. The logic of FIG. **8** moves from a start block to block **400** where the authenticity of the page is verified. Many algorithms can be used to verify the authenticity. For example, the trusted server that generates the authenticity key can encrypt the authenticity key with a private key. The user can then decrypt the authenticity key using a public key. Using this method, no certificate is required and no interaction is required by the user. Other algorithms can be used, some of which may require a certificate and/or user interaction. Unless the page contains confidential information, the authentication of pages should not require any additional security or encryption. The authentication of a page can be employed on any page, for example, marketing data, purchase information, etc., to prove the page's authenticity. In general, authentication of pages will not require additional security or encryption. However, if additional security is desired, page authentication performed in accordance with the present invention can be used in combination with other known or future security measures, for example, in conjunction with a secure protocol, such as HTTPS, along with the requirement for a UserID and a password, etc. If the authentication is successful (yes in decision block **402**), the logic moves to block **404** where the page is displayed with the authenticity stamp as defined by the user during the configuration process described above. If the authentication fails (no in decision block **402**), the logic moves to block **406** where the unsuccessfully authenticated page is displayed. In exemplary embodiments, an indication of the authentication failure is provided, for example a warning message may be displayed. For example, a flashing error message, such as "PAGE NOT AUTHENTICATED" can be displayed in the location where the authenticity stamp would normally be displayed. After the page is displayed (either as an authenticated page in block **404** or as an unsuccessfully authenticated page in block **406**), the logic of FIG. **8** ends and processing returns to FIG. **6B**.

Returning to FIG. **6B**, after a page has been displayed (block **210**, **212** or **218**) and a UserID/Password request has been processed, the logic moves to decision block **220** (FIG. **6A**) where a test is made to determine if it is time to exit. For example, if the user selects an "Exit" option form a web browser menu, it is time to exit. If it is not time to exit, the

US 7,631,191 B2

7

logic returns to block **200** to wait for the user's next page request. The logic of blocks **200-220** is repeated until it is time to exit. It will be appreciated that in alternative embodiments of the invention requests other than those shown and described herein may also be processed. When it is time to exit, the logic of FIG. **6A** ends.

FIG. **9** is a flow diagram illustrating exemplary logic performed by a web server **120** for performing authentication in accordance with the present invention. The logic of FIG. **9** moves from a start block to block **500** where the web server waits for a request. In exemplary embodiments, while the web server is waiting for a request other requests continue to be serviced (e.g., receiving and processing page requests). When a request is received, the logic moves to decision block **501** where a test is made to determine if the request is a request for validation of a UserID/Password. If so, the logic moves to block **502** where the received UserID/Password (sent in block **108** of FIG. **6A**) is forwarded to the authentication server **140**.

If the request is not a request for verification of a UserID/Password, the logic moves to decision block **504** where a test is made to determine if the request is a page request. If so, the logic moves to block **505** where the page request is read. The logic then moves to block **506** where the requested page is retrieved. Next, the logic moves to block **507** where the requested page is forwarded to an authentication server **140**. The logic then moves to block **508** where the web server waits for the authenticated page to be returned from the authentication server. In exemplary embodiments, while the web server is waiting for an authenticated page, other processing can be performed, for example, page requests can be received and processed. When an authenticated page is received, the logic moves to block **510** where the authenticated page is returned to the user that requested the page.

If the request is not a request to verify a UserID/Password (no in decision block **501**) or a page request (no in decision block **504**), the request is another request, which is processed in block **512**. Other requests which may be processed by a web Server are not described herein.

After the request (e.g., request for verification of UserID/Password, page request or other request) has been processed, the logic moves to decision block **514** where a test is made to determine if it is time to exit. The logic of blocks **500-514** is repeated until it is time to exit (e.g., shut down the web server). When it is time to exit, the logic of FIG. **9** ends.

FIG. **10** is a flow diagram illustrating exemplary logic performed by an authentication server **140** for performing authentication in accordance with the present invention. The logic of FIG. **10** moves from a start block to block **600** where the authentication server waits for an authentication request. When an authentication request is received, the logic moves to decision block **601** to determine if the request is a request to decrypt a UserID/Password. If so, the logic moves to block **602** where the UserID/Password is decrypted. The logic then moves to block **604** where the decrypted UserID/Password is forwarded to a security engine for verification. In exemplary embodiments, the security engine is an existing security engine, such as a DSS Security Engine. The Security Engine verifies the UserID/Password and forwards the verification as appropriate. For example, if the UserID is not valid, a message will be displayed on the user's computer. Because security engines are known in the art, the logic employed by the security engine is not discussed further herein.

If the request is not a request to decrypt a UserID/Password, the logic moves to decision block **606** where a test is made to determine if the request is an authentication request. If so, the logic moves to block **608** where the authentication server generates an authenticity key. Details for an exemplary

8

authenticity key are described below. The logic of FIG. **10** then moves to block **610** where the authenticity key is inserted into the web page. An exemplary authenticity key is shown in FIG. **12**. Next, the logic moves to block **612** where the page which includes the authenticity key is returned to the web server.

While the exemplary embodiments only include processing of requests for encryption/decryption or authenticating a page, it will be appreciated that alternative embodiments may process other requests. After a request is processed (e.g., a UserID/Password is decrypted or a page is authenticated), the logic moves to decision block **616** where a test is made to determine if it is time to exit. The logic of blocks **600-616** is repeated until it is time to exit (e.g., shut down the authentication server). When it is time to exit, the logic of FIG. **10** ends.

In alternative embodiments, there is no authentication server. Rather, graphical images include a hidden identifier identifying the true owner, as well as a cryptographic signature to ensure that the graphical image cannot be tampered with by a counterfeiter. In various embodiments, the identification is a portion of a URL that is encrypted, such as "bigbank.com". Those skilled in the art will recognize this as a second-level domain name. Upon receipt of the web page, the authentication module residing on the user's computer compares the identification in the page with the URL from which the web page was fetched. If the identification matches, the web page was served by its true owner. If the identifications do not match, the user is provided with an indication that the URL is not the true owner of the graphical images. For example, a "counterfeit" site may look just like the site that it was intended to look like because the counterfeiter can copy the page, including the graphical images. However, if the graphical images include a hidden identifier, the user can be notified that the page is "counterfeit."

An exemplary authenticity key is constructed in such a way that "freshness" can be determined, for example using a date/time stamp. The authenticity key will also include other identifying information as described later. An exemplary authenticity key contains one or more hidden signature objects. In exemplary embodiments, the hidden signature object is a value that is the encoding of the following fields: web page hash, action, date/time, key identifier and digital signature. In exemplary embodiments, the web page hash is generating using SHA-1 on the entire web page excluding this hidden signature object. The Secure Hash Algorithm (SHA) was developed by the National Institute of Standards and Technology (NIST) and is specified in the Secure Hash Standard (SHS, FIPS 180). SHA-1 is a revision to SHA that was published in 1994. SHA-1 is also described in the ANSI X9.30 (part 2) standard. The algorithm takes a message of greater than 264 bits in length and produces a 160-bit message digest.

The action is a value used to specify the action to be performed by the browser plug-in that verifies this page. Preferably, if the user computer does not have the browser plug-in installed, the user will be informed of the required plug-in. Preferably, the user can elect to download the plug-in at the time the web page is received, in which case the web page can be displayed immediately after installing the plug-in. In exemplary embodiments if the user elects not to install the plug-in, the web page is displayed and the user is provided with an indication (e.g., a warning message displayed in a pop-up window) that the page was not authenticated. Actions are specified in a bit-wise manner so that multiple actions can be specified. For example, the action value may be defined to both display the security object (e.g., to display a bitmapped image) and to request a secure login.

9

The date/time field is used to specify the current date and time that the web page was delivered from the web server. This value is used by the browser plug-in to verify that the page is "fresh" (e.g., is not being replayed by a rogue site). The present invention may include a synchronization feature which allows the user's computer to synchronize its internal clock with atomic clocks available over the Internet. This would provide additional security by allowing a more precise verification of the date/time stamp.

The key identifier is used to identify the public key used to verify the signature. In exemplary embodiments, a digital signature is used as a salt value concatenated with an SHA-1 hash of the other four fields (web page hash, action, date/time and key identifier) that has been encrypted using the private key of the web Page server. A "salt value" is an arbitrary random value that constantly changes in order to minimize the possibility of various attacks.

In exemplary embodiments of the present invention, four keys are used in the web page authentication process: a private key, a public key, a master encryption key and a preferences encryption key. A private key (of the web page server) is used to create the "digital signature" within the web page signature. A digital signature is generally defined to include a certificate. For the purposes of the present invention, exemplary embodiments do not include a certificate. It will be appreciated that various embodiments can include a certificate in the digital signature. The private key is only distributed to applications requiring its use. A public key is buried in multiple pieces throughout the browser plug-in. The public key is used to verify the Digital Signature within the web Page signature. Although the public key itself can be distributed, its storage location should remain as obscure as possible to reduce the possibility of attacks. The master encryption key is also buried in multiple places in the browser plug-in. The master encryption key is used to encrypt the preferences encryption key that is stored on the user's computer. The preferences encryption key that is stored on the user's computer is used to encrypt preferences (e.g., user configuration information, such as appearance and location of authenticity stamp) that are stored on the user's computer.

When the action indicates a Login, the browser plug-in displays a user ID and password request on the user's computer along with the secure word that will authenticate the UserID and Password request. These two values will be prefixed with the salt value and date/time information from the web page signature and encrypted using the public key. This information will then be sent by the plug-in performing the Submit. Preferably, the Submit explicitly references the URL to which the information is to be sent. This will allow the information only to be sent to the destination that was previously signed within the web Page signature.

The preferences file is used to store information, such as a user's secure word. Preferably, the preferences file is placed in a random directory to help obscure the location of the preference file and facilitate the creation of unique user configurations. This increases the difficulty in creating a general purpose rogue program for extracting preferences and keys.

In exemplary embodiments, new keys are implemented through redistribution of the browser plug-in. The new plug-in can contain both the old and new keys to facilitate implementation of the new keys on a particular date.

In exemplary embodiments of the invention, the authentication module may contain a list of all known UserIDs. The list of known UserIDs can be displayed so that the user can select a desired UserID. Upon selection of a UserID, the user is prompted to enter a password. The UserID and password are encrypted with the use of the public key to authenticate the

10

authenticity key. The entire string (e.g., [UserID][Password] [original salt value]) is sent to the trusted server for verification. The trusted server 120 then extracts the UserID and password and forwards them to the authentication server 140 for verification.

Exemplary embodiments allow a user to check the validity of their authentication module. A server allows the authentication module to send a request for self-verification. In various embodiments, the validation is performed in response to a user request. In exemplary embodiments, the authentication module includes a suitable user interface which allows a user to request self-verification. The authentication module generates a random number ("salt") and encrypts it with the public key. The value is then sent to a known URL (e.g., a URL that is hard-coded in the authentication module). When the authentication module receives the request, it is decrypted using the private key and adding an additional salt value which is then returned to the client module (user). The client module decrypts the response received from the authentication module. The random values are then compared (without the additional salt added by the authentication module). If the value matches the value originally sent, the self-verification is successful. A verification result is displayed to the user to indicate whether the verification was successful.

The present invention may be described herein in terms of functional block components, screen shots, optional selections and various processing steps. It should be appreciated that such functional blocks may be realized by any number of hardware and/or software components configured to perform the specified functions. For example, the present invention may employ various integrated circuit components, e.g., memory elements, processing elements, logic elements, look-up tables, and the like, which may carry out a variety of functions under the control of one or more microprocessors or other control devices. Similarly, the software elements of the present invention may be implemented with any programming or scripting language such as C, C++, Java, COBOL, assembler, PERL, or the like, with the various algorithms being implemented with any combination of data structures, objects, processes, routines or other programming elements. Further, it should be noted that the present invention may employ any number of conventional techniques for data transmission, signaling, data processing, network control, and the like. For a basic introduction of cryptography, please review a text written by Bruce Schneider which is entitled "Applied Cryptography: Protocols, Algorithms, And Source Code In C," published by John Wiley & Sons (second edition, 1996), which is hereby incorporated by reference.

It should be appreciated that the particular implementations shown and described herein are illustrative of the invention and its best mode and are not intended to otherwise limit the scope of the present invention in any way. Indeed, for the sake of brevity, conventional data networking, application development and other functional aspects of the systems (and components of the individual operating components of the systems) may not be described in detail herein. Furthermore, the connecting lines shown in the various figures contained herein are intended to represent exemplary functional relationships and/or physical couplings between the various elements. It should be noted that many alternative or additional functional relationships or physical connections may be present in a practical electronic transaction system.

To simplify the description of the exemplary embodiments, the invention is frequently described as pertaining to an authentication system. It will be appreciated, however, that many applications of the present invention could be formulated. One skilled in the art will appreciate that the network

US 7,631,191 B2

11

may include any system for exchanging data or transacting business, such as the Internet, an intranet, an extranet, WAN, LAN, satellite communications, and/or the like. The users may interact with the system via any input device such as a keyboard, mouse, kiosk, personal digital assistant, handheld computer (e.g., Palm Pilot®), cellular phone and/or the like. Similarly, the invention could be used in conjunction with any type of personal computer, network computer, workstation, minicomputer, mainframe, or the like running any operating system such as any version of Windows, Windows NT, Windows2000, Windows 98, Windows 95, MacOS, OS/2, BeOS, Linux, UNIX, or the like. Moreover, although the invention is frequently described herein as being implemented with TCP/IP communications protocols, it will be readily understood that the invention could also be implemented using IPX, Appletalk, IP-6, NetBIOS, OSI or any number of existing or future protocols. Moreover, while the exemplary embodiment will be described as an authentication system, the system contemplates the use, sale or distribution of any goods, services or information over any network having similar functionality described herein.

The customer and merchant may represent individual people, entities, or business. The bank may represent other types of card issuing institutions, such as credit card companies, card sponsoring companies, or third party issuers under contract with financial institutions. It is further noted that other participants may be involved in some phases of the transaction, such as an intermediary settlement institution, but these participants are not shown.

Each participant is equipped with a computing system to facilitate online commerce transactions. The customer has a computing unit in the form of a personal computer, although other types of computing units may be used including laptops, notebooks, hand held computers, set-top boxes, and the like. The merchant has a computing unit implemented in the form of a computer-server, although other implementations are possible. The bank has a computing center shown as a main frame computer. However, the bank computing center may be implemented in other forms, such as a mini-computer, a PC server, a network set of computers, and the like.

The computing units are connected with each other via a data communication network. The network is a public network and assumed to be insecure and open to eavesdroppers. In the illustrated implementation, the network is embodied as the internet. In this context, the computers may or may not be connected to the internet at all times. For instance, the customer computer may employ a modem to occasionally connect to the internet, whereas the bank computing center might maintain a permanent connection to the internet. It is noted that the network may be implemented as other types of networks, such as an interactive television (ITV) network.

Any merchant computer and bank computer are interconnected via a second network, referred to as a payment network. The payment network represents existing proprietary networks that presently accommodate transactions for credit cards, debit cards, and other types of financial/banking cards. The payment network is a closed network that is assumed to be secure from eavesdroppers. Examples of the payment network include the American Express®, VisaNet® and the Veriphone® network. In an exemplary embodiment, the electronic commerce system is implemented at the customer and issuing bank. In an exemplary implementation, the electronic commerce system is implemented as computer software modules loaded onto the customer computer and the banking computing center. The merchant computer does not require any additional software to participate in the online commerce transactions supported by the online commerce system.

12

The corresponding structures, materials, acts and equivalents of all elements in the claims below are intended to include any structure, material or acts for performing the functions in combination with other claimed elements as specifically claimed. The scope of the invention should be determined by the allowed claims and their legal equivalents, rather than by the examples given above.

The invention claimed is:

1. A method comprising:

transforming, at an authentication host computer, received data by inserting an authenticity key to create formatted data; and

returning, from the authentication host computer, the formatted data (i) to enable the authenticity key to be retrieved from the formatted data and (ii) to locate a preferences file,

wherein an authenticity stamp is retrieved from the preferences file.

2. The method of claim 1, wherein the formatted data is a web page.

3. The method of claim 1, further comprising:

reading the formatted data; and,

verifying authenticity of the formatted data based on the authenticity key in response to the formatted data including the authenticity key.

4. The method of claim 3, further comprising displaying the formatted data in response to the verification of the authenticity key.

5. The method of claim 3, wherein the authenticity stamp is displayed for formatted data that is verified.

6. The method of claim 3, wherein the authenticity stamp is displayed for a graphical image within the formatted data.

7. The method of claim 3, wherein a non-authenticity stamp is displayed for formatted data that is not verified.

8. The method of claim 1, wherein the formatted data is at least one of: a screen display or a Uniform Resource Locator (URL).

9. The method of claim 1, further comprising receiving third party data.

10. The method of claim 1, further transforming received data by inserting a second authenticity key into the received data.

11. The method of claim 1, wherein the authenticity key is received from a third-party.

12. The method of claim 1, further comprising retrieving additional data based on the received data.

13. The method of claim 1, further comprising validating the formatted data based on the authenticity key and, further transforming by inserting a second authenticity key into the formatted data.

14. The method of claim 1, further comprising retrieving an image selection based on a selection from a plurality of images, wherein the plurality of images are only known by a client and a challenge server.

15. The method of claim 14, wherein the image selection is at least one of: a graphic, text, video, or audio.

16. The method of claim 1, wherein the returning includes returning the formatted data to at least one of: a Personal Computer (PC), Personal Digital Assistant (PDA), cellular telephone, or an email device.

17. An authentication system comprising:

an authentication processor configured to insert an authenticity key into formatted data to enable authentication of the authenticity key (i) to verify a source of the formatted data and (ii) to retrieve an authenticity stamp from a preferences file.

US 7,631,191 B2

| 13 | 14 |

**18**. The system of claim **17**, wherein the formatted data is displayed on a client.

**19**. The system of claim **17**, wherein the authentication processor is further configured to send the formatted data including the authenticity key to a client.

**20**. The system of claim **19**, wherein authenticity of the formatted data is verified based on the authenticity key.

**21**. The system of claim **20**, wherein the formatted data is displayed with an indication of the authenticity of the formatted data.

**22**. The system of claim **17**, wherein the authentication processor is further configured to receive the formatted data from a third party.

**23**. The system of claim **17**, wherein the authentication processor is further configured to receive the formatted data having the authenticity key and, to insert a second authenticity key into the formatted data.

**24**. The system of claim **17**, wherein the authentication processor is further configured to receive a preferences key from a third party.

**25**. The system of claim **17**, wherein the authentication processor is further configured to receive additional data based the formatted data.

**26**. The system of claim **17**, wherein the authentication processor is further configured to validate the formatted data based on the authenticity key and, to insert a second authenticity key into the formatted data.

**27**. The system of claim **17**, wherein the authentication processor is further configured to receive an image selection that is at least one of: a graphic, text, video, or audio from the source based on a selection from a plurality of images, wherein the plurality of images are only known by a client and a challenge server.

**28**. The system of claim **17**, wherein a client authenticates the authenticity key and the client is at least one of: a Personal Computer (PC), Personal Digital Assistant (PDA), cellular telephone, or an email device.

**29**. An authentication system comprising:

an authentication processor configured to send formatted data having an authenticity key to a client, wherein the authenticity key enables location of a preferences file, and wherein an authenticity stamp is retrieved from the preferences file.

**30**. The system of claim **29**, wherein at least one of color or positioning of a graphic image within the formatted data is configurable.

**31**. A computer readable medium having stored thereon a plurality of instructions, the plurality of instructions comprising:

instructions to format received data by inserting an authenticity key to create formatted data; and

instructions to return the formatted data to a client, wherein the authenticity key is retrieved from the formatted data to locate a preferences file, and wherein an authenticity stamp is retrieved from the preferences file.

**32**. A method comprising:

receiving, at a client computer, formatted data from a authentication host computer wherein the authentication host computer receives the data to create received data, and transforms the received data by inserting an authenticity key to create the formatted data;

retrieving, by the client computer, the authenticity key from the formatted data to locate a preferences file; and,

retrieving an authenticity stamp from the preferences file.

\*    \*    \*    \*    \*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 7,631,191 B2                                              Page 1 of  1
APPLICATION NO. : 11/423340
DATED                    : December 8, 2009
INVENTOR(S)        : Glazer et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Title Page item 76 the inventors' full addresses are inappropriately listed on the face of the patent. City, State and Country should be listed only.

Claim 1, column 12, line 14, "data (i) to" should be changed to --data to--; line 15, "and (ii) to" should be changed to --and to--.

Claim 10, column 12, line 41, "transforming received" should be changed to --transforming the received--.

Claim 13, column 12, line 50, "transforming by" should be changed to --transforming the received data by--.

Claim 16, column 12, line 60, "Computer (PC), Personal Digital Assistant (PDA), cellular" should be changed to --Computer (PC), a Personal Digital Assistant (PDA), a cellular--.

Claim 17, column 12, line 65, "key (i) to" should be changed to --key to--; line 66, "and (ii) to" should be changed to --and to--.

Claim 25, column 13, line 23, "based the" should be changed to --based on the--.

Claim 28, column 14, line 3, "Computer (PC), Personal Digital Assistant (PDA), cellular" should be changed to --Computer (PC), a Personal Digital Assistant (PDA), a cellular--.

Claim 32, column 14, lines 24 to 25, "from a authentication" should be changed to --from an authentication--.

Signed and Sealed this

Eleventh Day of May, 2010

David J. Kappos
*Director of the United States Patent and Trademark Office*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 19th day of February, 2016, I electronically filed the foregoing document with the Clerk of the United States Court of Appeals for the Federal Circuit using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.


Dated: February 19, 2016.


_____

Andrew J. Wright


| | |
|---|---|
| **Law Firm:** | Bruster PLLC |
| **Address:** | P.O. Box 92091 |
| **City, State, ZIP:** | Southlake, Texas 76092 |
| **Telephone:** | 817.601.9564 |
| **Fax:** | N/A |
| **E-mail Address:** | andrew@brusterpllc.com |

## **CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

1.  This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

    ☑    The brief contains **9,794** words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), or

    ☐    The brief uses a monospaced typeface and contains **N/A** lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

    ☑    The brief has been prepared in a proportionally spaced typeface using **Microsoft® Word for Mac 2011, Version 14.5.7 (151005)** in **14-point Times New Roman**, or

    ☐    The brief has been prepared in a monospaced typeface using **N/A** with **N/A**.

_____
ANDREW J. WRIGHT

*Counsel for Appellant*
*Secure Axcess, LLC*

February 19, 2016