No. 2016-1354

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

SECURE AXCESS, LLC,

*Appellant*,

*v.*

EMC CORPORATION, RSA SECURITY LLC,

*Appellees.*

On Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in No. IPR2014-00475

## BRIEF FOR APPELLEES EMC CORPORATION AND RSA SECURITY LLC

PAUL T. DACIER
KRISHNENDU GUPTA
THOMAS A. BROWN
EMC CORPORATION
176 South Street
Hopkinton, MA  01748
(508) 293-7225

WILLIAM F. LEE
CYNTHIA D. VREELAND
MARK C. FLEMING
PETER M. DICHIARA
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

*Attorneys for Appellees EMC
Corporation and RSA Security LLC*

May 4, 2016

# CERTIFICATE OF INTEREST

Counsel for Appellees EMC Corporation and RSA Security LLC certifies the following:

1.     The full name of every party or *amicus* represented by us is:

EMC Corporation and RSA Security LLC

2.     The names of the real party in interest represented by us is:

Not applicable

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

RSA Security LLC is a wholly owned subsidiary of EMC Corporation. EMC Corporation has no parent corporation and no publicly-held corporation owns 10% or more of its stock.

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

WILMER CUTLER PICKERING HALE AND DORR LLP:  David L. Cavanaugh, Peter M. Dichiara, Mark C. Fleming, William F. Lee, Michael H. Smith, Cynthia D. Vreeland, Anna Lumelsky, Sameer Ahmed

EMC CORPORATION:  Paul T. Dacier, William R. Clark, Krishnendu Gupta, Thomas A. Brown

Dated:  May 4, 2016

/s/ William F. Lee
WILLIAM F. LEE
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST .................................................................i

TABLE OF AUTHORITIES ..................................................................iv

STATEMENT OF RELATED CASES ...................................................1

INTRODUCTION ................................................................................3

STATEMENT OF ISSUE ON APPEAL................................................4

STATEMENT OF THE CASE................................................................5

I.    THE PRIOR ART ........................................................................5

    A.    Overview of Web Page Authentication Prior Art .................5

    B.    Prior Art Cited By The Board ...............................................9

        1.    Arent.................................................................9

        2.    Tygar .............................................................12

II.   SECURE AXCESS'S '191 PATENT.................................................15

    A.    The '191 Patent Specification ...........................................15

    B.    The '191 Patent's "Preferences File" .................................21

    C.    The '191 Patent Claims .....................................................23

III.  PROCEEDINGS BEFORE THE BOARD .................................................25

SUMMARY OF THE ARGUMENT ......................................................31

ARGUMENT .....................................................................................33

I.    STANDARD OF REVIEW ...............................................................33

II.    THE BOARD CORRECTLY CONSTRUED CLAIM LANGUAGE
       RELATING TO THE "AUTHENTICITY KEY" AND THE
       PREFERENCES FILE ........................................................................34

       A.    The Board Correctly Concluded That The Authenticity
             Key Enables Location Of—But Does Not Directly
             Locate—The Preferences File.............................................34

             1.    The Authenticity Key Does Not Directly Locate
                   the Preferences File...................................................35

             2.    Secure Axcess's Argument That The Authenticity
                   Key Enables Location Of The Preferences File
                   Does Not Demonstrate Any Error, Because That Is
                   What The Board Found...............................................39

       B.    The Board Correctly Concluded That The Preferences
             File Need Not Be Hidden ....................................................42

III.   THE BOARD CORRECTLY CONCLUDED THAT ARENT AND TYGAR
       SATISFY THE CLAIM LANGUAGE RELATING TO THE
       "AUTHENTICITY KEY" AND THE PREFERENCES FILE.....................46

CONCLUSION ...................................................................................51

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Arthrocare Corp. v. Smith & Nephew, Inc.*,
406 F.3d 1365 (Fed. Cir. 2005) ........................................................48

*AstraZeneca LP v. Apotex, Inc.*,
633 F.3d 1042 (Fed. Cir. 2010) ........................................................48

*In re Baxter Travenol Labs.*,
952 F.2d 388 (Fed. Cir. 1991) ........................................................48

*In re Cuozzo Speed Technologies, LLC*,
793 F.3d 1268 (Fed. Cir. 2015), *cert. granted*, 136 S. Ct. 890
(2016) ............................................................................................33

*In re Gartside*,
203 F.3d 1305 (Fed. Cir. 2000) ........................................................33

*In re Preda*,
401 F.2d 825 (C.C.P.A. 1968) ........................................................48

*In re Roslin Institute (Edinburgh)*,
750 F.3d 1333 (Fed. Cir. 2014) ........................................................33

*In re Suitco Surface, Inc.*,
603 F.3d 1255 (Fed. Cir. 2010) ........................................................33

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc) ........................................44

*Secure Axcess LLC v. Bank of America*,
No. 6:10-cv-670, Memorandum Opinion & Order (E.D. Tex. July
9, 2012) ........................................................................................26

*SmithKline Beecham Corp. v. Apotex Corp.*,
439 F.3d 1312 (Fed. Cir. 2006) ............................................33, 37, 41

*Straight Path IP Group, Inc. v. Sipnet EU S.R.O.*,
806 F.3d 1356 (Fed. Cir. 2015) ....................................................46, 49

- iv -

*TriVascular, Inc. v. Samuels*,
   812 F.3d 1056 (Fed. Cir. 2016) ............................................................................33

## STATUTES

35 U.S.C. § 255 ......................................................................................................36

## OTHER AUTHORITIES

Chisum, Donald S., *Chisum on Patents* (2015) .......................................................25

*Manual of Patent Examining Procedure* (9th ed. 2015) ..........................................45

## STATEMENT OF RELATED CASES

No appeal in these proceedings was previously before this Court or any other court.  Appellant Secure Axcess, LLC ("Secure Axcess") has asserted U.S. Patent No. 7,631,191 (the "'191 patent") against numerous defendants. Accordingly, the following cases may be directly affected by this Court's decision in this appeal:

### Appeal before this Court:

1.     *Secure Axcess, LLC v. PNC Bank, et al.*, No. 16-1353 (Fed. Cir.), an appeal from the Final Written Decision in Covered Business Methods Review, Case No. CBM2014-00100 (P.T.A.B.) (the "CBM Appeal").  This Court has ordered that the CBM Appeal and this appeal be treated as companion cases.

### Covered Business Method Review before the PTAB:

1.     *T. Rowe Price Investment Services, Inc. v. Secure Axcess, LLC*, Case No. CBM2015-00027 (P.T.A.B.) (instituted June 22, 2015).

### United States District Court actions involving the patent at issue:

1.     *Secure Axcess, LLC v. U.S. Bank Nat'l Ass'n, et al.*, Civ. No. 6:13-cv-717 (E.D. Tex.).

2.     *Secure Axcess, LLC v. Ally Bank, et al.*, Civ. No. 6:13-cv-718 (E.D. Tex.).

3.     *Secure Axcess, LLC v. Nationwide Bank, et al.*, Civ. No. 6:13-cv-721 (E.D. Tex.).

4.     *Secure Axcess, LLC v. PNC Bank, N.A., et al.*, Civ. No. 6:13-cv-722 (E.D. Tex.).

5.     *Secure Axcess, LLC v. Sovereign Bank, Nat'l Ass'n*, Civ. No. 6:13-cv-723 (E.D. Tex.).

6.     *Secure Axcess, LLC v. The Vanguard Group, Inc., et al.*, Civ. No. 6:13-cv-724 (E.D. Tex.).

7.     *Secure Axcess, LLC v. Bank of the West, et al.*, Civ. No. 6:13-cv-779 (E.D. Tex.).

8.     *Secure Axcess, LLC v. Cadence Bank, N.A.*, Civ. No. 6:13-cv-780 (E.D. Tex.).

9.     *Secure Axcess, LLC v. Charles Schwab Bank, et al.*, Civ. No. 6:13-cv-781 (E.D. Tex.).

10.     *Secure Axcess, LLC v. Commerce Bank, et al.*, Civ. No. 6:13-cv-782 (E.D. Tex.).

11.     *Secure Axcess, LLC v. Ocwen Fin. Corp.*, Civ. No. 6:13-cv-783 (E.D. Tex.).

12.     *Secure Axcess, LLC v. Orange Savings Bank, SSB, et al.*, Civ. No. 6:13-cv-784 (E.D. Tex.).

13.    *Secure Axcess, LLC v. Raymond James & Assocs., Inc., et al.*, Civ. No. 6:13-cv-785 (E.D. Tex.).

14.    *Secure Axcess, LLC v. T. Rowe Price Inv. Servs., Inc., et al.*, Civ. No. 6:13-cv-787 (E.D. Tex.).

15.    *Secure Axcess, LLC v. Trustmark Nat'l Bank, et al.*, Civ. No. 6:13-cv-788 (E.D. Tex.).

Counsel for Appellees EMC Corporation and RSA Security LLC (together "EMC") are unaware of any other cases pending in this or any other forum that will directly affect or be directly affected by this Court's decision in this appeal.

## INTRODUCTION

The technology that Secure Axcess tried to claim for its own in the '191 patent was well known in the prior art.  Both the problem of fraudulent web pages designed to trick users and the patent's purported solution—displaying user-specific "authenticity stamps" on authenticated web pages—were nearly identically disclosed in multiple references, and even the figures depicting the supposed invention bear a remarkable resemblance to prior art illustrations.

On appeal, Secure Axcess does not dispute that the supposed novelty of the invention—displaying user-specific authenticity stamps—was disclosed in the prior art.  Nor does it discuss most of the Board's thorough 71-page decision analyzing the patent and the prior art, or the Board's numerous factual

determinations supporting its findings of anticipation and obviousness, or the Board's repeated crediting of EMC's expert over Secure Axcess's. Instead, Secure Axcess challenges only one narrow claim construction holding, relating to the precise method for locating the "preferences file" that contains the claimed "authenticity stamp." In particular, Secure Axcess argues that the "***authenticity key***" (e.g., a digital signature that allows authentication of a webpage) must locate a "hidden" preferences file. The Board properly rejected this argument. The claims do not require—and none of the patent's disclosed embodiments describes—an authenticity key that locates a hidden preferences file. Instead, as Secure Axcess's own expert conceded, a separate key, called a "preferences key," locates the preferences file.

Secure Axcess's alternative argument on appeal, that the authenticity key merely ***"enables"*** location of the preferences file, fails because that is exactly what the Board found. The Board properly relied on this construction in determining that the instituted claims are anticipated and/or obvious.

The Board's decision should be affirmed.

## STATEMENT OF ISSUE ON APPEAL

Whether the Board correctly concluded that independent claims 1, 17, 29, 31 and 32 of the '191 patent do not require the authenticity key to be used to locate or determine the location of a hidden preferences file.

# STATEMENT OF THE CASE

## I.    THE PRIOR ART

### A.    Overview of Web Page Authentication Prior Art

This case involves technology for visually confirming to a user that a web page is authentic and not from a fraudulent source.

Signatures, wax seals, stamps, and other means of authenticating documents and visually confirming their authenticity have been used for centuries. Decades before the '191 patent, computer scientists had already developed, and even standardized, comparable techniques for authenticating electronic documents. These techniques included the use of "digital signatures" to authenticate electronic documents. "Authenticity stamps" also had been developed, well before the '191 patent, to visually confirm the authenticity of electronic documents to a user.

For example, in a 1978 paper, Professors Ron Rivest, Adi Shamir, and Leonard Adleman of MIT described a technique for signing and authenticating an electronic document using a "digital signature" of the document. Appx757-763(Rivest). Just as a hand signature can be used to authenticate a paper document, this digital signature was a means of authenticating an electronic document. Rivest's technique used computer algorithms to mathematically confirm that a received electronic document was unaltered and originated from the sender who signed it, and not from someone else. Specifically, a document sender

could use a so-called "private key"—a computer code known only to the sender—
to generate a digital signature and transmit it along with the document.
Appx759(Rivest).  The recipient of the "signed" electronic document could then
use the sender's corresponding "public key"—a code that was publicly known—to
mathematically confirm that the document was authentic and originated from the
sender, and not from someone purporting to be the sender.  Appx759;
Appx763(Rivest).[1]

The concept of using an "authenticity stamp" to provide a visual
confirmation that a web page is authentic was also well known before the '191
patent.  With the advent of the World Wide Web, fraudsters had developed
techniques to trick users into sharing sensitive information over the Internet, such
as their passwords and credit card information.  *See, e.g.*, Appx323(1:24-
34)(Arent).  A fraudster could easily make a user believe that it was viewing the
web page of a legitimate business, such as a bank, when in fact the user was
viewing a fake web page.  Because the web page would appear legitimate,
however, the user might be deceived into entering sensitive information, which the
fraudster could then misuse.  *See, e.g.*, Appx341; Appx345-346 (Tygar).  To
combat this trick, computer scientists developed "authenticity stamps" to visually

---

[1]    A more detailed explanation of how private and public keys work together to
authenticate an electronic document using a digital signature is available at
Appx1565-1566.

indicate to a user that a web page was indeed authentic and could be trusted. Thus, a user could rely not only on the appearance of the web page, but also on the presence of the authenticity stamp, as confirmation that the web page was in fact authentic.

For example, in 1995, researchers from the National Center for Supercomputing Applications, led by Judson Weeks, proposed a technique in which, after the web page was confirmed as authentic, it would be displayed to the user with an authenticity stamp to visually indicate the web page's authenticity. Appx698-712(Weeks). As described by Weeks, the web page provider would first insert a digital signature into a web page, and the user's web browser and cooperating application would verify the authenticity of the page. Appx703-705(Weeks). If the web page was confirmed as authentic, the web page would be displayed to the user in conjunction with visual information (i.e., a username, ID, and date of the digital signature) that function as an authenticity stamp, confirming to the user that the web page was authentic and from a valid source. *See id.*

Analogously, Hiroshi Yoshiura, affiliated with Hitachi, disclosed a technique for authenticating a web page with a digital signature and displaying an authenticity stamp to confirm that the web page is from a valid source. Appx389(37:42-46, 37:56-38:8). Yoshiura disclosed that, after a web page was confirmed as authentic with a digital signature, an authenticity stamp would be

displayed on the web page on the user's computer to visually indicate that the page was valid, as shown in Figure 9 below. Appx389(37:56-38:8).



Appx400(Yoshiura Fig. 9) (excerpted and annotated).

Researchers further improved on these techniques and created authenticity stamps that included various forms of user-specific text or graphics. For example, Michael Arent of Sun Microsystems taught techniques for authenticating web page-based offers to sell goods and services using digital signatures and user-customized authenticity stamps. Appx312-336(Arent). Likewise, J.D. Tygar (EMC's expert in this case) and Alma Whitten proposed techniques for displaying a user-customized authenticity stamp to confirm the authenticity of a user interface. Appx337-348(Tygar).

## B.    Prior Art Cited By The Board

The Board's decision in this case turns on two primary prior art references—Arent (Appx312-336)[2] and Tygar (Appx337-348)[3]—both of which disclosed systems and methods for authenticating a web page in the same way described in the '191 patent.[4]  Secure Axcess does not dispute that Arent and Tygar are prior art to the '191 patent.

### 1.    Arent

Arent recognized, years before the '191 patent, the need to ensure the authenticity of web pages when users respond to offers to sell goods or services over the Internet.  Appx323(1:20-30).  As Arent explains:

> One factor impeding the growth of electronic commerce is a concern over the security of transactions conducted via the internet … .  It is easy for legitimate and illegitimate businesses alike to set up web sites to solicit business over the internet.  Accordingly, there is a degree of uncertainty about the identity and legitimacy of any business offering goods or services via an internet web page and about the authenticity of data related to on-line transactions.

---

[2]    Arent, Method and Apparatus For Authenticating On-Line Transaction Data, U.S. Patent No. 6,018,724 (filed Jun. 30, 1997).

[3]    J.D. Tygar and Alma Whitten, *WWW Electronic Commerce and Java Trojan Horses*, Proceedings of the 2nd USENIX Workshop on Electronic Commerce 243-250 (Nov. 1996).

[4]    The Board also cited three secondary references—Schneier, Merritt, and Yoshiura—in connection with certain dependent claim limitations not at issue in this appeal.

*Id.* Arent accordingly disclosed techniques for authenticating a web page using a digital signature, and displaying a user-customized authenticity stamp to visually confirm to the user that the web page is authentic.

Arent's techniques involve two basic steps. First, an authentication computer (i.e., the merchant's computer) inserts a digital signature into a web page-based offer so that the authenticity of the web page can be verified at the user's computer. *See, e.g.*, Appx325(6:2-6) (the user's computer program's "instructions … determine whether or not an offer presented to a user (e.g. via a web site) has been digitally signed … as well as whether or not other information displayed to the user … is authentic"); Appx325(6:10-11, 6:32-35); Appx323(1:66-2:2); Appx324(4:24-26).

Second, after the web page is verified as authentic, a user-customized authenticity stamp—called a "certification indicator"—is displayed to the user on the web page. Appx323(2:2-5); Appx324(4:26-30). The authenticity stamp is customized by the user and stored in a "wallet database file" on the user's computer to make it difficult for the authenticity stamp to be copied or forged. *See, e.g.*, Appx324(4:44-50) (The authenticity stamp "is stored in a secure form in a local storage device of the user's internet access device" and "cannot be easily copied and forged by an unscrupulous merchant."); Appx326(7:38-40) ("The Wallet database" file containing the authenticity stamp "is stored in a secure

manner on local storage of the user's computer."). Arent's authenticity stamp can include graphics, text, and audio. *See, e.g.*, Appx323(2:2-7); Appx325(5:20-23). After the web page has been authenticated, the authenticity stamp is located and retrieved from the wallet database file, and is displayed on the web page. *See, e.g.*, Appx324-325(4:65-5:7) (The authenticity stamp is "retrieved" and "displayed on top of merchant web page."); Appx325(6:32-35) (The authenticity stamp "is displayed to the user … when the [web page] is authentic.")

Arent illustrates this process in Figure 2, a relevant portion of which is reproduced below:



Appx314(Arent Fig. 2) (excerpted). Steps 280 and 290 verify, on the user's computer, that the web page and any other transaction data are authentic. *See, e.g.*,

Appx324(4:24-30); Appx323(1:37-40).  Step 270 displays a "certified" symbol (i.e., an authenticity stamp) if the data is authentic, and step 250 displays a different "not certified" symbol if the data is not authentic.  *See, e.g.*, Appx324(4:24-30); Appx325(6:2-62).

Figure 6 of Arent shows the authenticity stamp, or "certification indicator"—item 500 including user-specific code 520 (in a blue box in the figure below)—displayed on a web page, after the web page has been authenticated:



Appx318(Arent Fig. 6) (annotation added); *see also* Appx324-325(4:67-5:7).

### 2.    Tygar

Like Arent, Tygar sought to ensure that Internet users are not deceived by "imposters" who imitate the appearance of a trusted user interface, such as a web

page, in order to obtain sensitive personal information from the users (such as credit card numbers, bank information, and personal demographic data).  Appx341, 348; *see also* Appx345 ("Trojan horse attacks … rely on imitating the visual appearance of some program that the consumer already trusts.").  To address this problem, Tygar discloses authenticating a user interface using a digital signature and displaying an authenticity stamp to visually confirm that the user interface is authentic.  Tygar describes an application of its proposed technique using Java "applets" (executable program code written in Java and embedded on web pages) as the exemplary user interface.[5]  Appx343.

Tygar, like Arent, discloses two basic steps.  First, an authentication server (i.e., a "trusted authority") inserts a digital signature, using known techniques, into the applet (to create a signed applet) so that the authenticity of the applet can be verified at the user's computer.  Appx344 (The "applets [are] certified and digitally signed by some trusted authority.").

Second, after the applet is returned to the user's computer and verified as authentic, a user-customized authenticity stamp—using a "window personalization technique"—is displayed to the user.  Appx345-346; *see also* Appx342-343 ("Window personalization allows a consumer to select a pattern for window

---

[5]    The Board found, and Secure Axcess has not disputed, that Tygar's applets are executable code embedded on web pages.  Appx54.

display that will be unknowable (or very difficult to determine) by rogue applets and other transmission media for trojan horses."). The authenticity stamp is customized by the user to make it difficult to copy or forge. Appx345 (window appearances should be "easily recognizable to the consumer yet difficult to predict by an attacker" so that the attacker "would not be able to predict this personalization, and [any] ability to fake the appearance … would be substantially weakened"). The stamp is stored in a file on the user's computer, and the file must "be 'locate[d]' so that its contents … can be accessed when rendering the appearance" of the stamp. Appx265 ¶ 132(Tygar declaration); *see also* Appx345-346. Tygar notes that this technique is applicable "to any situation in which a user needs the ability to verify that a user interface is being presented by a trusted entity and not by an imposter." Appx347.

Figure 3 of Tygar shows the authenticity stamp—in this case, a Batman logo customized by the user—displayed on an applet after it has been authenticated:



Appx346(Tygar Fig. 3)(annotation added).

## II.    SECURE AXCESS'S '191 PATENT

### A.    The '191 Patent Specification

The '191 patent claims basic concepts that were well known for years before the patent's 1999 priority date.  The patent—like Arent and Tygar—discloses systems and methods for authenticating web pages using a digital signature and displaying a user-customized authenticity stamp to visually confirm to the user that the web page is authentic.  Appx350 ("[T]he claimed technology allows a user to verify that the web page is authentic based on the presence of an authenticity stamp (e.g., an icon).").  While the patent purports to improve over earlier systems because the disclosed authenticity stamp "allows a user to validate that current information (*e.g.*, a web page) originates from the true owner … and is not merely

a copy," Appx86(2:39-42), this concept was well known in the prior art, including Arent and Tygar.

The '191 patent purports to address the **same problem** as Arent and Tygar—that a "fraudster" can impersonate icons, logos, and other information associated with the true owner of a website, and trick a user into entering personal information at a fraudulent website. *See, e.g.*, Appx86(1:28-35) (a "fraudster" may register a URL that is similar to the URL of a legitimate business, and "[t]hus a user may retrieve an unwanted webpage that appears authentic"). Consequently, a user "may not always be confident that the web page being viewed is authentic." Appx86(1:35-38); *see also* Appx86(1:44-48) ("[A] need exists for a system and method that allow a page to be authenticated so that a user feels secure in the authenticity of pages displayed from Internet sites."); *cf.* Appx323(1:26-30) (Arent); Appx345-346(Tygar).

The '191 patent also discloses the **same solution** as Arent and Tygar. First, after a user requests a web page from a web site, an authentication server inserts an "authenticity key" that includes a digital signature into the web page, so that the page's authenticity can be verified at the user's computer. Appx86(1:53-55); Appx87(4:13-24; 4:56-58); *see also* Appx86(1:57-60) ("If the page includes an authenticity key, the authenticity is verified at the user's computer because the user computer includes logic (e.g., software) to verify the authenticity."); *cf.*

Appx325(6:2-6; 6:10-11; 6:32-35)(Arent); Appx344(Tygar).  The authenticity key

indicates that the page should be authenticated and contains information—such as

the digital signature—that may be used to support the authentication.  Appx89-

90(8:36-9:17); *see also* Appx1212 (Decision on Institution).[6]

Second, after the digitally-signed web page—referred to as "formatted

data"—is returned to the user's computer and verified as authentic, a user-

customized authenticity stamp is retrieved from a "preferences file" stored on the

user's computer and is displayed to the user on the web page.  *See, e.g.*,

Appx88(6:47-50); Appx87(4:40-3) ("The plug-in … reads the preferences file to

determine the authenticity stamp and how it is to be displayed.  The page is then

displayed with the user's preferred authenticity stamp."); *cf.* Appx324-325(4:28-

30, 6:18-19)(Arent); Appx345-346(Tygar).[7]  A second key—called a "preferences

---

[6]    The '191 patent specification uses the term "authenticity key" to refer to a
different key from the "public key" and "private key" associated with the digital
signature.  As in the prior art, the digital signature is generated with a "private key"
and verified with a "public key."  *See, e.g.*, Appx87(4:14-24); Appx88(6:28-32);
*see also supra* pp. 5-6 & n.1.

While the authenticity key contains other information used to support
authentication in addition to the digital signature, *see, e.g.*, Appx89(8:39-43), none
of the other information included in the authenticity key is relevant to this appeal,
and there is no dispute between the parties that the authenticity key includes a
digital signature.

[7]    The '191 patent specification discloses a variety of embodiments of the
claimed authenticity stamp.  In some embodiments, the user "defines the
authenticity stamp which determines the format of an authenticated page."
Appx86(1:61-65).  In alternative embodiments, the user can instead "define[] a

key"—is used to locate the preferences file containing the authenticity stamp.
Appx87(4:35-40) ("[T]he plug-in … must get the preferences key to determine the
location of the preferences file.").

As the figures below demonstrate, the authenticity stamps disclosed in the
'191 patent are virtually identical to those in the prior art:

---

non-authenticity stamp which will appear on non-authenticated pages."
Appx86(1:65-67); *see also* Appx87(3:8-10).  And in other embodiments, "the user
can define both an authenticity stamp and a non-authenticity stamp."
Appx87(3:13-15).



**Appx75 ('191 Patent Fig. 2)**
**(annotated)**



**Appx400 (Arent Fig. 6)**
**(annotated)**



**Appx346 (Tygar Fig. 3)**
**(annotated)**



**Appx318 (Yoshiura Fig. 9)**
**(excerpted and annotated)**

Furthermore, the process disclosed in the '191 patent is virtually identical to those in Arent and Tygar. In fact, the '191 patent (Figure 8) discloses almost the same logic as depicted in Arent (Figure 2):



**Appx82 ('191 Patent Fig. 8)**
**(annotated)**

**Appx314 (Arent Fig. 2)**
**(excerpted & annotated)**

At steps 400 and 402 of the '191 patent, the user's computer verifies the

authenticity of the web page (blue) and determines whether authentication was

successful (yellow).  Appx88(6:25-47).  If authentication is successful, at step 404,

the authenticated page is displayed with an authenticity stamp (green).  If

authentication is not successful, then at step 406, the unsuccessfully authenticated

page is displayed without an authenticity stamp (red).  Appx88(6:47-61).  Steps

400 and 402 of the '191 patent correspond to steps 280 and 290 of Arent, and steps

404 and 406 of the '191 patent correspond to steps 250 and 270 of Arent.

*Compare* Appx88(6:25-61) *with* Appx324(4:24-30).

In short, as the following chart demonstrates, the authentication concepts at

the heart of the '191 patent are identical to the concepts disclosed and used in

Arent and Tygar:

| Concept | Arent | Tygar | '191 Patent |
|---------|-------|-------|-------------|
| Digital signature | "Digital signature" | "Digital signature" | "Authenticity key" (e.g., a "digital signature," Appx90(9:21-33)) |
| Digitally signed web page | "Signed web page offer" | "Signed applet" | "Formatted data" |
| Stamp that visually confirms authenticity of web page | "Certification indicator" | "Window personalization" | "Authenticity stamp" |
| File that contains authenticity stamp | "Wallet database file" | "File" | "Preferences file" |

## B.    The '191 Patent's "Preferences File"

Secure Axcess's arguments on appeal focus on a narrow issue relating to the file on the user's computer that contains the authenticity stamp.  The '191 patent refers to this file as the "preferences file."  Appx90(9:52-53).  As the '191 specification states, the authenticity key (digital signature) is ***not*** used to locate the

preferences file.[8]  Instead, a separate key—called the "preferences key"—is used to locate or decrypt the preferences file containing the authenticity stamp. Appx324(4:24-44).

For example, Figure 5, which illustrates exemplary communications among the various components of the claimed method, confirms that the ***preferences key*** locates the preferences file:



**FIG. 5**

Appx78(Fig. 5)(annotated).  In Figure 5, after a web page is verified as authentic using the authenticity key, a plug-in (114) on the user's computer sends a request (186) for the user's preferences key.  Appx87(4:24-26) ("The plug-in 114 requests the user's preferences key 186 so that the page can be displayed with an

---

[8]    Thus, the patent itself belies Secure Axcess's contrary contention. *See, e.g.*, Br. 17, 19-20.

authenticity stamp.").  As the specification confirms, the ***preferences key*** locates the preferences file on the user's computer that contains the user's authenticity stamp.[9]  Appx87(4:38-40) ("The plug-in 114 must get the preferences key to determine the location of the preferences file.").  The plug-in then reads the preferences file, and the web page is displayed to the user with the authenticity stamp.  Appx87(4:40-43).

The specification discloses multiple embodiments for the preferences file. In some embodiments, the preferences file is encrypted.  *See* Appx87(4:34-35).  In other embodiments, the location of the preferences file is "not readily known." Appx87(4:37-38).  And in other embodiments, the location of the preferences file is "obscure[d]."  Appx90(9:52-56) ("Preferably, the preferences file is placed in a random directory to help obscure the location of the preference file.").  According to the specification, the ***preferences key*** (not the authenticity key) is the key that is used to access the preferences file.  *See, e.g.*, Appx87(4:34-37); Appx87(4:38-40).

## C.     The '191 Patent Claims

The '191 patent claims describe authenticating a web page using a digital signature and displaying an authenticity stamp to visually confirm the web page's

---

[9]     The preferences key also can decrypt the preferences file.  Appx87(4:34-37) ("[T]he plug-in reads the preferences file and decrypts it" with the preferences key.).

authenticity.  Claim 1 is representative of the '191 patent's independent claims

(claims 1, 17, 29, 31, and 32):

> A method comprising:
>
> transforming, at an authentication host computer,
> received data by inserting an authenticity key to create
> formatted data; and
>
> returning, from the authentication host computer, the
> formatted data *to enable the authenticity key to be
> retrieved from the formatted data* and *to locate a
> preferences file*,
>
> wherein an authenticity stamp is retrieved from the
> preferences file.

Appx91(12:9-18) (emphasis added).  In plain English and using parentheticals to

identify specific examples from the disclosed embodiments, "received data" (e.g.,

a web page) is transformed, at an authentication host computer (e.g., an

authentication server), by inserting an "authenticity key" (e.g., information

including a digital signature) into the data to create "formatted data" (e.g., the

signed web page).  The formatted data is then returned, from the authentication

host computer to the user's computer, to enable the authenticity key to be retrieved

from the formatted data (so that the web page can be verified as authentic) and to

locate a "preferences file."  The "authenticity stamp" is then retrieved from the

preferences file (so it may be displayed to visually indicate to the user that the web

page is authentic).  Appx91(12:9-18).

Secure Axcess attempts to contrast the '191 patent claims with the claims of its parent, U.S. Patent No. 7,203,838 ("the '838 patent"). However, the patent examiner initially rejected the '191 claims based on double patenting, finding that the '191 claims were not patentably distinct from the '838 claims. *See* Appx 2155. In response, the patent applicant filed a terminal disclaimer of the '191 patent to get the claims allowed.[10] *Id.*

## III.    PROCEEDINGS BEFORE THE BOARD

On March 4, 2014, EMC filed a petition requesting an *inter partes* review of the '191 patent. EMC argued, *inter alia*, that the patent's independent claims (1, 17, 29, 31, and 32) were anticipated by Arent and Tygar, and that the dependent claims were either anticipated by these references or obvious over the references in combination with other prior art. *See* Appx131-163. EMC explained in its petition that the claims, properly understood, did ***not*** require the authenticity key to be used to locate a hidden preferences file. Appx116-119. EMC also stated alternative grounds for review, however, arguing that—were the Board to construe the claims to require that the preferences file be hidden or to require that the authenticity key

---

[10]    A terminal disclaimer "ties the affected patents together" such that "they expire on the same date and are enforceable only during periods in which they are owned by the same person." 3A-9 Chisum, Donald S., *Chisum on Patents* § 9.04[5] (2015).

locate the preferences file—the claims would be invalid on other grounds.[11]  *See*

Appx145-149.

On June 11, 2014, Secure Axcess filed a preliminary response opposing

institution.  Secure Axcess's preliminary response did ***not*** argue, as Secure Axcess

does on appeal, that the "location" terms in the claims should be narrowly

construed to require that the preferences file be hidden.  *See, e.g.*, Appx1045-1051

(proposing claim constructions only for "authenticity key," "preferences file," and

"authenticity stamp").  Secure Axcess also did not argue that the "authenticity key"

term should be construed to require that the authenticity key locate the preferences

file.  Appx1045-1048.  Instead, Secure Axcess requested that the Board adopt the

same construction of "authenticity key" as the district court in *Secure Axcess LLC*

*v. Bank of America*, No. 6:10-cv-670 (E.D. Tex. July 9, 2012).  *See* Appx1045-

1046.  That court had rejected Secure Axcess's proposed construction of

"authenticity key" as "information that is used to locate a preferences file."

Appx1090-1094.

On September 9, 2014, the Board instituted *inter partes* review of all claims

in the '191 patent except claim 24.  The Board did not institute with respect to

---

[11]     For example, EMC presented three prior art references—Schneier '475,
Faltstrom, and Takada—which each taught that hiding files is well-known and
obvious in security contexts.  *See* Appx145-147.  EMC also presented a prior art
reference, Palage, which taught a method where the authenticity key locates the
preferences file.  *See* Appx147-149.

EMC's prior art disclosing a "hidden" preferences file, because Secure Axcess had not argued that the preferences file must be hidden.  *See* Appx1232 (Decision on Institution) ("Neither Patent Owner nor Petitioner contends the preferences file must be hidden ….  Therefore, we do not need to consider the alternative grounds presented for consideration if claims are construed to require a preferences file to be hidden.").  Similarly, the Board did not institute the *inter partes* review with respect to the prior art that disclosed the authenticity key locating the preferences file, because it concluded that the challenged claims did not require the authenticity key to do so.  *See* Appx1232.

After electing **not** to include in its preliminary response the claim construction issue it now asserts, Secure Axcess reversed course and raised the issue after the Board instituted the *inter partes* review.  Specifically, in its patent owner response following institution, Secure Axcess asked the Board to construe the various claim limitations relating to the authenticity key and the preferences file to require the authenticity key to locate, or provide the ability to locate, a **hidden** preferences file.  Appx1277-1280.

On September 8, 2015, the Board issued a 71-page final written decision finding all instituted claims unpatentable.  The decision provides a detailed analysis of the Board's findings on a claim-by-claim and element-by-element basis.  *See* Appx1-71.  In reaching its decision, the Board considered the parties'

submissions, the declarations and deposition testimony from EMC's and Secure Axcess's experts, and numerous prior art references. The Board construed the claims, carefully evaluated the voluminous record, and weighed the expert opinions. The Board consistently credited the testimony of EMC's expert, Dr. Tygar, over the testimony of Secure Axcess's expert. *See, e.g.*, Appx42 ("Weighing the testimony of the declarants, we credit Dr. Tygar's testimony over Dr. Katz's testimony."); *see also* Appx14; Appx29-30; Appx31-32; Appx43; Appx56-58; Appx62-63. The Board also recognized several critical admissions by Dr. Katz that supported EMC's position. *See, e.g.*, Appx19-20 ("Dr. Katz acknowledges the authenticity key does not have information to locate the preferences file."); *see also* Appx19; Appx57-58. The Board also repeatedly found that Secure Axcess's arguments were contrary to the express disclosures in the '191 patent. *See, e.g.*, Appx14 ("Neither Patent Owner nor its declarant addresses persuasively this embodiment disclosed in the '191 patent."); Appx19 ("[T]he '191 patent does not disclose using an authenticity key to locate the preferences file.").

The Board decided two claim construction issues, only one of which is raised here: the limitations relating to the authenticity key and the preferences file, which appear with slight variations in each independent claim.[12] In construing

---

[12]    The claim limitations at issue are:

these limitations, the Board rejected Secure Axcess's argument that the claims

require the preferences file to be hidden:

> None of the independent claims requires that the location of the preferences file be obscured or hidden; the ordinary and customary meaning of 'to locate' is 'to find,' which does not require something to be hidden; and the '191 patent describes the location of the preferences file as being obscured or not readily known only as preferred embodiments.

Appx17.  The Board also rejected Secure Axcess's argument that the claims

require that the authenticity key be used to locate or determine the location of the

preferences file:

> We agree with [EMC] that none of the claims requires the authenticity key to locate the preferences file or have the ability to determine the location of a preferences file.  First, none of the independent claims recites the authenticity key being used to locate the preferences file.  Nor is there evidence of written description support for such an

---

Claim 1:  "returning … the formatted data to enable the authenticity key to be retrieved from the formatted data and to locate a preferences file." Appx91(12:9-18).

Claim 17:  "an authentication processor configured to insert an authenticity key into formatted data to enable authentication of the authenticity key to verify a source of the formatted data and to retrieve an authenticity stamp from a preferences file."  Appx91(12:62-67).  (Notably, the words "locate" or "location" do not appear anywhere in claim 17.)

Claim 29:  "the authenticity key enables location of a preferences file." Appx92(14:5-10).

Claim 31:  "the authenticity key is retrieved from the formatted data to locate a preferences file."  Appx92(14:14-22).

Claim 32:  "retrieving, by the client computer, the authenticity key from the formatted data to locate a preferences file."  Appx92(14:23-31).

interpretation—the '191 patent does not disclose using an authenticity key to locate the preferences file.

Appx19.  The Board based this finding not only on the claim language and specification, but also on the testimony of Secure Axcess's own expert:

> [T]he '191 patent discloses in a preferred embodiment that a preferences key, which is different than an authenticity key, is used to locate the preferences file.  *See* Ex. 1001, 4:38-40.  ***This understanding is confirmed by Patent Owner's declarant Dr. Katz.***  *See* Ex. 1034, 164:20-165:5.  Further, Dr. Katz acknowledges the authenticity key does not have the information to locate the preferences file.  *See, e.g*., Ex. 1034, 165:6-9.

Appx19-20 (emphasis added).

The Board found that the claims "only requir[e] some action as a ***precondition*** to locating the preferences file" because that construction "better comports with the claims and written description of the '191 patent":

> The verification of the received digital signature must occur ***before*** the preferences key can be requested and used to determine the location of the preferences file.  In other words, verification of the received digital signature is a ***precondition*** of requesting and using the preferences key to determine the location of the preferences file.  Thus, verification of the received digital signature enables—supplies the opportunity for—the requested preferences key.

Appx20 (emphasis added).

The Board concluded that EMC had shown by a preponderance of the evidence that all instituted claims of the '191 patent are unpatentable.  The Board determined that the patent's independent claims (1, 17, 29, 31, and 32) are anticipated by each of Arent and Tygar separately, and that the instituted

dependent claims are either anticipated by Arent and Tygar or obvious over these references in combination with additional references not at issue on this appeal. *See* Appx69.

## SUMMARY OF THE ARGUMENT

The Board correctly decided the narrow claim construction issue that Secure Axcess raises on appeal, relating to the specific process described in the '191 patent for locating the authenticity stamp. The challenged claims do not require the authenticity key to locate or determine the location of a ***hidden*** preferences file.

***First***, the Board correctly rejected Secure Axcess's suggestion that the authenticity key must "locate" the preferences file. Secure Axcess's position is flatly inconsistent not only with the intrinsic evidence, but also with the conclusion of every expert and decision maker who has considered the issue—including Secure Axcess's own expert, who conceded that it is the ***preferences*** key, and not the authenticity key, that locates the preferences file. Appx1648:16-18.

***Second***, Secure Axcess's alternative argument that the authenticity key must at least "***enable***" location of the preferences file does not show any error in the Board's decision; on the contrary, that is precisely what the Board found. Consistent with the explicit language of the claims and the disclosed embodiments, the Board concluded that the authenticity key "enables"—or "supplies the

opportunity for"—the locating of the preferences file.  Appx20.  Secure Axcess's challenge on this ground is thus no challenge at all.

***Third***, Secure Axcess's related argument that the preferences file must be "hidden" is inconsistent with the claim language and improperly attempts to read a limitation into the claims from ***some*** of the preferred embodiments, while ignoring others.  As the Board correctly recognized, an item may be "located" without ever being "hidden."  Moreover, while the specification describes an embodiment in which the preferences file is "obscured," it also describes other embodiments in which the preferences file is not obscured, a point again admitted by Secure Axcess's own expert.  Appx1652:12-16.  The Board thus properly declined to read a "hidden" requirement into the claims.

***Finally***, Secure Axcess's assertion that the Board "ignored" the "locate" limitations in its anticipation analysis, Br. 42, is inconsistent with the Board's repeated reference to those limitations in its decision, *see* Appx27-28; Appx55; Appx58.  As the Board recognized, the prior art meets these limitations in precisely the same way that the '191 patent's embodiments meet the limitations – authentication with the authenticity key is a precondition to locating the preferences file.  Appx20.

The Board's decision should be affirmed.

# ARGUMENT

## I.   STANDARD OF REVIEW

This Court reviews the Board's legal determinations *de novo*, and its factual findings for substantial evidence.  *In re Roslin Inst. (Edinburgh)*, 750 F.3d 1333, 1335 (Fed. Cir. 2014); *In re Gartside*, 203 F.3d 1305, 1312, 1320 (Fed. Cir. 2000).

Claim construction is a legal issue reviewed *de novo*, based on underlying factual findings reviewed for substantial evidence.  *TriVascular, Inc. v. Samuels*, 812 F.3d 1056, 1061 (Fed. Cir. 2016).  Because this is an appeal from the Patent Office, the issue to be reviewed is whether the Board properly applied the "broadest reasonable interpretation" (BRI) standard when construing the patent claims, as Secure Axcess agrees.  Br. 6.[13]

Anticipation is a question of fact reviewed for substantial evidence.  *In re Suitco Surface, Inc.*, 603 F.3d 1255, 1259 (Fed. Cir. 2010).

---

[13]   Secure Axcess does not argue that the result here may be affected by the Supreme Court's review of *In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268 (Fed. Cir. 2015), *cert. granted*, 136 S. Ct. 890 (2016).  On the contrary, Secure Axcess cites the *Phillips* and BRI standards together in its brief, Br. 29, 33-34, and nowhere suggests that the claims would be construed differently under the two standards.  Having failed to argue in its opening brief that the claim construction standard affects the outcome, Secure Axcess may not raise this argument for the first time in its reply brief.  *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006) ("[A]rguments not raised in the opening brief are waived.").  Regardless, Secure Axcess's claim construction arguments fail whether considered under the *Phillips* or BRI standard, for the reasons articulated in this brief.

## II.    THE BOARD CORRECTLY CONSTRUED CLAIM LANGUAGE RELATING TO THE "AUTHENTICITY KEY" AND THE PREFERENCES FILE

### A.    The Board Correctly Concluded That The Authenticity Key Enables Location Of—But Does Not Directly Locate—The Preferences File

The Board carefully evaluated the '191 patent claims and specification, as well as the testimony of both parties' experts, and correctly determined that "none of the claims requires the authenticity key to locate the preferences file or have the ability to determine the location of a preferences file."  Appx19.  As the Board explained, "none of the independent claims recites" such a requirement, "[n]or is there evidence of written description support for such an interpretation."  *Id.*  Instead, as the Board correctly found—and Secure Axcess's own expert agreed—the specification describes the ***preferences key*** locating the preferences file.  *Id.*  The Board accordingly concluded that the independent claims of the '191 patent only require certain action involving the authenticity key as a precondition to locating the preferences file.  Appx20.  In particular, the Board found, consistent with the patent specification, that authentication using the authenticity key "must occur before the preferences key can be requested and used to determine the location of the preferences file."  The Board thus concluded that the authenticity key ***enables location of***, but does not itself locate, the preferences file.  Appx18-20.  This conclusion was correct and should be upheld.

### 1.    The Authenticity Key Does Not Directly Locate the Preferences File

Secure Axcess asserts that the claims of the '191 patent require the authenticity key to "locate, or enable location of, the preferences file." Br. 8; *see also* Br. 17, 19, 20, 26, 31, 32. The suggestion that the authenticity key must ***directly*** locate the preferences file is inconsistent with the claim language and specification, and has been rejected by every expert and decision maker who has considered the issue.

As the Board correctly recognized, none of the independent claims states that the authenticity key itself directly locates the preferences file. Appx19; Appx91-92. Even Secure Axcess admits this point. *See* Br. 35 ("[T]he claim language does not consistently say … that the authenticity key itself must directly locate the preferences file."). Rather, the claims recite an ***indirect*** role for the authenticity key in locating the preferences file, just as the Board determined. Claim 1, for example, describes "returning … the formatted data" in order to accomplish two things: first, "to enable the authenticity key to be retrieved from the formatted data," and second, "to locate a preferences file"—i.e., returning the formatted data is a precondition to both the authenticity key being retrieved and the preferences file being located. Appx91. Similarly, claim 29 states that "the authenticity key ***enables location*** of the preferences file" (emphasis added)—not that the authenticity key directly locates the preferences file itself. Appx92. And

claims 31 and 32 each describe retrieving the authenticity key from the formatted data *before* locating a preferences file. *Id.*[14]

The Board's construction is further confirmed by the language of claim 1 before the filing of a certificate of correction, which separated the two actions in claim 1 by roman numerals. Appx91 ("returning … the formatted data (i) to enable the authenticity key to be retrieved from the formatted data and (ii) to locate a preferences file.")  As the roman numerals confirm, "returning … the formatted data" is a precondition to "locat[ing] the preferences file."  Since a certificate of correction may correct only "a mistake of a clerical or typographical nature, or of minor character," and may not relate to changes that "would constitute new matter or would require re-examination," 35 U.S.C. § 255, the roman numerals provide guidance on the scope of the claim both before and after correction.  The Eastern District of Texas confirmed this understanding in its claim construction decision, where it rejected an argument that the post-correction claim was indefinite because it could suggest either that the authenticity key does or does not locate the preferences file.  *See* Appx93; Appx365-366.  The district court held that "[t]he natural reading of this claim language post-amendment is the same as the natural

---

[14]    Claim 17 does not even recite locating of a preferences file, as the Board recognized, Appx19 n.10, but Secure Axcess nonetheless appears to argue that claim 17 requires the authenticity key to locate the preferences file. Br. 31.

reading of the language pre-amendment"—i.e., that the authenticity key does not locate the preferences file.  Appx366.[15]

Moreover, the Board's reading of the claims is the *only* reading supported by the specification.  The specification does not describe *any* embodiment in which the *authenticity key* locates the preferences file.  *See, e.g.*, Appx89(8:36-46) (discussing exemplary authenticity key with no reference to locating preferences file).  Instead, as both parties' experts agreed, in all of the embodiments involving location of the preferences file, the *preferences key* locates the preferences file. *See* Appx87(4:38-40) ("[T]he plug-in 114 must get the preferences key to determine the location of the preferences file.").

Both parties' experts confirmed that the preferences key—*not* the authenticity key—locates the preferences file.  EMC's expert, Dr. Tygar, testified that the patent "squarely teaches" that the preferences key locates the preferences file.  *See* Appx223 ¶ 48 ("The Patent squarely teaches that neither the formatted data nor the authenticity key locates the preferences file; instead the patent is explicit that a preferences key … *must be* used to locate the preferences file."); *see also* Appx251 ¶ 107; Appx1772 ¶ 11; Appx1782-1784 ¶¶ 32, 33.

---

[15]    Secure Axcess has not argued that the certificate of correction somehow changed the claim's scope, nor may it do so in its reply brief.  *See SmithKline*, 439 F.3d at 1319.

Secure Axcess's own expert, Dr. Katz, agreed.  Dr. Katz conceded that, in the '191 patent, the ***preferences key*** locates the preferences file.  *See* Appx1648:16-18 ("[T]he description talks about determining the location of the preferences file using a preferences key."); *see also* Appx1628:22-1629:4; Appx1648:18-21; Appx1731:20-1732:5.  Dr. Katz also admitted that the specification provides no indication that the authenticity key even has the information necessary to locate the preferences file.  Appx1732:6-9 (Q: "And, in fact, there is no information in the authenticity key that is described that would in any way locate the preferences file?" A: "Nothing as described in the description."); *see also* Appx1653:2-18.  Although the Board relied on Dr. Katz's admissions (Appx19-20), Secure Axcess completely fails to address them.

In fact, the conclusion that the preferences key locates the preferences file was shared not only by the experts, but by every decision maker who has considered the issue.  The Board agreed with the experts that the preferences key—not the authenticity key—locates the preferences file.  Appx19-20.  The United States District Court for the Eastern District of Texas reached the same conclusion in the litigation between Secure Axcess and Bank of America.  In construing the claims of the '191 patent, it explicitly found that the authenticity key is ***not*** used to locate the preferences file.  *See* Appx366 ("The Court has already clarified that the

authenticity key is not used to locate the preferences file.  Rather, the preferences

key is used to locate a preferences file.").

> **2.**    **Secure Axcess's Argument That The Authenticity Key Enables Location Of The Preferences File Does Not Demonstrate Any Error, Because That Is What The Board Found**

Facing an indisputable record that the authenticity key does ***not*** locate the

preferences file, Secure Axcess all but abandons this argument in its brief,

essentially conceding that the authenticity key does not "directly" locate the

preferences file.  *See* Br. 35 ("[T]he claim language does not consistently say—and

Secure Axcess is not arguing—that the authenticity key itself must directly locate

the preferences file." ).  Instead, Secure Axcess attempts to argue that the

authenticity key must at least "***enable location***" of the preferences file.  *See, e.g.*,

Br. 8 ("the '191 Patent secures the [preferences] file … by requiring … the

'authenticity key'… to locate, ***or enable location of***, the preferences file"

(emphasis added)); *see also* Br. 20, 31, 32, 35, 36.  In particular, Secure Axcess

argues that the authentication conducted with the authenticity key must happen

***before*** location of the preferences file, and thus is necessary for such location to

occur—i.e., that authentication is a precondition (or a "trigger") for location of the

preferences file.  *See* Br. 36 ("[I]n that preferred embodiment, the plug-in does not

request the preferences key ***until*** the authenticity key has been used to authenticate

the page.  Thus, the authenticity key '***enables***' location of the preferences file by

*triggering* the retrieval of the preferences key." (emphasis added; citation

omitted)).

But this construction now urged by Secure Axcess is precisely the

construction that the Board relied on in finding the '191 claims unpatentable.  In its

institution decision, the Board construed the term "enable" as "supply the

opportunity."  Appx1210-1211.  In its final written decision, the Board found that

the authenticity key "enables" location of the preferences file by acting as a

precondition or trigger—the later step (location of the preferences file) cannot

happen until the earlier step (verification of the authenticity key) occurs:

> The verification of the received digital signature must occur ***before***
> the preferences key can be requested and used to determine the
> location of the preferences file.  In other words, verification of the
> received digital signature ***is a precondition of*** requesting and using
> the preferences key to determine the location of the preferences file.
> Thus, verification of the received digital signature ***enables***—supplies
> the opportunity for—the requested preferences key.

Appx20 (emphasis added); *see also* Appx20 n.11; Appx2180.[16]

The Board's conclusion is thus consistent both with the claim language and

with Secure Axcess's own argument on appeal.[17]  *See* Br. 35-36.  The Board's

---

[16]    This finding by the Board directly contradicts Secure Axcess's assertion that
the Board "determin[ed] that the authenticity key need not be involved in the
location of the preferences file."  Br. 28.

[17]    That the Board found that the authenticity key "enables" location of the
preferences file is unsurprising, since one claim states this explicitly.  *See*
Appx92(claim 29) ("the authenticity key enables location of a preferences file").

construction is also consistent with the specification.  In the disclosed

embodiments, the authentication of the web page with the authenticity key is

simply a precondition or trigger for the location of the preferences file.  *See*

Appx87(4:22-40) (describing how ***first*** plug-in 114 "validate[s] the authenticity of

the page" and ***then*** plug-in 114 "requests the user's preferences key 186,"

requiring in some embodiments for "the preferences key to determine the location

of the preferences file"); *see also* Appx78(Fig. 5) (authentication step leads to later

separate step of "request[ing] preferences key").

Because the Board construed the claims in the same way that Secure Axcess

is urging here—that the authenticity key enables location of the preferences file—

Secure Axcess's argument that the Board should have made such a construction

provides no basis for disturbing the Board's decision.[18]

---

[18]     To the extent that Secure Axcess asserts that it is making a different
argument here—that the authenticity key must play some unidentified role more
extensive than acting as a precondition but less extensive than acting directly to
locate the preferences file—that enigmatic position is not articulated in its brief
and is inconsistent with the '191 patent.  (While Secure Axcess refers to the
authenticity key "provid[ing] the ability to, determine the location of a preferences
file" in its statement of issues, Br. 6, it mentions this nowhere else in its brief and
does not explain it.)  In light of its argument that "enabling" is sufficient, Secure
Axcess has waived any assertion that greater involvement by the authenticity key
is ***required***, and may not raise such an argument in its reply brief.  *See SmithKline*,
439 F.3d at 1319.  Even if such an argument were proper, it is wholly unsupported
by the '191 patent specification and claims—as discussed *supra* pp. 21-23, 37-39,
the ***preferences key*** and not the authenticity key locates the preferences file in the
'191 patent.  Thus, to the extent that the Arent and Tygar references fail to disclose

### B.     The Board Correctly Concluded That The Preferences File Need Not Be Hidden

Secure Axcess attempts to bolster its argument that the authenticity key must "locate or enable location of" the preferences file with a related argument that the preferences file must be "hidden." Br. 32. This argument is wrong for multiple reasons.

*First*, Secure Axcess attempts to read a limitation into the claims that is simply not there. The claims do not say that the preferences file is "hidden." Nor does the term "locate" suggest that the preferences file must be hidden—it is possible to "locate" something that is hidden, but equally possible to "locate" something that is *not* hidden. As the Board found, for example, one can "locate" a term in the dictionary even if it is not hidden or obscured in any way. Appx16. One can also locate an address on a map, or an item on a desktop, or a web page on the Internet, even though they are not hidden.

Secure Axcess dismisses the dictionary analogy, arguing that "[a] user looking a word up in a dictionary has the benefit of certain information" such as alphabetical arrangement, while no such information is available under the '191 patent. Br. 39-40. But Secure Axcess cites nothing in the patent requiring that the system have no information about the location of the preferences file; in fact, the

---

an authenticity key that plays an "intermediate" role in locating the preferences file, the '191 patent similarly fails to make such a disclosure.

preferences file in the '191 patent *is* known to be located on the user's computer. *See* Appx87(4:35-37) ("In exemplary embodiments, the preferences file is stored on the user's 110 file system."); Appx78(Fig. 5).  Moreover, Secure Axcess's argument that dictionary definitions of "locate" such as "to find" and "to seek out and determine the location of" require that "the location of the preferences file is not readily known," Br. 37-38, is wrong—an item may be found and its location determined even if certain information about its location is already available.  But even if "not readily known" were an appropriate requirement of locating (it is not), "not readily known" does not imply "hidden"; someone looking up a word in the dictionary does not "readily know[]" what specific page in the dictionary to turn to; nonetheless, the word can still be located and is not hidden, a distinction the Board recognized.  Appx16 ("Patent Owner's contentions seem to require the location of the preferences file to be concealed, rather than merely not being known.").  Nothing in the '191 patent claims or specification narrows the plain meaning of the term "locate" as Secure Axcess asserts.  There is thus no basis for reading a "hidden" requirement into the claims.[19]

---

[19]    Consistent with EMC's position, the Eastern District of Texas in the *Bank of America* litigation did not find any "hidden" requirement in construing the term "preferences file" in the claims of the '191 patent, and instead construed the term simply to refer to "a file containing one or more authenticity stamps."  Appx358.

***Second***, the patent specification does not support Secure Axcess's position. Secure Axcess points to one of the preferred embodiments in which the preferences file is "not readily known to plug-in 114."  Appx87(4:37-38) (cited at Br. 32).  As Secure Axcess itself acknowledges, however, the claims of the '191 patent "should not be limited to the preferred embodiment."  Br. 17 (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (en banc)).  That is particularly true where, as here, only some of the embodiments involve an obscured preferences file.  Moreover, ***none*** of these embodiments describes the feature that Secure Axcess contends the claims require—an ***authenticity key*** that locates or determines the location of a "***hidden***" preferences file.

It is undisputed that the '191 patent discloses embodiments that do ***not*** require a hidden preferences file.  Secure Axcess's own expert, Dr. Katz, acknowledged this point.  *See* Appx1652:12-16 (Q: "But you agree with me that as far as the patent spec is concerned, they have approaches which are hidden, and they have approaches which are encrypted."  A:  "Yes, I think that's right."); Appx1652:17-1653:1 (admitting that the '191 patent does not state that the preferences file must be hidden); *see also* Appx87(4:26-28) (describing embodiment that uses encryption).  Dr. Tygar agreed.  *See* Appx1811 ¶ 63.

***Finally***, Secure Axcess argues that its position is supported by the claims of the '838 patent, the parent of the '191 patent, which require the preferences file to

be encrypted. Secure Axcess attempts to contrast the '838 claims with the '191 claims, suggesting that the '191 claims must require hidden preference files. Br. 17-20. But Secure Axcess's suggestion that the '838 and '191 claims are directed to distinct embodiments is contradicted by the prosecution history. The patents are related as continuations of one another, not as divisionals representing different species of the claimed invention. *See* MPEP §§ 201.06; 201.07. Moreover, the patent examiner initially rejected the '191 claims based on double patenting over the '838 claims, finding that the pending '191 claims and the '838 claims were not patentably distinct from each other. *See* Appx2155. The patent applicant responded by filing a terminal disclaimer of the '191 patent claims, disclaiming any term of the '191 patent beyond that of the '838 patent. *Id.* The examiner's rejection and the applicant's terminal disclaimer are flatly inconsistent with Secure Axcess's argument that the '191 patent claims are limited to hidden preferences files. Rather, as the examiner confirmed in his initial rejection for double patenting, the '191 claims are broad enough to encompass not only hidden files, but also files protected in other ways such as encryption.

Secure Axcess's assertion that the '191 patent claims require a hidden preferences file is meritless and should be rejected.[20]

---

[20] Notably, EMC's petition offered prior art disclosing a hidden preferences file. In its institution decision, the Board declined to consider such prior art because neither party had argued that the '191 patent claims should be construed to

- 45 -

### III. THE BOARD CORRECTLY CONCLUDED THAT ARENT AND TYGAR SATISFY THE CLAIM LANGUAGE RELATING TO THE "AUTHENTICITY KEY" AND THE PREFERENCES FILE

Secure Axcess also complains that the Board ignored the "location" claim terms in comparing the claims to the prior art. Br. 38. Its arguments in this regard, however, essentially reduce to the same claim construction issue—namely, whether the claims require the authenticity key to locate a hidden preferences file.

After construing the claims, the Board compared the Arent and Tygar references to the challenged claims in detail, concluding that both references separately anticipate the independent claims of the '191 patent. Appx26-37; Appx54-59. In reaching this conclusion, the Board carefully considered the opinions of the experts, and credited the views of Dr. Tygar over those of Dr. Katz on various issues. *See, e.g.*, Appx31-32; Appx56. The Board correctly determined that Tygar and Arent each independently meet every limitation of the independent claims of the '191 patent. Appx37; Appx59.

---

require the preferences file to be hidden. Appx1232. Only after the Board denied institution on these grounds and the "hidden" prior art was no longer part of the proceeding did Secure Axcess argue that the preferences file should be hidden. If this Court agrees with Secure Axcess that the '191 patent claims require a hidden preferences file, it should remand for the Board to reconsider its denial of institution on prior art disclosing such matter. *Cf. Straight Path IP Grp., Inc. v. Sipnet EU S.R.O.*, 806 F.3d 1356, 1363 (Fed. Cir. 2015) (remanding for Board to reconsider prior art in light of altered claim construction).

Contrary to Secure Axcess's assertions, the Board did not "ignore[] the 'location' elements altogether" in its anticipation analysis.[21]  Br. 38, 42.  Instead, the Board specifically addressed what Secure Axcess refers to as the "location" terms in discussing both Arent and Tygar.  *See* Appx27-28; Appx55; Appx58.  With respect to Tygar, for example, the Board accepted Dr. Tygar's testimony that a skilled artisan would have understood from the Tygar reference that "the preference[s] file would need to be *'locate[d]'* so that its contents … can be accessed."  Appx265 ¶ 132 (emphasis added); Appx55 (citing Appx265 ¶ 132).  Similarly, with respect to Arent, the Board accepted Dr. Tygar's testimony that a skilled artisan "would have appreciated that the [preferences file] ***must first be located*** before any contents, such as the stamp, can be retrieved from it."  *Id.* (emphasis added).  Dr. Tygar's testimony concerning the understanding of a person of ordinary skill in the art was more than adequate to support the Board's anticipation findings.  As this Court has repeatedly confirmed, a prior art reference

---

[21]     Secure Axcess notes that the Board did not mention "location of the preferences file" in a summary sentence about the independent claims, and argues that this omission is "illustrative" of the Board's "erroneous approach to construing the claim terms at issue."  Br. 38.  In fact, the sentence in question is not part of the Board's claim construction, and simply points out certain salient features of the five independent claims.  Appx26.  The very next sentence includes a full reproduction of two independent claims, and includes the "location" claim language.  Appx26-27.  The Board also discussed the "location" claim language extensively in its decision.  *See, e.g.*, Appx15-20; Appx27-28; Appx55; Appx58.  The Board's failure to mention "location" in a particular sentence in its decision is no basis to conclude that the Board ignored the issue.

need not spell out material that a skilled artisan would readily understand from the reference.  *See, e.g.*, *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1055 (Fed. Cir. 2010) ("[T]he dispositive question regarding anticipation [is] whether one skilled in the art would reasonably understand ***or infer from*** a [prior art reference] that every claim element is disclosed in that reference." (emphasis added; internal quotation marks omitted)); *Arthrocare Corp. v. Smith & Nephew, Inc.*, 406 F.3d 1365, 1373-1374 (Fed. Cir. 2005) ("[E]ven if a piece of prior art does not expressly disclose a limitation, it anticipates if a person of ordinary skill in the art would understand the prior art to disclose the limitation and could combine the prior art description with his own knowledge to make the claimed invention."); *In re Baxter Travenol Labs.*, 952 F.2d 388, 390 (Fed. Cir. 1991) (finding anticipation although there was "no express reference to DEHP" in Becker reference because a skilled artisan would have understood the disclosure as including DEHP; "the dispositive question regarding anticipation [is] whether one skilled in the art would reasonably understand or infer from the Becker document's teaching that Becker's primary bag was plasticized with DEHP"); *In re Preda*, 401 F.2d 825, 826 (C.C.P.A. 1968) ("[I]n considering the disclosure of a reference, it is proper to take into account not only specific teachings of the reference but also the inferences which one skilled in the art would reasonably be expected to draw therefrom.").

Secure Axcess's only response to Dr. Tygar's testimony on this issue is to return to claim construction:  it responds that Dr. Tygar did not establish that the authenticity key locates the preferences file or that the preferences file is hidden. Br. 42.  But as discussed at pages 35-39 above, the Board properly concluded that the claims do not require—and the specification does not teach—the authenticity key locating or determining the location of a hidden preferences file.[22]

Moreover, substantial evidence supports the Board's conclusion that Arent and Tygar both satisfy the requirement that the authenticity key "enables location" of the preferences file.  In the '191 patent, *if* a web page is authenticated using the authenticity key, **then** the preferences file is located and accessed to retrieve the authenticity stamp.  *See supra* pp. 16-20, 40-41; Appx78(Fig. 5); Appx87(4:22-40).  As the Board concluded, this means that authentication using the authenticity key "enables—supplies the opportunity for—the requested preferences key." Appx20.

---

[22]    In revisiting claim construction, Secure Axcess also cites Dr. Tygar's statement that, should the Board determine that the authenticity key must locate the preferences file, the Palage reference discloses that element. Br. 43.  As Secure Axcess notes, the Board did not consider the Palage reference in its analysis. *Id.* The Board declined to consider Palage because it determined that the '191 patent claims do not require the authenticity key to locate the preferences file.  Appx1232. If this Court disagrees, it should remand for the Board to reconsider its decision not to institute on EMC's alternative grounds relating to the authenticity key, including the Palage reference. *Cf. Straight Path*, 806 F.3d at 1363.

Arent and Tygar operate in precisely the same way. In Arent, for example, the authenticity of the web page is verified after an authentication computer inserts a digital signature into the web page-based offer. *See, e.g.*, Appx325(6:2-6). Once the web page has been verified, the certification indicator, which is stored in a wallet database file, is displayed to the user on the web page. Appx323(2:2-5); Appx324(4:26-30, 4:45-50); Appx326(7:38-40). Thus, just as in the '191 patent, ***if*** the web page is authenticated using a digital signature (authenticity key), ***then*** the wallet database file (preferences file) is located and accessed to retrieve the certification indicator (authenticity stamp). *See supra* pp. 10-12; Appx324 (4:28-30) ("If the data is authenticated, a certification indicator confirming authentication is displayed to the user at step 270."); Appx325(6:32-35).

Similarly, Tygar discloses that an applet is authenticated after a digital signature is inserted into the applet. Appx344. Once the applet has been verified, a user-customized authenticity stamp, which is stored in a file on the user's computer, is displayed to the user using a window personalization technique. Appx345-346. Thus, just as in the '191 patent, ***if*** the applet is authenticated using a digital signature (authenticity key), ***then*** the file (preferences file) is located and accessed to retrieve the user-customized window personalization (authenticity stamp). *See supra* pp. 13-14; Appx344 (The "applets [are] certified and digitally signed by some trusted authority."); Appx345-346 (discussing a "window

personalization technique" where a user-customized authenticity stamp is displayed to the user after the applet is verified as authentic).

Secure Axcess does not dispute that Arent and Tygar operate in this manner. Each accordingly anticipates the instituted claims of the '191 patent.

## CONCLUSION

The Board's decision should be affirmed.

Respectfully submitted,

/s/ William F. Lee

| | |
|---|---|
| PAUL T. DACIER | WILLIAM F. LEE |
| KRISHNENDU GUPTA | CYNTHIA D. VREELAND |
| THOMAS A. BROWN | MARK C. FLEMING |
| EMC CORPORATION | PETER M. DICHIARA |
| 176 South Street | WILMER CUTLER PICKERING |
| Hopkinton, MA  01748 |    HALE AND DORR LLP |
| (508) 293-7225 | 60 State Street |
| | Boston, MA  02109 |
| | (617) 526-6000 |

*Attorneys for Appellees EMC*
*Corporation and RSA Security LLC*

May 4, 2016

## CERTIFICATE OF SERVICE

I hereby certify that, on this 4th day of May, 2016 I filed the foregoing Brief for Appellees EMC Corporation and RSA Security LLC with the Clerk of the United States Court of Appeals for the Federal Circuit via the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

/s/ William F. Lee
WILLIAM F. LEE
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned hereby certifies

that this brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) and Circuit Rule 32(b).

1.     Exclusive of the exempted portions of the brief, as provided in Fed. R.

App. P. 32(a)(7)(B), the brief contains 10,251 words.

2.     The brief has been prepared in proportionally spaced typeface using

Microsoft Word 2010 in 14 point Times New Roman font.  As permitted by Fed.

R. App. P. 32(a)(7)(C), the undersigned has relied upon the word count feature of

this word processing system in preparing this certificate.

/s/ William F. Lee
WILLIAM F. LEE
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

May 4, 2016